# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:13−mc−00712−BAH

| | |
|---|---|
| In Re IN THE MATTER OF THE APPLICATION OF JASON LEOPOLD TO UNSEAL CERTAIN ELECTRONIC SURVEILLANCE APPLICATIONS AND ORDERS<br>Assigned to: Chief Judge Beryl A. Howell<br>Cause: Complaint | Date Filed: 07/16/2013<br>Date Terminated: 02/27/2018<br>Jury Demand: None<br>Nature of Suit: 890 Other Statutory Actions<br>Jurisdiction: Federal Question |

**In Re**

**IN THE MATTER OF THE
APPLICATION OF JASON
LEOPOLD TO UNSEAL CERTAIN
ELECTRONIC SURVEILLANCE
APPLICATIONS AND ORDERS**

**Petitioner**

**JASON LEOPOLD**                                represented by    **Jeffrey Louis Light**
LAW OFFICES OF JEFFREY LIGHT
1712 Eye Street, NW
Suite 915
Washington, DC 20006
(202) 277−6213
Fax: (202) 223−5316
Email: jeffrey@lawofficeofjeffreylight.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**KatieLynn Boyd Townsend**
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street, NW
Suite 1250
Washington, DC 20005
(202) 795−9303
Fax: (202) 795−9310
Email: ktownsend@rcfp.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Plaintiff**

**REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS**                          represented by    **KatieLynn Boyd Townsend**
(See above for address)
*LEAD ATTORNEY*

1

V.

**Respondent**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | represented by | **Leslie Ann Gerardo** |

**Leslie Ann Gerardo**
United States Attorney's Office
Special Proceedings Division
555 Fourth Street, N.W.
Washington, DC 20530
(202)252−7578
Email: Leslie.Gerardo@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Margaret J. Chriss**
U.S. ATTORNEY'S OFFICE
Special Proceedings Section
555 Fourth Street, NW
Washington, DC 20530
(202) 252−7555
Fax: (202) 514−8784
Email: margaret.chriss@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Pamela Stever Satterfield**
U.S. ATTORNEYS OFFICE FOR THE
DISTRICT OF COLUMBIA
Special Proceedings Division
555 4th Street, NW
Washington, DC 20530
(202) 252−7578
Email: pamela.satterfield@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 07/16/2013 | 1 | | MOTION to Unseal Records by JASON LEOPOLD (Attachments: # 1 Text of Proposed Order)(jf, ) (Entered: 07/17/2013) |
| 07/16/2013 | | | Filing fee: $ 46.00, receipt number 4616058033 (jf, ) (Entered: 07/17/2013) |
| 08/26/2013 | 2 | | ORDER ordering the government to respond to petition 1 to unseal by Jason Leopold within 30 days of the entry of this order. Signed by Chief Judge Richard W. Roberts on 8/23/13. (lcrwr3) (Entered: 08/26/2013) |
| 08/26/2013 | | | Set/Reset Deadlines: Government's Response due by 9/25/2013 (hs) (Entered: 08/26/2013) |
| 10/11/2013 | 3 | | |

| | | |
|---|---|---|
| | | NOTICE of Appearance by Leslie Ann Gerardo on behalf of UNITED STATES OF AMERICA (Gerardo, Leslie) (Entered: 10/11/2013) |
| 10/11/2013 | 4 | Unopposed MOTION for Extension of Time to File Response/Reply by UNITED STATES OF AMERICA (Attachments: # 1 Text of Proposed Order)(Gerardo, Leslie) (Entered: 10/11/2013) |
| 10/11/2013 | | MINUTE ORDER: It is hereby ORDERED that the government's unopposed motion 4 for enlargement of time be, and hereby is, GRANTED. The government's response to the petition to unseal records shall be filed by 11/8/2013. Signed by Chief Judge Richard W. Roberts on 10/11/2013. (lcrwr3) (Entered: 10/11/2013) |
| 10/15/2013 | | Set/Reset Deadlines: Government's Response due by 11/8/2013 (hs) (Entered: 10/15/2013) |
| 11/08/2013 | 5 | Unopposed MOTION for Extension of Time to File Response/Reply as to 1 MOTION to Unseal Document by UNITED STATES OF AMERICA (Attachments: # 1 Text of Proposed Order)(Gerardo, Leslie) (Entered: 11/08/2013) |
| 11/18/2013 | 6 | MINUTE ORDER: It is hereby ORDERED that the government's unopposed motion 5 for enlargement of time to File Response/Reply be, and hereby is, GRANTED. The government's response to the petition to unseal records shall be filed by 12/6/2013. Signed by Chief Judge Richard W. Roberts on 11/18/13.(lcrwr3) Modified on 11/18/2013 (hs). (Entered: 11/18/2013) |
| 11/19/2013 | | Set/Reset Deadlines: Government's Response due by 12/6/2013 (hs) (Entered: 11/19/2013) |
| 12/06/2013 | 7 | NOTICE of Appearance by Margaret J. Chriss on behalf of UNITED STATES OF AMERICA (Chriss, Margaret) (Entered: 12/06/2013) |
| 12/06/2013 | 8 | Unopposed MOTION for Extension of Time to File Response/Reply as to 1 MOTION to Unseal Document by UNITED STATES OF AMERICA (Attachments: # 1 Text of Proposed Order)(Chriss, Margaret) (Entered: 12/06/2013) |
| 12/09/2013 | 9 | MINUTE ORDER: It is hereby ORDERED that the government's unopposed motion 8 for extension of time to file response to petition to unseal records be, and hereby is, GRANTED. The government's response to the petition to unseal records shall be filed by 12/20/2013. Signed by Chief Judge Richard W. Roberts on 12/9/2013.(lcrwr3) (Entered: 12/09/2013) |
| 12/09/2013 | | Set/Reset Deadlines: Government's Response due by 12/20/2013 (hs) (Entered: 12/09/2013) |
| 12/20/2013 | 10 | RESPONSE *to Application to Unseal* filed by UNITED STATES OF AMERICA. (Gerardo, Leslie) (Entered: 12/20/2013) |
| 12/23/2013 | 11 | MOTION Appointment of Special Master by JASON LEOPOLD (Attachments: # 1 Text of Proposed Order)(Light, Jeffrey) (Entered: 12/23/2013) |
| 03/25/2016 | | Case reassigned to Chief Judge Beryl A. Howell. Judge Richard W. Roberts has retired and is no longer assigned to the case. (ztnr) (Entered: 03/25/2016) |
| 04/26/2016 | 12 | |

| | | | |
|---|---|---|---|
| | | | MOTION for Hearing by JASON LEOPOLD (Attachments: # 1 Text of Proposed Order)(Light, Jeffrey) (Entered: 04/26/2016) |
| 04/29/2016 | | | MINUTE ORDER granting 12 Motion for Hearing; it is ORDERED that the parties shall appear before the Court for a status hearing scheduled for 5/6/2016 at 9:30 AM in Courtroom 15 before Chief Judge Beryl A. Howell. Signed by Chief Judge Beryl A. Howell on 4/29/2016. (tg) (Entered: 04/29/2016) |
| 04/29/2016 | 13 | | MOTION to Continue *Status Hearing* by UNITED STATES OF AMERICA (Attachments: # 1 Text of Proposed Order)(Chriss, Margaret) (Entered: 04/29/2016) |
| 05/02/2016 | | | Set/Reset Hearings: Status Hearing RESCHEDULED for 5/4/2016 at 10:00 AM in Courtroom 15 before Chief Judge Beryl A. Howell. (tg) (Entered: 05/02/2016) |
| 05/04/2016 | | | Minute Entry for proceedings held 0n 5/4/2016 before Chief Judge Beryl A. Howell: Case called for a status hearing but not held. Status conference to be rescheduled at a later date. (Court Reporter Elizabeth Saint−Loth.) (tg) Modified text on 5/4/2016 (tg). (Entered: 05/04/2016) |
| 06/08/2016 | | | NOTICE of Hearing: The parties shall take notice that a continuation Status Conference is scheduled for 6/17/2016 at 11:00 AM in Courtroom 15 before Chief Judge Beryl A. Howell. (tg) (Entered: 06/08/2016) |
| 06/14/2016 | | | Set/Reset Hearings: Status Conference RESCHEDULED for 6/24/2016 at 9:30 AM in Courtroom 15 before Chief Judge Beryl A. Howell. (tg) (Entered: 06/14/2016) |
| 06/24/2016 | | | Minute Entry for proceedings held before Chief Judge Beryl A. Howell: Status Conference held on 6/24/2016; 11 Motion for Appointment of Special Master, withdrawn. Status Report due by 8/15/2016; Status Hearing scheduled for 9/16/2016 at 9:30 AM in Courtroom 15 before Chief Judge Beryl A. Howell. (Court Reporter Elizabeth Saint−Loth). (tg) (Entered: 06/24/2016) |
| 08/08/2016 | 14 | | NOTICE of Appearance by Pamela Stever Satterfield on behalf of UNITED STATES OF AMERICA (Satterfield, Pamela) (Entered: 08/08/2016) |
| 08/12/2016 | 15 | | Unopposed MOTION for Extension of Time to File *Joint Status Report* by UNITED STATES OF AMERICA (Attachments: # 1 Text of Proposed Order)(Satterfield, Pamela) (Entered: 08/12/2016) |
| 08/12/2016 | | | MINUTE ORDER (paperless) GRANTING the 15 United States' Unopposed Motion for Enlargement of Time in Which to File Joint Status Report to the Court. Accordingly, the parties shall, by August 24, 2016, file their Joint Status Report. Signed by Chief Judge Beryl A. Howell on August 12, 2016. (lcbah4) (Entered: 08/12/2016) |
| 08/15/2016 | | | Set/Reset Deadlines: Joint Status Report due by 8/24/2016. (tg) (Entered: 08/15/2016) |
| 08/17/2016 | 16 | | Unopposed MOTION to Intervene by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (Attachments: # 1 Memorandum in Support, # 2 Petition to Unseal, # 3 Text of Proposed Order)(Townsend, KatieLynn) (Entered: 08/17/2016) |

| 08/17/2016 | 17 | Corporate Disclosure Statement by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS. (Townsend, KatieLynn) (Entered: 08/17/2016) |
|---|---|---|
| 08/18/2016 | | MINUTE ORDER (paperless) GRANTING the Reporters Committee for Freedom of the Press's unopposed 16 Motion to Intervene and DIRECTING the Clerk to file on the docket the Reporters Committee for Freedom of the Press's [16−2] Application to Unseal and for Other Appropriate Relief. Signed by Chief Judge Beryl A. Howell on August 18, 2016. (lcbah1) (Entered: 08/18/2016) |
| 08/18/2016 | 18 | MOTION to Unseal and for Other Appropriate Relief by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (zrdj) (Entered: 08/18/2016) |
| 08/23/2016 | 19 | Joint STATUS REPORT by UNITED STATES OF AMERICA. (Satterfield, Pamela) (Entered: 08/23/2016) |
| 08/24/2016 | | Set/Reset Hearings: Status Hearing RESCHEDULED for 9/16/2016 at 9:00 AM in Courtroom 22A before Chief Judge Beryl A. Howell. (tg) (Entered: 08/24/2016) |
| 08/24/2016 | 20 | TRANSCRIPT OF PROCEEDINGS before Chief Judge Beryl A. Howell held on 05−04−2016; Page Numbers: 1−14. Date of Issuance:8/24/2016. Court Reporter/Transcriber Elizabeth SaintLoth, Telephone number 202−354−3242, Transcripts may be ordered by submitting the <a href="http://www.dcd.uscourts.gov/node/110">Transcript Order Form</a><P></P><P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<P>NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<P></P> Redaction Request due 9/14/2016. Redacted Transcript Deadline set for 9/24/2016. Release of Transcript Restriction set for 11/22/2016.(Saint−Loth, Elizabeth) (Entered: 08/24/2016) |
| 08/24/2016 | 21 | TRANSCRIPT OF PROCEEDINGS before Chief Judge Beryl A. Howell held on 6−24−2016; Page Numbers: 1−20. Date of Issuance:08/24/2016. Court Reporter/Transcriber Elizabeth SaintLoth, Telephone number 202−354−3242, Transcripts may be ordered by submitting the <a href="http://www.dcd.uscourts.gov/node/110">Transcript Order Form</a><P></P><P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<P>NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on |

| | | |
|---|---|---|
| | | our website at www.dcd.uscourts.gov.<P></P> Redaction Request due 9/14/2016. Redacted Transcript Deadline set for 9/24/2016. Release of Transcript Restriction set for 11/22/2016.(Saint−Loth, Elizabeth) (Entered: 08/24/2016) |
| 09/16/2016 | | Minute Entry for proceedings held before Chief Judge Beryl A. Howell: Status Conference held on 9/16/2016. (Order forthcoming). (Court Reporter Bryan Wayne). (tg) (Entered: 09/16/2016) |
| 09/21/2016 | 22 | ORDER AND NOTICE to the parties. Signed by Chief Judge Beryl A. Howell on 9/21/2016. (Attachments: # 1 Attachment A) (tg) (Entered: 09/21/2016) |
| 10/04/2016 | | MINUTE ORDER (paperless) DIRECTING, in accordance with the oral order issued during the status conference held on September 16, 2016, that the government file a status report 60 days from the date of issuance of the Court's Notice containing the Miscellaneous case numbers for pen register and/or trap and trace applications and orders filed, pursuant to 18 U.S.C. §§ 3122 and 3123(b), in 2012 in this Court by the United States Attorney's Office for the District of Columbia. Accordingly, the government shall, by November 21, 2016, file a status report. Signed by Chief Judge Beryl A. Howell on October 4, 2016. (lcbah1) (Entered: 10/04/2016) |
| 10/04/2016 | | Set/Reset Deadlines: Government's Status Report due by 11/21/2016. (tg) (Entered: 10/04/2016) |
| 10/04/2016 | 23 | TRANSCRIPT OF 9/16/16 STATUS HEARING before Chief Judge Beryl A. Howell held on September 16, 2016. Page Numbers: 1−31. Date of Issuance: 10/4/16. Court Reporter: Bryan A. Wayne. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, t he transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 10/25/2016. Redacted Transcript Deadline set for 11/4/2016. Release of Transcript Restriction set for 1/2/2017.(Wayne, Bryan) (Entered: 10/04/2016) |
| 11/18/2016 | 24 | STATUS REPORT by UNITED STATES OF AMERICA. (Satterfield, Pamela) (Entered: 11/18/2016) |
| 12/02/2016 | | MINUTE ORDER (paperless) upon consideration of the government's 24 Status Report to the Court, DIRECTING the government to file, by December 9, 2016, a second motion to unseal in the four partially unsealed matters, indicating any proposed redactions. The parties are further DIRECTED to propose, by |

| | | |
|---|---|---|
| | | December 9, 2016, a schedule to govern further proceedings in this matter, including a process for addressing the remaining 2012 pen register and trap and trace applications and orders, as well as such material from other years. The parties are further DIRECTED to appear for a status hearing on December 16, 2016, at 10:00am. Signed by Chief Judge Beryl A. Howell on December 2, 2016. (lcbah1) (Entered: 12/02/2016) |
| 12/02/2016 | | Set/Reset Deadlines/Hearings: Government's Second Motion to Unseal due by 12/9/2016; Joint proposed schedule due by 12/9/2016; Status Hearing scheduled for 12/16/2016 at 10:00 AM in Courtroom 22A before Chief Judge Beryl A. Howell. (tg) (Entered: 12/02/2016) |
| 12/09/2016 | 25 | Joint STATUS REPORT *Second* by UNITED STATES OF AMERICA. (Attachments: # 1 Text of Proposed Order)(Satterfield, Pamela) (Entered: 12/09/2016) |
| 12/09/2016 | 26 | NOTICE to the Parties. Upon consideration of the parties' Second Joint Status Report to the Court, ECF No. 25, and the government's four motions to partially unseal cases 12mc12, 12mc129, 12mc227, and 12mc397. NOTICE is hereby provided that redacted copies of the filings in the four 2012 cases are being filed on the docket for the instant case as well as the Court's website. The redactions consist of information identifying the device or individual targeted for surveillance. Signed by Chief Judge Beryl A. Howell. (Attachments: # 1 12mc12, # 2 12mc129, # 3 12mc227, and # 4 12mc397) (ad) (Entered: 12/09/2016) |
| 12/12/2016 | | Set/Reset Hearings: Status Hearing RESCHEDULED for 12/19/2016 at 10:00 AM in Courtroom 22A before Chief Judge Beryl A. Howell. (tg) (Entered: 12/12/2016) |
| 12/16/2016 | 27 | Third STATUS REPORT *Jointly Filed* by UNITED STATES OF AMERICA. (Satterfield, Pamela) (Entered: 12/16/2016) |
| 12/19/2016 | | Minute Entry for proceedings held before Chief Judge Beryl A. Howell: Status Hearing held on 12/19/2016. Counsel for the Petitioner failed to appear. The parties shall submit a Joint Status Report on or before 1/17/2017. (Court Reporter Elizabeth Saint−Loth). (tg) Modified on 12/20/2016 (tg). (Entered: 12/19/2016) |
| 12/19/2016 | | Set/Reset Deadlines: Joint Status Report due by 1/17/2017. (tg) (Entered: 12/19/2016) |
| 12/19/2016 | | MINUTE ORDER (paperless) DIRECTING, for the reasons stated during the December 19, 2016, status hearing, that the parties submit a joint status report by January 17, 2017. Signed by Chief Judge Beryl A. Howell on December 19, 2016. (lcbah1) (Entered: 12/19/2016) |
| 01/17/2017 | 28 | Joint STATUS REPORT *Fourth* by UNITED STATES OF AMERICA. (Satterfield, Pamela) (Entered: 01/17/2017) |
| 01/23/2017 | | MINUTE ORDER (paperless), in light of the parties' 28 Fourth Joint Status Report to the Court, DIRECTING the parties to appear for a status conference on February 10, 2017, at 10:15 AM. In addition, upon consideration of the government's request for "access to the Court's electronic records in the[] currently sealed matters," Fourth Joint Status Report to the Court at 3, the |

| | | |
|---|---|---|
| | | government shall provide, to the Clerk of Court, the names and email addresses of those persons within the United States Attorney's Office for the District of Columbia requiring access to the subject sealed dockets. Signed by Chief Judge Beryl A. Howell on January 23, 2017. (lcbah1) (Entered: 01/23/2017) |
| 01/24/2017 | | Set/Reset Hearings: Status Conference scheduled for 2/10/2017 at 10:15 AM in Courtroom 22A before Chief Judge Beryl A. Howell. (tg) (Entered: 01/24/2017) |
| 01/31/2017 | 29 | Unopposed MOTION to Continue *February 10, 2017 Status Conference to February 17, 2017* by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (Attachments: # 1 Text of Proposed Order)(Townsend, KatieLynn) (Entered: 01/31/2017) |
| 01/31/2017 | | MINUTE ORDER (paperless) GRANTING the Reporters Committee for Freedom of the Press's 29 Unopposed Motion of the Reporters Committee for Freedom of the Press to Continue Status Conference from February 10, 2017 to February 17, 2017. Accordingly, the parties shall appear for a status conference on February 17, 2017, at 10:00 AM. Signed by Chief Judge Beryl A. Howell on January 31, 2017. (lcbah1) (Entered: 01/31/2017) |
| 02/01/2017 | | Set/Reset Hearings: Status Conference CONTINUED to 2/17/2017 at 10:00 AM in Courtroom 22A before Chief Judge Beryl A. Howell. (tg) (Entered: 02/01/2017) |
| 02/10/2017 | 30 | Joint STATUS REPORT *Fifth* by UNITED STATES OF AMERICA. (Satterfield, Pamela) (Entered: 02/10/2017) |
| 02/10/2017 | 31 | TRANSCRIPT OF STATUS CONFERENCE before Chief Judge Beryl A. Howell held on 12−19−2016; Page Numbers: 1 − 39. Date of Issuance:02−10−2017. Court Reporter/Transcriber Elizabeth Saint−Loth, Telephone number 202−354−3242, Transcripts may be ordered by submitting the <a href="http://www.dcd.uscourts.gov/node/110">Transcript Order Form</a><P></P><P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<P></P> Redaction Request due 3/3/2017. Redacted Transcript Deadline set for 3/13/2017. Release of Transcript Restriction set for 5/11/2017.(Saint−Loth, Elizabeth) (Entered: 02/10/2017) |
| 02/17/2017 | | Minute Entry for proceedings held before Chief Judge Beryl A. Howell: Status Conference held on 2/17/2017, Status Report due by 3/24/2017. (Court Reporter Elizabeth Saint−Loth). (tg) (Entered: 02/17/2017) |
| 02/22/2017 | 32 | ORDER AND NOTICE to the parties. Signed by Chief Judge Beryl A. Howell on 2/22/2017. (Attachments: # 1 Attachment A, # 2 Attachment B, # 3 Attachment C, # 4 Attachment D, # 5 Attachment E) (ad) (Entered: 02/22/2017) |
| 02/22/2017 | 33 | |

| | | |
|---|---|---|
| | | ORDER regarding ECF access, partial unsealing, and extraction of pen register and/or trap and trace records. See Order for further details. Signed by Chief Judge Beryl A. Howell on February 22, 2017. (lcbah1) (Entered: 02/22/2017) |
| 03/09/2017 | 34 | TRANSCRIPT OF STATUS CONFERENCE before Chief Judge Beryl A. Howell held on 02−17−2017; Page Numbers: 1 − 54. Date of Issuance:03−09−2017. Court Reporter/Transcriber Elizabeth SaintLoth, Telephone number 202−354−3242, Transcripts may be ordered by submitting the <a href="http://www.dcd.uscourts.gov/node/110">Transcript Order Form</a><P></P><P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<P></P> Redaction Request due 3/30/2017. Redacted Transcript Deadline set for 4/9/2017. Release of Transcript Restriction set for 6/7/2017.(Saint−Loth, Elizabeth) (Entered: 03/09/2017) |
| 04/12/2017 | 35 | NOTICE is hereby provided that redacted copies of the filings in Misc. No. 12−585 are being filed on the docket for the instant case as well as the Court's website. Signed by Chief Judge Beryl A. Howell on 4/12/2017. (Attachment: # 1) (zad) (Entered: 04/13/2017) |
| 04/14/2017 | 36 | Joint STATUS REPORT *Sixth* by UNITED STATES OF AMERICA. (Satterfield, Pamela) (Entered: 04/14/2017) |
| 04/20/2017 | | MINUTE ORDER (paperless), in light of the parties' 36 Sixth Joint Status Report to the Court, indicating that "the parties are unable to reach agreement on an extraction process," ISSUING the following SCHEDULING ORDER to control further proceedings in this case: (1) The petitioners shall, by May 19, 2017, file any memorandum supplementing their 1 Petition to Unseal Records and 18 Application of the Reporters Committee for Freedom of the Press to Unseal and for Other Appropriate Relief ("Application to Unseal"), and Memorandum in support thereof, docketed at ECF No. 16−1. The petitioners' supplemental memorandum shall specify the precise relief sought. (2) The government shall, by June 16, 2017, file any opposition to the Petition to Unseal Records and Application to Unseal. (3) The petitioners shall, by June 30, 2017, file any reply in support of their Petition to Unseal Records and Application to Unseal. (4) The parties shall appear for a hearing on July 14, 2017, at 10:00 A.M. in Courtroom 22. Signed by Chief Judge Beryl A. Howell on April 20, 2017. (lcbah1) (Entered: 04/20/2017) |
| 04/20/2017 | | Set/Reset Deadlines/Hearings: Petitioners' Supplemental Memorandum due by 5/19/2017; Government's Opposition, if any, due by 6/16/2017; Petitioners' Reply, if any, due by 6/30/2017; Hearing scheduled for 7/14/2017 at 10:00 AM in Courtroom 22A before Chief Judge Beryl A. Howell. (tg) (Entered: 04/20/2017) |
| 04/24/2017 | 37 | |

| | | |
|---|---|---|
| | | ORDER AND NOTICE to the parties. Signed by Chief Judge Beryl A. Howell on 4/24/2017. (Attachments: # 1 Attachment A, # 2 Attachment B, # 3 Attachment C) (ad) (Entered: 04/24/2017) |
| 05/19/2017 | 38 | SUPPLEMENTAL MEMORANDUM to re 1 MOTION to Unseal Document, 18 MOTION to Unseal Case *Re Pen Register and/or Trap and Trace Applications, Orders, and Related Court Records* filed by JASON LEOPOLD, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS. (Attachments: # 1 Declaration of Andrew Crocker, # 2 Declaration of Jason Leopold, # 3 Declaration of Riana Pfefferkorn, # 4 Declaration of Will Potter, # 5 Declaration of Nathan Freed Wessler)(Townsend, KatieLynn) (Entered: 05/19/2017) |
| 05/22/2017 | | MINUTE ORDER (paperless), in light of the petitioners' 38 Supplemental Memorandum of Points and Authorities in Support of Their Application to Unseal Pen Register and/or Trap and Trace Applications, Orders, and Related Court Records ("Supplemental Memorandum"), which indicates that the parties have not yet conferred regarding any applications and orders filed and issued pursuant to the Stored Communications Act ("SCA Materials"), revising the Scheduling Order as follows: (1) The parties shall, by June 2, 2017, meet and confer to discuss their respective positions with regard to SCA Materials. (2) The petitioners shall, by June 16, 2017, refile their Supplemental Memorandum, addressing both the Pen Register/Trap and Trace statute as well as SCA. The petitioners' supplemental memorandum shall specify the precise relief sought. (2) The government shall, by July 14, 2017, file any opposition to the Petition to Unseal Records and Application to Unseal. (3) The petitioners shall, by July 28, 2017, file any reply in support of their Petition to Unseal Records and Application to Unseal. (4) The parties shall appear for a hearing on August 4, 2017, at 10:00 A.M. in Courtroom 22. Signed by Chief Judge Beryl A. Howell on May 22, 2017. (lcbah1) (Entered: 05/22/2017) |
| 05/22/2017 | | Set/Reset Deadlines/Hearings: Attorney Meet and Confer Conference due by 6/2/2017; Petitioners' Supplemental Memorandum due by 6/16/2017; Government's Opposition due by 7/14/2017; Petitioners' Reply due by 7/28/2017; Status Hearing Rescheduled for 8/4/2017 at 10:00 AM in Courtroom 22A before Chief Judge Beryl A. Howell. (tg) (Entered: 05/22/2017) |
| 06/05/2017 | 39 | Joint MOTION for Extension of Time to File *Supplemental Memorandum and Related Briefing and Hearing Schedule* by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (Attachments: # 1 Text of Proposed Order)(Townsend, KatieLynn) (Entered: 06/05/2017) |
| 06/07/2017 | 40 | ORDER AND NOTICE GRANTING the parties' 39 Joint Motion to Extend Briefing and Hearing Schedule, and NOTIFYING the parties that their request for lists reflecting Miscellaneous Case numbers for 2703(d) Records is DENIED. See ORDER AND NOTICE for further details. Signed by Chief Judge Beryl A. Howell on June 7, 2017. (lcbah1) (Entered: 06/07/2017) |
| 06/08/2017 | | Set/Reset Deadlines/Hearings: Attorney Meet and Confer Conference due by 7/3/2017; Petitioner's Supplemental Memorandum due by 7/18/2017; Government's opposition due by 8/18/2017; Petitioner's reply due by 8/28/2017; Status Hearing scheduled for 9/14/2017 at 10:00 AM in Courtroom 22A before Chief Judge Beryl A. Howell. (tg) (Entered: 06/08/2017) |
| 06/30/2017 | 41 | |

| | | |
|---|---|---|
| | | Joint STATUS REPORT *Seventh* by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS. (Attachments: # 1 Text of Proposed Order Setting Status Conference and/or Extending Briefing Schedule)(Townsend, KatieLynn) (Entered: 06/30/2017) |
| 07/07/2017 | 42 | NOTICE *of Filing of Pen Register Extraction Charts* by UNITED STATES OF AMERICA (Satterfield, Pamela) (Entered: 07/07/2017) |
| 07/12/2017 | | NOTICE OF HEARING: The parties shall take notice that a Status Hearing is scheduled for 7/14/2017 at 11:00 AM in Courtroom 22A before Chief Judge Beryl A. Howell. The parties shall also note that the Status Hearing previously scheduled for 9/14/2017 at 10:00 AM in Courtroom 22A before Chief Judge Beryl A. Howell shall convene as scheduled. (tg) (Entered: 07/12/2017) |
| 07/14/2017 | | MINUTE ORDER (paperless), in light of the parties' 41 Seventh Joint Status Report to the Court and the discussion during the July 14, 2017 status conference, SUSPENDING the briefing schedule through July 28, 2017, by which date the parties shall jointly propose a briefing schedule to govern further proceedings in this case. Signed by Chief Judge Beryl A. Howell on July 14, 2017. (lcbah1) (Entered: 07/14/2017) |
| 07/14/2017 | | Minute Entry for proceedings held before Chief Judge Beryl A. Howell: Status Hearing held on 7/14/2017. (Court Reporter Elizabeth Saint−Loth.) (tg) (Entered: 07/14/2017) |
| 07/14/2017 | | Set/Reset Deadlines: Joint Proposed Briefing Schedule due by 7/28/2017. (tg) (Entered: 07/17/2017) |
| 07/17/2017 | 43 | NOTICE TO THE PARTIES regarding the total number of Miscellaneous matters connected to three event subcategories in CM/ECF. Signed by Chief Judge Beryl A. Howell. (tg) (Entered: 07/17/2017) |
| 07/17/2017 | 44 | NOTICE *REPORT PROVIDING GUIDANCE TO THE CLERK OF THE COURT REGARDING THE SEARCH FOR STORED COMMUNICATIONS ACT SEARCH WARRANT MATERIALS* by JASON LEOPOLD (Attachments: # 1 Exhibit Screenshots)(Light, Jeffrey) (Entered: 07/17/2017) |
| 07/21/2017 | 45 | NOTICE TO THE PARTIES in response to the joint request by the petitioners and the United States Attorney's Office for the District of Columbia for the "total number of matters" involving "[Stored Communications Act ('SCA') Search Warrant Materials," (tg) (Entered: 07/21/2017) |
| 07/28/2017 | 46 | PROPOSED BRIEFING SCHEDULE by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS. (Attachments: # 1 Text of Proposed Order)(Townsend, KatieLynn) (Entered: 07/28/2017) |
| 07/28/2017 | | MINUTE ORDER (paperless), in light of the parties' 46 Joint Proposed Briefing Schedule on Petitioners' Application to Unseal Electronic Surveillance Applications, Orders, and Related Court Records, ISSUING the following schedule to govern briefing in this matter: (1) the petitioners shall, by August 25, 2017, submit a supplemental memorandum in support of their petitions; (2) the government shall, by October 10, 2017, file a response to the petitioners' supplemental memorandum; and (3) the petitioners shall, by October 24, 2017, file a reply in support of their supplemental memorandum. Signed by Chief Judge Beryl A. Howell on July 28, 2017. (lcbah1) (Entered: 07/28/2017) |

| 07/28/2017 | | | Set/Reset Deadlines: Petitioners' Supplemental Memorandum due by 8/25/2017; Government's Response due by 10/10/2017; Petitioners' Reply due by 10/24/2017. (tg) (Entered: 07/28/2017) |
| --- | --- | --- | --- |
| 08/25/2017 | 47 | | SUPPLEMENTAL MEMORANDUM to re 1 MOTION to Unseal Document, 18 MOTION to Unseal Case *Re Pen Register and/or Trap and Trace Applications, Orders, and Related Court Records* filed by JASON LEOPOLD, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS. (Attachments: # 1 Declaration Supp. Decl. of A. Crocker, # 2 Declaration Supp. Decl. of J. Leopold, # 3 Declaration Supp. Decl. of R. Pfefferkorn, # 4 Declaration Supp. Decl. of W. Potter, # 5 Declaration Supp. Decl. of G. Rottman, # 6 Declaration Supp. Decl. of K. Townsend, # 7 Declaration Supp. Decl. of N. Wessler, # 8 Text of Proposed Order Re: Petitioners' Applications to Unseal Certain Electronic Surveillance Applications, Orders, and Related Court Records, and For Other Relief)(Townsend, KatieLynn) (Entered: 08/25/2017) |
| 08/31/2017 | 48 | | TRANSCRIPT OF STATUS CONFERENCE before Chief Judge Beryl A. Howell held on 07−14−2017; Page Numbers: 1 − 30. Date of Issuance:08−31−2017. Court Reporter/Transcriber Elizabeth SaintLoth, Telephone number 202−354−3242, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court repor ter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 9/21/2017. Redacted Transcript Deadline set for 10/1/2017. Release of Transcript Restriction set for 11/29/2017.(Saint−Loth, Elizabeth) (Entered: 08/31/2017) |
| 09/06/2017 | | | MINUTE ORDER (paperless) VACATING the status hearing scheduled for September 14, 2017, in light of the postponement of the briefing schedule. *See* Minute Order (dated July 28, 2017). Signed by Chief Judge Beryl A. Howell on September 6, 2017. (lcbah1) (Entered: 09/06/2017) |
| 10/06/2017 | 49 | | Unopposed MOTION for Extension of Time to File Response/Reply by UNITED STATES OF AMERICA (Attachments: # 1 Text of Proposed Order)(Satterfield, Pamela) (Entered: 10/06/2017) |
| 10/06/2017 | | | MINUTE ORDER (paperless) GRANTING the respondent's 49 Unopposed Motion for Enlargement of Time in Which to File Its Response to Petitioners' Supplemental Memoranda. Accordingly, the respondent shall, by October 31, 2017, file its response. Signed by Chief Judge Beryl A. Howell on October 6, 2017. (lcbah1) (Entered: 10/06/2017) |

| 10/06/2017 | | | Set/Reset Deadlines: Respondent's response to Petitioners' Supplemental Memoranda due by 10/31/2017. (hmc) (Entered: 10/06/2017) |
|---|---|---|---|
| 10/11/2017 | 50 | | Unopposed MOTION for Extension of Time to File Response/Reply by JASON LEOPOLD, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (Attachments: # 1 Text of Proposed Order)(Townsend, KatieLynn) (Entered: 10/11/2017) |
| 10/26/2017 | 51 | | Memorandum in opposition to re 1 MOTION to Unseal Document, 18 MOTION to Unseal Case *and Supplemental Memoranda* filed by UNITED STATES OF AMERICA. (Satterfield, Pamela) (Entered: 10/26/2017) |
| 10/26/2017 | | | MINUTE ORDER (paperless) GRANTING the petitioner's 50 Unopposed Motion For Extension of Time to File Response/Reply. Accordingly, the petitioner shall file a response/reply by November 17, 2017. Signed by Chief Judge Beryl A. Howell on October 26, 2017. (lcbah1) (Entered: 10/26/2017) |
| 10/27/2017 | | | Set/Reset Deadlines: Petitioner's Response/Reply due by 11/17/2017. (tg) (Entered: 10/27/2017) |
| 11/17/2017 | 52 | | REPLY re 1 MOTION to Unseal Document, 18 MOTION to Unseal Case *Re Pen Register and/or Trap and Trace Applications, Orders, and Related Court Records* filed by JASON LEOPOLD, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS. (Townsend, KatieLynn) (Entered: 11/17/2017) |
| 02/26/2018 | 53 | 57 | ORDER GRANTING in part and DENYING in part petitioner Jason Leopold's 1 Petition to Unseal Records and petitioner Reporters Committee for Freedom of the Press's 18 Application to Unseal and for Other Appropriate Relief. See Order for details. Signed by Chief Judge Beryl A. Howell on February 26, 2018. (lcbah1) (Entered: 02/26/2018) |
| 02/26/2018 | 54 | 59 | MEMORANDUM OPINION regarding petitioner Jason Leopold's 1 Petition to Unseal Records and petitioner Reporters Committee for Freedom of the Press's 18 Application to Unseal and for Other Appropriate Relief. Signed by Chief Judge Beryl A. Howell on February 26, 2018. (lcbah1) (Main Document 54 replaced on 3/2/2018) (hmc). (Entered: 02/26/2018) |
| 03/23/2018 | 55 | | MOTION for Reconsideration re 54 Memorandum & Opinion, *regarding petitioner Jason Leopold's Petition to Unseal Records and petitioner Reporters Committee for Freedom of the Press's Application to Unseal and for Other Appropriate Relief* by JASON LEOPOLD, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (Townsend, KatieLynn) (Entered: 03/23/2018) |
| 03/30/2018 | 56 | | MOTION for Extension of Time to File Response/Reply as to 55 MOTION for Reconsideration re 54 Memorandum & Opinion, *regarding petitioner Jason Leopold's Petition to Unseal Records and petitioner Reporters Committee for Freedom of the Press's Application to Unseal and for Other Appropriate Re* by UNITED STATES OF AMERICA (Attachments: # 1 Text of Proposed Order)(Satterfield, Pamela) (Entered: 03/30/2018) |
| 04/03/2018 | | | MINUTE ORDER (paperless) GRANTING the government's unopposed 56 Motion for Enlargement of Time in Which to File Its Response to Petitioners' Motion for Reconsideration. By May 18, 2018, the government shall file any response to the petitioners' motion. Signed by Chief Judge Beryl A. Howell on April 3, 2018. (lcbah1) (Entered: 04/03/2018) |

| 04/03/2018 | | | Set/Reset Deadlines: Government's response to Petitioner's motion for reconsideration due by 5/18/2018. (tg) (Entered: 04/03/2018) |
|---|---|---|---|
| 04/12/2018 | 57 | | Unopposed MOTION for Extension of Time to File Response/Reply as to 55 MOTION for Reconsideration re 54 Memorandum & Opinion, *regarding petitioner Jason Leopold's Petition to Unseal Records and petitioner Reporters Committee for Freedom of the Press's Application to Unseal and for Other Appropriate Re by JASON LEOPOLD, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (Attachments: # 1 Text of Proposed Order)(Townsend, KatieLynn) (Entered: 04/12/2018)* |
| 04/13/2018 | | | MINUTE ORDER (paperless) GRANTING the petitioners' 57 Unopposed Motion for Enlargement of Time In Which To File Its Reply Brief. By June 1, 2018, the petitioners shall file any reply to the government's response. Signed by Chief Judge Beryl A. Howell on April 13, 2018. (lcbah1) (Entered: 04/13/2018) |
| 04/13/2018 | | | Set/Reset Deadlines: Petitioners' reply to government's response due by 6/1/2018. (tg) (Entered: 04/13/2018) |
| 05/18/2018 | 58 | | Memorandum in opposition to re 55 MOTION for Reconsideration re 54 Memorandum & Opinion, *regarding petitioner Jason Leopold's Petition to Unseal Records and petitioner Reporters Committee for Freedom of the Press's Application to Unseal and for Other Appropriate Re filed by UNITED STATES OF AMERICA. (Satterfield, Pamela) (Entered: 05/18/2018)* |
| 06/01/2018 | 59 | | REPLY to opposition to motion re 55 MOTION for Reconsideration re 54 Memorandum & Opinion, *regarding petitioner Jason Leopold's Petition to Unseal Records and petitioner Reporters Committee for Freedom of the Press's Application to Unseal and for Other Appropriate Re filed by JASON LEOPOLD, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS. (Townsend, KatieLynn) (Entered: 06/01/2018)* |
| 08/16/2018 | 60 | 18 | ORDER DENYING the petitioners' 55 Motion for Reconsideration. See Order for further details. Signed by Chief Judge Beryl A. Howell on August 16, 2018. (lcbah1) (Entered: 08/16/2018) |
| 08/16/2018 | 61 | 19 | MEMORANDUM OPINION regarding the petitioners' 55 Motion for Reconsideration. Signed by Chief Judge Beryl A. Howell on August 16, 2018. (lcbah1) (Entered: 08/16/2018) |
| 09/07/2018 | 62 | 15 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 60 Order on Motion for Reconsideration, 53 Order on Motion to Unseal Document, by JASON LEOPOLD, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS. Filing fee $ 505, receipt number 0090−5677795. Fee Status: Fee Paid. Parties have been notified. (Townsend, KatieLynn) (Entered: 09/07/2018) |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**IN RE APPLICATION OF**
**JASON LEOPOLD TO UNSEAL**
**CERTAIN ELECTRONIC**
**SURVEILLANCE APPLICATIONS**
**AND ORDERS**

Misc. Action No. 13-mc-00712 (BAH)

---

## NOTICE OF APPEAL

Notice is hereby given that the Reporters Committee for Freedom of the Press and Jason

Leopold, petitioners in the above-named case, hereby appeal to the United States Court of

Appeals for the District of Columbia Circuit from (1) this Court's order of February 26, 2018

granting in part and denying in part Jason Leopold's Petition to Unseal Records and Reporters

Committee for Freedom of the Press's Application to Unseal and for Other Appropriate Relief

(Dkt. #53), and (2) this Court's order of August 16, 2018 denying Petitioners' motion for

reconsideration (Dkt. #61). This notice of appeal is timely pursuant to D.C. Circuit Rule

4(a)(4)(A)(iv) (where a motion "to alter or amend the judgment under Rule 59" is timely filed,

"the time to file an appeal runs for all parties from the entry of the order disposing of the last

such remaining motion.").

Dated: September 7, 2018                    Respectfully submitted,

*/s/ Katie Townsend*
Katie Townsend
D.C. Bar No. 1026115
THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1250
Washington, DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310
ktownsend@rcfp.org

1

*Counsel for the Reporters Committee for*
*Freedom of the Press*

*/s/ Jeffrey Light*
Jeffrey Light
D.C. Bar No. 485360
1712 Eye St. NW, Suite 915
Washington, DC 20006
jeffrey@lawofficeofjeffreylight.com

*Counsel for Jason Leopold*

2

## CERTIFICATE OF SERVICE

      I hereby certify that on September 7, 2018, an electronic copy of the foregoing Notice of Appeal was filed with the Clerk of Court for the United States District Court for the District of Columbia using the Court's CM/ECF system and was served electronically upon all parties in the case. I certify that all participants in the case are CM/ECF users and that service will be accomplished by the CM/ECF system.

                        */s/ Katie Townsend*
                        Katie Townsend

3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF JASON LEOPOLD TO UNSEAL CERTAIN ELECTRONIC SURVEILLANCE APPLICATIONS AND ORDERS. | Misc. Action No. 13-mc-00712 <br><br> Chief Judge Beryl A. Howell |

## ORDER

Upon consideration of petitioners Jason Leopold and Reporters Committee for Freedom of the Press's Motion for Reconsideration, ECF No. 55, the related legal memoranda in support of and opposition to this motion, and the entire record herein, for the reasons set out in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the petitioners' motion is DENIED.

**SO ORDERED.**

*This is a final and appealable order.*

Date: August 16, 2018

_____
BERYL A. HOWELL
Chief Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF JASON LEOPOLD TO UNSEAL CERTAIN ELECTRONIC SURVEILLANCE APPLICATIONS AND ORDERS. | Misc. Action No. 13-mc-00712<br><br>Chief Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

Jason Leopold and the Reporters Committee for Freedom of the Press filed petitions to unseal voluminous judicial records, dating back years, authorizing the government's use of certain statutory authorities to gather information for use in now-closed criminal investigations, which petitions were predicated on asserted rights of access under the First Amendment and the common law. *See* Leopold's Pet. Unseal Records ("Leopold's Pet."), ECF No. 1; Reporters Comm.'s Appl. to Unseal & for Other Appropriate Relief ("Reporters Comm.'s Appl."), ECF No. 18. On February 26, 2018, the Court recognized a prospective right of access under the common law to limited information concerning three categories of judicial records, routinely maintained under seal, relating to applications filed by the U.S. Attorney's Office for the District of Columbia ("USAO") for: (1) warrants issued pursuant to the Stored Communications Act ("SCA"), *see* 18 U.S.C. § 2703(a); (2) court orders issued pursuant to the SCA's § 2703(d); and (3) orders authorizing the installation and use of pen register and trap and trace ("PR/TT") devices pursuant to the Pen Register Act ("PRA"), *see id.* § 3123. *See* Order Granting in Part & Denying in Part Leopold's Pet. & Reporters Comm.'s Appl. ("Order"), ECF No. 53; *Matter of Leopold to Unseal Certain Elec. Surveillance Applications & Orders* ("*Leopold*"), 300 F. Supp. 3d 61 (D.D.C. 2018). The Court declined to recognize a broader or retrospective right of access

1

under the common law or to recognize any right of access under the First Amendment to these routinely sealed records. *Leopold*, 300 F. Supp. 3d at 108.

The petitioners now seek reconsideration of the Court's Order and Memorandum Opinion. *See* Pet'rs' Mot. Reconsideration, ECF No. 55. Specifically, the petitioners ask the Court to (1) reconsider its conclusion that the First Amendment affords no right of access to the three categories of judicial records at issue, (2) reconsider its conclusion that the common law provides no broader right of access than that which the Court has recognized, and (3) more clearly specify the factual findings upon which the Court based its resolution of the petitioners' common law claim. *Id.* at 1. For the reasons explained below, the petitioners' motion for reconsideration is denied.

## I.     BACKGROUND

The Court's previous Memorandum Opinion laid out this matter's background in great detail, *see Leopold*, 300 F. Supp. 3d at 68–79, so only a brief overview of the relevant facts is necessary. In July 2013, Leopold, a journalist currently employed by BuzzFeed News, filed a petition to unseal nearly twenty years of sealed government applications, pursuant to various statutory authorities, plus related affidavits and orders, regarding the government's collection of information during law enforcement investigations, "except for those which relate to an ongoing investigation." *See* Leopold's Pet. at 1. Leopold asserted that both the First Amendment and the common law established rights of access to these materials. *Id.* at 4, 12–18. Three years later, after the case was reassigned to the undersigned Judge, the Reporters Committee was permitted to intervene, *see* Reporters Comm.'s Unopposed Mot. Intervene, ECF No. 16, and filed its own petition to unseal, *see* Reporters Comm.'s Appl. Over the next year, the petitioners and the USAO, with guidance from this Court, engaged in discussions on how properly to vindicate, in

2

light of substantial law enforcement investigative and individual privacy concerns, the public's

interest in transparency of judicial records concerning the government's use of statutorily

authorized investigative tools. *See Leopold*, 300 F. Supp. 3d at 67–68.

In the course of these discussions, the petitioners agreed to limit the scope of their

unsealing request by shortening the time period covered and seeking only records relating to (1)

SCA warrants, pursuant to 18 U.S.C. § 2703(a); (2) SCA orders, pursuant to 18 U.S.C. §

2703(d); and PR/TT orders. *Id.* at 69. The USAO, meanwhile, agreed to unseal

> (1) the total numbers of USAO-filed PR/TT matters during the period of 2008
> through 2016; (2) the total numbers of § 2703(d) and SCA warrant matters,
> retrieved using certain search criteria, filed by the USAO and DOJ components
> during this period; (3) certain docket information concerning PR/TT matters the
> USAO initiated during this period; (4) over 100 pages of redacted documents from
> four representative sample PR/TT matters from 2012; and (5) fifteen categories of
> extracted information from a representative sample of ten percent of USAO-filed
> PR/TT matters from 2012.

*Id.* at 100. At all times, the petitioners' limited the scope of their requested relief to materials

from closed investigations. This limit necessarily precludes real-time disclosure of any

information or records, including docketed case numbers, for these criminal investigative

matters, since the USAO only seeks, and the Court only grants, such orders in "ongoing criminal

investigation[s]." 18 U.S.C. § 2703(d); *id.* § 3123(a)(1). Eventually, the parties could reach no

further agreement, and requested that the Court resolve the petitioners' claims. *Leopold*, 300 F.

Supp. 3d at 79.

On February 26, 2018, the Court granted in part and denied in part the petitioners'

petitions. *See* Order. The Court explained, in an accompanying Memorandum Opinion, that the

petitioners' First Amendment right of access claim failed because the petitioners had failed to

establish "the prerequisite [] showing [of] a longstanding tradition of public access . . . as to the

PR/TT and SCA materials at issue." *Leopold*, 300 F. Supp. 3d at 85. Further, no retrospective

3

right of access under the common law was recognized, in light of the considerable administrative burden that such extensive unsealing of nearly a decade's worth of surveillance materials would impose on the USAO and the Clerk's Office, due to the necessity of identifying, reviewing and redacting sensitive law enforcement and privacy-protected information from any unsealed records. *Id.* at 97–103. The Court held, however, that the common law afforded the petitioners a limited prospective right of access to certain information on the materials sought "in light of the changes recently adopted by the USAO and Clerk's Office in the processing of such materials." *Id.* at 85. Specifically, the Court held that the petitioners enjoyed a prospective common law right of access to information, to be disclosed periodically, "regarding the total number of PR/TT, § 2703(d), and SCA warrant applications filed by the USAO, the number and type of accounts that such applications target, the names of the providers to which these applications are directed, and the primary criminal offense under investigation for these applications." *Id.* at 108.

The petitioners have now filed a motion for reconsideration, *see* Pet'rs' Mot. Reconsideration, which is ripe for review.

## II.    LEGAL STANDARD

Rule 59(e) of the Federal Rules of Civil Procedure allows a party to file "[a] motion to alter or amend a judgment." FED. R. CIV. P. 59(e). A Rule 59(e) motion is "discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Messina v. Krakower*, 439 F.3d 755, 758 (D.C. Cir. 2006) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)). As the D.C. Circuit recently stressed, "the reconsideration or amendment of a judgment is nonetheless an extraordinary measure." *Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 217 (D.C. Cir. 2018). A Rule 59(e)

4

motion "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment," *id*. (quoting *Exxon Shipping v. Baker*, 554 U.S. 471, 486 n.5 (2008)), and "is 'not a vehicle to present a new legal theory that was available prior to judgment,'" *id*. (quoting *Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 403 (D.C. Cir. 2012)). Thus, "Rule 59(e) is not available to a party who 'could have easily avoided the outcome, but instead elected not to act until after a final order had been entered.'" *Id*. at 220 (quoting *Ciralsky v. CIA*, 355 F.3d 661, 665 (D.C. Cir. 2004)).

## III. DISCUSSION

Having identified no "intervening change of controlling law" or new and previously unavailable evidence, the petitioners are entitled to reconsideration only if the Court committed "clear error" or worked "manifest injustice." *Messina*, 439 F.3d at 758 (quoting *Firestone*, 76 F.3d at 1208). The petitioners contend that reconsideration is appropriate because the Court erred in concluding that (1) the First Amendment affords no right of access to judicial records relating to SCA warrants, § 2703(d) orders, and PR/TT orders, and (2) the common law affords the petitioners only a limited, prospective right of access to these records.[1] Additionally, the petitioners ask the Court to (3) clarify the factual basis of its conclusion as to the common law right of access. As detailed below, the petitioners identify no error in the Court's analysis, much less error that is "clear" or gives rise to "manifest injustice." *Id.* The petitioners thus are not entitled to reconsideration.

---

[1]      Even if the Court had erred in failing to recognize a First Amendment right of access to SCA warrant materials, any such error could not have prejudiced the petitioners, as the petitioners ultimately sought only prospective access to SCA warrant materials, in light of the acknowledged practical difficulties demonstrated over the course of the litigation that attend identifying, reviewing and unsealing only appropriate materials, *see* Pet'rs' Suppl. Mem. Pts. & Auths. Supp. App. Unseal ("Pet'rs' Mem. Supp. App. Unseal") at 42–43, ECF No. 47, and the Court granted the requested prospective access to limited information concerning SCA warrant materials under the common law, *Leopold*, 300 F. Supp. 3d at 108; *see Russell v. Harman Int'l Indus., Inc.*, 773 F.3d 253, 255 (D.C. Cir. 2014) ("A district court's" error "does not constitute reversible error if it did not *prejudice* the parties.").

5

### A. The Court Did Not Err in Concluding That SCA Warrants Are Analogous to Subpoenas Rather Than to Traditional Search Warrants.

To establish a right of access to judicial records under the First Amendment, a petitioner must show both (1) "an 'unbroken, uncontradicted history' of openness" as to the materials to which access is sought and that (2) "public access plays a significant positive role in the functioning of the proceeding." *United States v. Brice*, 649 F.3d 793, 795 (D.C. Cir. 2011) (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980)). "A new procedure that substituted for an older one" is "evaluated by the tradition of access to the older procedure." *United States v. El-Sayegh*, 131 F.3d 158, 161 (D.C. Cir. 1997).

The Court concluded that the First Amendment afforded no right of access to the judicial records at issue because the petitioners had failed to show that SCA and PR/TT materials either historically have been publicly available or may be analytically substituted for materials to which courts have recognized a First Amendment right of access. *Leopold*, 300 F. Supp. 3d at 85–91.[2] In reaching this conclusion, the Court determined that SCA warrants, § 2703(d) orders, and PR/TT orders are more analogous to subpoenas, to which no recognized First Amendment right of access attaches, than to traditional search warrants. *Id.* at 88–91.

The petitioners argue that the Court erred in concluding that SCA warrants, § 2703(d) orders, and PR/TT orders are more analogous to subpoenas than to traditional search warrants. Pet'rs' Mem. Supp. Mot. Reconsideration ("Pet'rs' Mem.") at 6, ECF No. 55.[3] Specifically, the

---

[2]    The petitioners assert that the Court erred in suggesting that "the SCA is not sufficiently 'new' to be 'evaluated by the tradition of access to' an older procedure, such as search warrants." Pet'rs' Mem. at 10 (internal citation omitted). This assertion is incorrect, as the Court did in fact evaluate SCA warrants by the tradition of access to an older procedure—namely, subpoenas. *See Leopold*, 300 F. Supp. 3d at 88–91. While expressing doubt that "SCA orders are of such recent vintage as to require analytical substitution," given that such orders have existed for over thirty years, the Court conducted such analytical substitution nonetheless. *Id.* at 34–35. The Court's skepticism as to analytical substitution's propriety thus did not prejudice the petitioners.

[3]    The petitioners posit that reconsideration of the Court's denial of the petitioners' First Amendment claim "is appropriate" because they had not previously had a "full opportunity . . . to address" the argument that "SCA search warrants, Section 7703(d) [sic] orders, and PR/TT orders are [more] analogous to subpoenas" than to

6

petitioners make the following arguments, several of which the Court previously rejected: (1) the SCA's use of the term "warrant" establishes that SCA warrants are akin to traditional search warrants, *id.* at 6, 9, 11; (2) SCA warrants do not differ sufficiently as to method of execution from traditional search warrants so as to be more like subpoenas, *id.* at 7; (3) the practical inability of a target or subject of an ongoing criminal investigation to challenge an SCA warrant prior to execution renders an SCA warrant akin to a traditional search warrant, *id.* at 7–8; and (4) a Fourth Amendment search requires a warrant, *id.* at 8. The petitioners further contend that: (5) the Court's analysis will diminish journalists' ability to resist government efforts to collect evidence in their possession relevant to a law enforcement investigation, *id.* at 12–15; (6) § 2703(d) and PR/TT order materials are more analogous to traditional search warrants than to subpoenas, *id.* at 15–16; (7) the Court failed to address the petitioners' asserted right of access to court dockets, *id.* at 17–18; and (8) the Reporters Committee has from the beginning sought real-time unsealing of docket information, *id.* at 18. These arguments are addressed in turn.

### 1. The Court Correctly Concluded That the SCA's "Warrant" Nomenclature Does Not Support a First Amendment Right of Access.

---

traditional search warrants, as the USAO had not taken that position. Pet'rs' Mem. at 3. To the contrary, the petitioners had every opportunity to address this argument in their initial memorandum, *see* Pet'rs' Mem. Supp. App. Unseal at 42–43, but instead simply assumed, without further discussion of the issue, that SCA warrants are substantively akin to traditional search warrants. That the USAO did not dispute this erroneous assumption did not deprive the petitioners of the opportunity they had in both their initial and reply memoranda to show, rather than just assume, "that SCA search warrants, Section 7703(d) [sic] orders, and PR/TT orders are analogous to" Pet'rs' Mem. at 3, traditional search warrants rather than to subpoenas. A central question in the *Microsoft* litigation, which the petitioners cite throughout their briefing, was whether an SCA warrant is more akin to a traditional search warrant or to a subpoena. *See Matter of Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp.*, 855 F.3d 53, 60 (2d Cir. 2017) (Jacobs, J., dissenting from the denial of rehearing en banc) ("The instrument functions as a subpoena though the Act calls it a warrant"); *id.* at 70 (Raggi, J., dissenting from the order denying rehearing en banc); *Matter of Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp.*, 829 F.3d 197, 214–16 (2d Cir. 2016); *id.* at 226–27 (Lynch, J., concurring); *In re Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp.*, 15 F. Supp. 3d 466, 471 (S.D.N.Y. 2014). The prominence, at every stage of the *Microsoft* litigation, of the issue of whether an SCA warrant is in substance more akin to a traditional search warrant or to a subpoena plainly put the petitioners on notice of the need to address this predicate issue in arguing that an SCA warrant is analogous to a traditional search warrant for purposes of establishing a First Amendment right of access. In short, the petitioners' failure to address this issue owes more to an incorrect assumption rather than to any lack of opportunity to do so.

7

First, the petitioners argue that the SCA's use of the term of art "warrant" in § 2703(a)

shows that Congress intended "that the public ha[ve] a First Amendment right of access to

records related to a warrant once the related investigation has come to an end." *Id.* at 6. The

Court addressed and rejected this argument in recognizing that "First Amendment analysis looks

to the substance of the government's powers rather than how an Act nominally refers to those

powers." *Leopold*, 300 F. Supp. 3d at 88 (quoting *Big Ridge, Inc. v. Fed. Mine Safety & Health

Review Comm'n*, 715 F.3d 631, 646 (7th Cir. 2013) (alterations and internal quotation marks

omitted)). To determine whether an SCA warrant is analogous to a traditional search warrant or

to a subpoena, the Court reasoned, "requires determining the procedures' degree of functional

similarity, rather than looking to labels." *Id.* As a matter of function and substance, an SCA

warrant is more like a subpoena than a traditional search warrant. *See id.* at 88–91. The

petitioners do not explain why "labels," *id.*, rather than function and substance, should govern

analysis of whether SCA warrants should "be evaluated by the tradition of access to" traditional

search warrants or subpoenas, *El-Sayegh*, 131 F.3d at 161. This is not to say the word choice on

what to call an SCA warrant is irrelevant to its substance and function. After all, "when

Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were

attached" to that term. *FAA v. Cooper*, 132 S. Ct. 1441, 1449 (2012). Thus, the language

Congress uses to describe SCA warrants may help to understand an SCA warrant's substantive

and functional content, but a label is not dispositive.[4]

---

[4]     The legislative history cited by the petitioners for the proposition "that Congress had in mind conventional search warrants when it used the term 'warrant' in the SCA," Pet'rs' Mem. at 9, shows only that Congress intended to import into SCA warrants the probable cause requirement. *See* H.R. REP. No. 99-647, at 68 (1986) ("The Committee required the government to obtain a search warrant because it concluded that the contents of a message in storage [for less than 180 days] were protected by the Fourth Amendment."); S. REP. 99-541, at 3 (1986) (describing the SCA's purpose as "to protect privacy interests in personal and proprietary information, while protecting the Government's legitimate law enforcement needs.").

As this Court previously has explained, however, Congress's purpose in using the term "warrant" in the SCA was to "import[] some—but not all—of the requirements of Rule 41, including, most importantly, the probable cause requirement." *In re Search of Info. Associated with [redacted]@gmail.com that is Stored at Premises Controlled by Google, Inc.* ("*Google*"), No. 16-MJ-00757 (BAH), 2017 WL 3445634, at *21 (D.D.C. July 31, 2017).[5]  The question here is not whether or not to respect Congress's decision to "adopt[]" into the SCA "the cluster of ideas that were attached" to the term "warrant," but rather, which particular ideas Congress intended to include in the "cluster of ideas" "adopted" into the SCA. *Cooper*, 132 S. Ct. at 1449.

Nothing in the SCA's text, structure, or legislative history suggests a congressional design to incorporate into the SCA any "understanding that the public has a First Amendment right of access to records related to a warrant once the related investigation has come to an end." Pet'rs' Mem. at 6.  Indeed, as *Google* noted, an SCA warrant provides for less public disclosure regarding government collection of information than does a traditional search warrant in at least one respect: "unlike a [traditional] search warrant, which requires that the warrant and receipt for property taken be left with 'the person from whom, or from whose premises, the property was taken,' . . . no notice to the customer is required to be given by the government when using an SCA warrant."  2017 WL 3445634, at *19 (quoting FED. R. CRIM. P. 41(f)(1)(C)).  The government, under § 2705(b), also may preclude a service provider from notifying a customer of an SCA warrant's existence, *id.*, "for such period as the court" that approved the SCA warrant

---

[5]    The petitioners fail to address *Google*'s reasoning in any meaningful way other than perfunctorily to "respectfully urge the Court to follow" the analysis of the Second Circuit's *Microsoft* ruling, Pet'rs' Mem. at 10; *see Microsoft*, 829 F.3d 197, which analysis *Google* expressly considered and rejected, *see* 2017 WL 3445634, at *5, **13–14, **18–19, **23–24.  The Court's Memorandum Opinion in this matter reached a conclusion contrary to that of *Microsoft* on the issue of whether an SCA warrant is more analogous to a traditional search warrant or a subpoena, and in so doing relied on *Google*, which expressly rejected *Microsoft*, and cited to the opinions of judges who disagreed with the reasoning of the Second Circuit's *Microsoft* ruling, as well as the opinion of the magistrate judge of the Southern District of New York that *Microsoft* reversed.  *See Leopold*, 300 F. Supp. 3d at 89.  The Court thus rejected, rather than failed to consider, *Microsoft*'s reasoning.

"deems appropriate," 18 U.S.C. § 2705(b).  A person subject to a search and seizure pursuant to a traditional search warrant is entitled to be notified of such search and seizure, while a person whose information the government obtains through an SCA warrant is not entitled to know the government has obtained such information.  *See Google*, 2017 WL 3445634, at *22 (noting the SCA's "omission of any user notification requirement").  Congress's provision of less public disclosure regarding searches and seizures conducted pursuant to SCA warrants than those conducted pursuant to traditional search warrants belies the notion that Congress, merely by employing the term "warrant," designed SCA warrants to disclose the government's collection of evidence to the same extent as does a traditional search warrant.

That an SCA warrant incorporates the probable cause standard, *see* 18 U.S.C. § 2703(a), does not make an SCA warrant more akin to a traditional search warrant, because an SCA warrant, like a subpoena, lacks those features of a traditional search warrant that necessitate the probable cause standard in the first place.  "[T]he immediacy and intrusiveness of a search and seizure conducted pursuant to a warrant demand the safeguard of demonstrating probable cause to a neutral judicial officer before the warrant issues."  *In re Subpoena Duces Tecum*, 228 F.3d 341, 348 (4th Cir. 2000).  A subpoena, in contrast, "requires the recipient of the order to turn over evidence to the government within a specified period of time" and provides *ex ante* opportunity to challenge disclosure, and so "do[es] not require probable cause" to issue.  Orin S. Kerr, *A User's Guide to the Stored Communications Act, and A Legislator's Guide to Amending It*, 72 GEO. WASH. L. REV. 1208, 1211 (2004).[6]  As this Court has explained, an SCA warrant is

---

[6]    In this regard, a subpoena provides two core elements of due process: notice and an opportunity to be heard.  *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950) ("Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.").

10

more akin to a subpoena than to a traditional search warrant as to both "method of execution and opportunity for pre-disclosure challenge," *Leopold*, 300 F. Supp. 3d at 88, in that an SCA warrant compels a recipient to hand over information rather than authorizing government agents' physical intrusion to seize it, and is subject to pre-execution challenge, *see id.* at 88–90. Thus, an SCA warrant shares neither feature of a traditional search warrant that necessitates the probable cause standard. The fact that Congress, in SCA's §2703(a), accorded the content of wire and electronic communications held by providers of electronic communication services ("ECS") or remote computing services ("RCS") heightened protection with a probable cause requirement before a government entity is authorized to compel disclosure does not otherwise render an SCA warrant more akin to a traditional search warrant than to a subpoena.

The petitioners attempt to bolster their argument by pointing to the CLOUD Act, enacted as part of the Consolidated Appropriations Act, 2018, Pub. L. 115-141. In the petitioners' view, this legislation "makes clear that Congress used 'warrant' in the SCA as a term of art." Pet'rs' Reply Supp. Mot. ("Pet'rs' Reply") at 5, ECF No. 59. Under the CLOUD Act,

> [a] provider of [ECS] or [RCS] shall comply with the obligations of this chapter to preserve, backup, or disclose the contents of a wire or electronic communication and any record or other information pertaining to a customer or subscriber within such provider's possession, custody, or control, regardless of whether such communication, record, or other information is located within or outside of the United States"

18 U.S.C. § 2713. The petitioners acknowledge the "considerable case law establishing that subpoenas apply to information stored abroad," whereas "conventional warrants . . . do not apply abroad unless a statute expressly permits it," Pet'rs' Reply at 7 (internal quotation marks omitted); *see Google*, 2017 WL 3445634, at **14–15, and argue that Congress's enactment of the CLOUD Act shows that Congress intended an SCA warrant to be akin to a traditional search warrant, because "[i]f Congress intended SCA warrants to be a type of subpoena, there would be

11

no need to pass the CLOUD Act." Pet'rs' Reply at 7; *see also id.* ("If SCA search warrants are indeed a form of subpoena, the CLOUD Act would have been superfluous."). This reasoning ignores the seemingly (but apparently not) obvious reality that Congress just as likely enacted the CLOUD Act precisely to clarify that an SCA warrant is functionally analogous to a subpoena, rather than to a traditional search warrant, because Congress feared the Supreme Court would reach a contrary (and, in Congress's view, erroneous) conclusion in the then-pending appeal from the Second Circuit of the *Microsoft* decision.[7] The CLOUD Act's enactment thus, if anything, shows that Congress intended an SCA warrant to function as a subpoena, rather than as a traditional search warrant.

### 2. An SCA Warrant's Method of Execution is More Akin to That of a Subpoena Than That of a Traditional Search Warrant.

The petitioners argue that an SCA warrant's "typical method of execution . . . does not establish that an SCA search warrant is more akin to a subpoena than to a conventional, brick-and-mortar search warrant." Pet'rs' Mot. at 7. First, the petitioners note, "brick-and-mortar search warrants *may* also require third-party compliance." *Id.* (emphasis added). This is true enough, but an SCA warrant's execution *always* requires a third-party provider's compliance, *see*

---

[7]    Certainly, prior to the CLOUD Act's enactment, the view of the vast majority of courts to consider the question of whether an SCA warrant applied to information stored overseas was directly opposite to the position advanced by the Second Circuit panel in *Microsoft*. *Compare Microsoft*, 829 F.3d at 201 (construing 18 U.S.C. § 2703(a)'s use of the term "warrant" to import traditional search warrants' domestic "territorial limitations"), *with Google*, 2017 WL 3445634, at *5 (construing 18 U.S.C. § 2703(a) to allow the government to compel production of information stored abroad); *Matter of Search of Info. Associated with [redacted]@gmail.com That is Stored at Premises Controlled by Google, Inc.*, No. 16-MJ-757 (GMH), 2017 WL 2480752, at *1 (D.D.C. June 2, 2017), *aff'd sub nom. Google* (same); *Matter of Search of Contents & Records Relating to Google Accounts*, No. 18-MC-00020, 2018 WL 942301, at *1 (S.D. Ohio Feb. 15, 2018) (same); *In re Search Warrant Issued to Google*, 264 F. Supp. 3d 1268, 1269 (N.D. Ala. 2017) (same); *In re Search Warrant No. 16-960-M-1 to Google*, 275 F. Supp. 3d 605, 606 (E.D. Pa. 2017) (same); *Matter of Search of Content Stored at Premises Controlled by Google Inc.*, No. 16-MC-80263-RS, 2017 WL 3478809, at *5 (N.D. Cal. Aug. 14, 2017) (same); *In re Search of Content That is Stored at Premises Controlled by Google*, Case No. 16–mc–80263, 2017 WL 1487625, at *1 (N.D. Cal. Apr. 25, 2017) (same); *In re Search of Premises Located at [redacted]@yahoo.com, Stored at Premises Owned, Maintained, Controlled or Operated by Yahoo, Inc.*, Case No. 17–mj–1238 (M.D. Fla. April 7, 2017) (same); *In re Information Associated with One Yahoo Email Address that is Stored at Premises Controlled by Yahoo*, Case Nos. 17–mj–1234, 17–mj–1235, 2017 WL 706307, at *4 (E.D. Wis. Feb. 21, 2017) (same); *In re Search Warrant No. 16–960–M–01 to Google*, 232 F.Supp.3d 708, 722–723 (E.D. Pa. Feb. 3, 2017) (same).

12

18 U.S.C. § 2703(a), whereas a traditional search warrant's execution does not, *see generally* FED. R. CRIM. P. 41. An SCA warrant is more analogous to a subpoena than to a traditional search warrant in this respect. Second, the petitioners note that "[a]n agent's physical presence is not precluded in the execution of an SCA search warrant." Pet'rs' Mot. at 7 (alterations and internal quotation marks omitted). This too is true enough, but a traditional search warrant's execution *always* entails a government officer's physical presence, *see* 18 U.S.C. § 3105, whereas an SCA warrant's execution does not, *see id.* § 2703(g) ("Notwithstanding section 3105 of this title, the presence of an officer shall not be required for service or execution of a search warrant issued in accordance with this chapter.").[8] An SCA warrant thus is more analogous to a subpoena than to a traditional search warrant as to method of execution.

### 3. A Target's Practical Inability to Move to Quash an SCA Warrant Prior to Execution Does Not Render an SCA Warrant Analogous to a Traditional Search Warrant.

The petitioners argue that an SCA warrant is more akin to a traditional search warrant than to a subpoena with respect to opportunity for pre-execution challenge because only the provider of ECS or RCS, not the target whose content or records are sought, typically has such opportunity as a practical matter. *See* Pet'rs' Mem. at 7.[9] The fact that the government generally

---

[8]    The petitioners' admission "that a government agent's physical presence is more often involved in the execution of a traditional search warrant than in the execution of an SCA search warrant," Pet'rs' Mem. at 7, is at best a serious understatement.

[9]    The petitioners assert that "[t]he records obtained via an SCA warrant . . . belong to the subscriber," Pet'rs' Mem. at 8, citing *United States v. Warshak*, 631 F.3d 266, 286 (6th Cir. 2010), for the proposition that a subscriber has a property interest in records the government may obtain through an SCA warrant. *Warshak*, however, merely held that a subscriber has "a reasonable expectation of privacy," not a property interest, "in the contents of an email account." *Id.* In any event, conflating property with privacy interests, as petitioners do, is analytically incorrect because ownership may be a factor in but is not the touchstone of Fourth Amendment protections. *See Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) ("More recently, the Court has recognized that 'property rights are not the sole measure of Fourth Amendment violations.'" (*quoting Soldal v. Cook County*, 506 U. S. 56, 64 (1992))); *United States v. Jones*, 565 U.S. 400, 411 (2012) ("[W]e do not make trespass the exclusive test" of reasonableness under the Fourth Amendment); *Katz v. United States*, 389 U.S. 347, 353 (1967) ("[T]he premise that property interests control the right of the Government to search and seize has been discredited." (internal quotation marks omitted)); *id.* at 360 (Harlan, J., concurring) ("[A]n enclosed telephone booth is an area where . . . a person has a constitutionally protected reasonable expectation of privacy.").

13

can prevent a target from learning of an SCA warrant's existence, and thus, from challenging the SCA warrant's execution ahead of time, through non-disclosure and sealing orders does not render an SCA warrant more akin to a traditional search warrant than to a subpoena in this respect. The recipient of the SCA warrant may nonetheless challenge compliance with the subpoena on grounds of scope or undue burden. *See, e.g.*, *Matter of Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp.*, 829 F.3d 197, 200 (2d Cir. 2016) (recognizing that an SCA warrant's recipient may move to quash); *cf.* 18 U.S.C. §2703(d) (allowing a court to modify or quash order "if the information or records requested are unusually voluminous in nature or compliance with such order otherwise would cause an undue burden on such provider.").

Further, ECS and RCS providers to whom SCA warrants are directed, like the targets themselves, have legal incentives to move to quash SCA warrants that appear defective in some regard. The SCA prohibits providers from disclosing to the government contents of or records relating to a target's electronic communications except under certain enumerated circumstances. 18 U.S.C. § 2702(a). One such circumstance is where disclosure is authorized pursuant to § 2703. *Id.* § 2702(b)(2), (c)(1). The SCA creates a cause of action under which one aggrieved by an SCA violation may sue a provider for damages, including potentially punitive damages. *Id.* § 2707(a)–(c). A provider, however, may assert "[a] good faith reliance on . . . a court warrant or order" as "a complete defense to any civil . . . action." *Id.* § 2707(e)(1).

The D.C. Circuit has not clarified the meaning of the SCA's term "good faith," but other courts have weighed in on this question. The Ninth Circuit has held "that the good faith defense under 18 U.S.C. § 2707(e) is met when the defendant complies with [SCA process] that appears valid on its face, in the absence of any indication of irregularity sufficient to put the defendant on

14

notice that the [process] may be invalid or contrary to applicable law," and did not "*actually kn[o]w* that the [process] was invalid under the applicable law." *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1180–81 (9th Cir. 2013). The Seventh Circuit, meanwhile, has held that a provider is entitled to raise the good faith exception where SCA process lacks "any indication of irregularity sufficient to put [the provider] on notice that the [SCA process] was 'phony.'" *McCready v. eBay, Inc.*, 453 F.3d 882, 892 (7th Cir. 2006); *accord John K. Maciver Inst. for Pub. Pol'y, Inc. v. Schmitz*, 885 F.3d 1004, 1010 (7th Cir. 2018). The Tenth Circuit has concluded that the SCA's good faith exception tracks that of the Fourth Amendment, *Davis v. Gracey*, 111 F.3d 1472, 1484 (10th Cir. 1997), under which an officer's reliance on a warrant defeats a motion to suppress unless the warrant was "so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers [could not] reasonably [have] presume[d] it to be valid." *United States v. Leon*, 468 U.S. 897, 923 (1984). Another court has concluded that "good faith" in the SCA context requires, among other things, "a subjective good faith belief that [one] disclosed plaintiff's subscriber information pursuant to a signed, valid warrant." *Freedman v. Am. Online, Inc.*, 325 F. Supp. 2d 638, 648 (E.D. Va. 2004) (Ellis, J.).

This case presents no need definitively to construe the SCA's good faith exception, but the point is that while a target typically will be unable to move to quash an SCA warrant prior to execution, the provider to whom the SCA warrant is directed has an incentive to move to quash an apparently defective SCA warrant—namely, to avoid the risk of civil liability—and thereby stands somewhat in the target's shoes to vindicate the target's interests in ensuring a valid SCA warrant. In fact, the Cloud Act added grounds for which the provider may seek to quash or modify "legal process" for "the contents of a wire or electronic communication" if the provider reasonably believes the customer or subscriber is not a U.S. person or resident and "the required

15

disclosure would create a material risk that the provider would violate the laws of a qualifying

foreign government." 18 U.S.C. § 2703(h)(2)(i)–(ii).

A provider's ability to move to quash, to be sure, is not a perfect substitute for a target's

ability to do the same. The question, however, is not whether an SCA warrant is identical to a

subpoena in every respect, but merely whether an SCA warrant is more like a subpoena or a

traditional search warrant. The existence of an actor—the provider to whom an SCA warrant is

directed—with both the opportunity to move to quash a seemingly-deficient SCA warrant and

incentives to do so makes an SCA warrant more akin to a subpoena than to a traditional search

warrant in this regard.[10]

### 4. That an SCA Warrant's Execution Constitutes a "Search" Does Not Render an SCA Warrant Analogous to a Traditional Search Warrant.

The petitioners argue that "[l]ike a physical search requiring a warrant, the government's

collection of the content of private communications in electronic form constitutes a search."

Pet'rs' Mem. at 8. In so saying, the petitioners appear to assume that a search warrant is the only

instrument by which the government can effectuate a Fourth Amendment search. That an SCA

warrant's execution constitutes a search within the Fourth Amendment's meaning, however,

would not establish that an SCA warrant is more analogous to a traditional search warrant than to

a subpoena, as either instrument is used to effectuate a Fourth Amendment search. "[T]he

Fourth Amendment's protection against unreasonableness" applies to "*compulsory* production of

---

[10]     The petitioners' contention that "[t]he government appears, at times, to use conventional search warrants and SCA search warrants interchangeably," Pet'rs' Mem. at 8 n.4, merely underscores the differences between SCA warrants and traditional search warrants. The petitioners assert that "records unsealed by the Reporters Committee in a separate matter illustrate that government agents used non-SCA search warrants to seize, during a physical search, computer and electronic records, documents, and materials, electronic information or data, and correspondence, emails, documents, calendar or diary entries, electronic files, contact information, or data of any kind which reflect or relate to any communications or contacts." *Id.* (internal quotation marks omitted). Of course, the very fact that those "government agents" physically "seize[d], during a physical search," the "records, documents, and materials" in question, *id.*, is precisely what distinguishes the traditional search warrants at issue there from SCA warrants, which instead compel a provider's production of information.

16

private papers," and thus, to a subpoena *duces tecum*. *Subpoena Duces Tecum*, 228 F.3d at 347 (quoting *Hale v. Henkel*, 201 U.S. 43, 76 (1906)).  "[N]o unreasonable search and seizure" occurs, however, "when a subpoena, suitably specific and properly limited in its scope, calls for the production of documents which, as against their lawful owner to whom the writ is directed, the party procuring its issuance is entitled to have produced."  *Id.* (quoting *Wilson v. United States*, 211 U.S. 361, 376 (1911) (alterations omitted)).  A subpoena "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome" thus passes constitutional muster.  *Id.* (quoting *See v. City of Seattle*, 387 U.S. 541, 544 (1967)).  As such, the petitioners' contention that "the government's collection of the content of private communications in electronic form constitutes a search," Pet'rs' Mem. at 8, is a non-sequitur with no bearing whatsoever on whether an SCA warrant is more analogous to a subpoena or to a traditional search warrant.

### 5. Any Impact the Court's Ruling Will Have on the Privacy Protection Act's Construction is Not Ground for Reconsideration.

The petitioners argue, for the first time on reconsideration, that "[t]he Court's determination that SCA search warrants are akin to subpoenas . . . . introduces troubling uncertainty into a realm of well-established existing legal protections for the news media." Pet'rs' Mem. at 12.  Under the Privacy Protection Act ("PPA"), the government may not, "in connection with the investigation or prosecution of a criminal offense, [] search for or seize" (1) "any work product materials possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication" or (2) "documentary materials . . . possessed by a person in connection with a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication," except under certain enumerated circumstances.  42 U.S.C. §

17

2000aa(a)–(b).  One such excepted circumstance is that the government may search for and seize "documentary materials, other than work product materials," otherwise subject to the PPA's protections, where "such materials have not been produced in response to a court order directing compliance with a subp[o]ena duces tecum" and "there is reason to believe that the delay in an investigation or trial occasioned by further proceedings relating to the subp[o]ena would threaten the interests of justice."  42 U.S.C. § 2000aa(b)(4)(B).  In this circumstance, "the person possessing the materials shall be afforded adequate opportunity to submit an affidavit setting forth the basis for any contention that the materials sought are not subject to seizure."  *Id.* §2000aa(c).

The petitioners contend that "[t]he Court's Opinion gives rise to uncertainty with respect to the PPA's application to SCA search warrants, which can be used by the government to obtain the contents of communications between reporters and their sources."  Pet'rs' Mem. at 14. [11] This argument is unavailing for several reasons.

First, as noted, the petitioners' previous briefing did not mention the PPA whatsoever, *see* Pet'rs' Mem. Supp. Mot. Unseal.  Thus, even if the petitioners' assertions regarding the PPA somehow amounted to reversible error, the petitioners' failure to raise this argument in their

---

[11]    The petitioners find error in "[t]he Court's Opinion, which concludes that a defining feature of a search warrant was the lack of an opportunity for pre-disclosure challenge by the target of the investigation," because this "conflicts with" the PPA, "which ensures that certain warrant targets will have an opportunity to bring a pre-disclosure challenge."  Pet'rs' Mem. at 14.  The Court recognized that "[a] traditional search warrant . . . *generally* provides the target neither prior notice of the search and/or seizure nor *ex ante* opportunity to quash."  *Leopold*, 300 F. Supp. 3d at 89 (emphasis added).  Use of the term "generally," *id.*, contemplated that unusual exceptions to this rule exist.  One such exception is 42 U.S.C. § 2000aa(c).  At the same time, the Fourth Amendment itself does not require a search warrant to provide the target pre-execution notice or opportunity to object, *see Subpoena Duces Tecum*, 228 F.3d at 348, and the PPA enumerates six distinct circumstances under which the government may search and seize otherwise-protected "work product" or "documentary materials" without providing the person possessing such materials any opportunity to challenge the search and seizure.  *See* 42 U.S.C. § 2000aa(a)(1)–(2), (b)(1)–(4)(A).  Congress, in electing to allow, under one particular circumstance, a warrant's target to challenge the warrant's execution ahead of time, has created a narrow exception to, rather than overturned wholesale, the general rule that a search warrant provides "neither prior notice of the search and/or seizure nor *ex ante* opportunity to quash."  *See Leopold*, 300 F. Supp. 3d at 89.

18

earlier briefing prevents them from doing so for the first time on a motion for reconsideration. *See Leidos, Inc.*, 881 F.3d at 217.

Second, more significantly, the petitioners' argument is not a claim of legal error, but rather, a concern about the precedential impact the Court's ruling may have in future, yet-to-be-litigated matters concerning "laws and procedures not directly at issue in this case," Pet'rs' Mem. at 12, to which the petitioner may or may not be party. The petitioners' dismay that the Court's ruling may have undesired precedential value in some future proceeding does not amount to a showing of error at all, much less a showing of "clear error or . . . manifest injustice" that the petitioners must make to obtain reconsideration. *Messina*, 439 F.3d at 758 (quoting *Firestone*, 76 F.3d at 1208).

Third and finally, it is far from clear that the PPA's procedural limits on the issuance of search warrants for information possessed by reporters, properly construed, do in fact apply to SCA warrants. The PPA was enacted in 1980, prior to the Internet's widespread usage, *see* Pub. L. 96-440, § 101, 94 Stat. 1879 (1980), and last amended in 1996, *see* Pub. L. 104–208, § 101(a), 110 Stat. 3009 (1996), "when commenters still referred to the Internet as the information super-highway," Bryan R. Kelly, *#privacyprotection: How the United States Can Get Its Head Out of the Sand and into the Clouds to Secure Fourth Amendment Protections for Cloud Journalists*, 55 WASHBURN L.J. 669, 690 (2016). Indeed, the petitioners identify no case evaluating the PPA's applicability to SCA warrants, much less holding the PPA to apply to SCA warrants, nor has the Court identified any such cases. In any event, this matter does not involve the PPA and presents no need to construe that statute.[12]

---

[12]    The petitioners argue that certain Department of Justice regulations, which contemplate prior notice to a journalist or news organization prior to a search warrant's execution, "assume[] SCA search warrants are akin to other warrants" and "make[] clear that SCA search warrants fall within the scope of the PPA." Pet'rs' Mem. at 15 (citing 28 C.F.R. § 50.10(b)(2)(ii) ("The policy also governs applications for warrants to search the premises or

19

### 6.  The Petitioners Offer No New Arguments as to Whether a First Amendment Right of Access Attaches to PR/TT & § 2703(d) Materials.

The petitioners argue that the Court erred in determining that no First Amendment right of access attaches to § 2703(d) and PR/TT orders, asserting that PR/TT and § 2703(d) orders are functionally equivalent to search warrants, which "have been 'traditionally open to public scrutiny,'" and "that the 'method of execution' of PR/TT and Section 2703(d) orders . . . does not functionally distinguish them from search warrants."  Pet'rs' Mem. at 15–16 (quoting *In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1337 (D.C. Cir. 1985)).  The Court's Memorandum Opinion, which determined that "Section 2703(d) and PR/TT orders are even less analogous to traditional search warrants than are SCA warrants, differing in both execution and applicable legal standard," already has rejected this reasoning, *Leopold*, 300 F. Supp. 3d at 91, and the Court need not rehash these reasons on a motion for reconsideration, *see Leidos, Inc.*, 881 F.3d at 217 (recognizing that a Rule 59(e) motion "may not be used to relitigate old matters").

In a last gasp effort to save their First Amendment right of access claim, the petitioners contend that "[l]ogic [] strongly supports" recognition of this right because access will (1) allow "the public" to "ensure that judges are not merely serving as a rubber stamp for the police," and (2) "enable judges to more effectively perform their oversight function when it comes to law enforcement use of PR/TT devices and Section 2703(d) orders."  Pet'rs' Mem. Supp. App.

---

property of members of the news media, pursuant to [Rule] 41; or to obtain from third-party [providers of ECS or RCS] the communications records or business records of members of the news media, pursuant to [the SCA].")).  Any position that the Department of Justice has taken on the interpretive question of whether an SCA warrant falls within the PPA's scope, and the degree of deference, if any, due to such interpretation under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), is not at issue in this matter, and the Court declines the petitioners' highly irregular insistence on litigating that question.  In any event, even if the PPA were construed not to apply to SCA warrants, nothing prevents the Department of Justice, as a matter of policy, from obtaining and executing SCA warrants only in circumstances where the PPA would allow the execution of a traditional search warrant.  In other words, even if the PPA does not by its own terms apply to SCA warrants, the Department of Justice nonetheless may elect to treat the PPA as a floor rather than a ceiling with respect to use of SCA warrants.

20

Unseal at 23–24; Pet'rs' Mem. at 11, 16.  The "logic" prong of the First Amendment right of access analysis was not previously addressed since the petitioners' failure to show a history of access to the materials at issue "preclude[d] petitioners from prevailing on their First Amendment right of access claim."  *Leopold*, 300 F. Supp. 3d at 91; *see also Brice*, 649 F.3d at 795 ("The public possesses a qualified First Amendment right of access to judicial proceedings where (i) there is an 'unbroken, uncontradicted history' of openness, *and* (ii) public access plays a significant positive role in the functioning of the proceeding." (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (emphasis added)); *Reporters Comm.*, 773 F.2d at 1332 ("[B]oth these ['history' and 'logic'] questions must be answered affirmatively before a constitutional requirement of access can be imposed.").  Indeed, *El-Sayegh* considered a petitioner's "fail[ure] to satisfy the first of the two necessary criteria for a First Amendment right of access" claim fatal to the petitioner's claim.  131 F.3d at 161.  Rather than present any new argument as to why the First Amendment affords right of access to § 2703(d) and PR/TT materials the Court has not already heard and rejected, the petitioners merely repeat arguments they already have made and insist that the Court got it wrong the first time.  This will not do at the motion for reconsideration stage.[13]  *See Leidos, Inc.,* 881 F.3d at 217.

---

[13]     In asserting that the First Amendment affords a right of access to § 2703(d) and PR/TT materials, the petitioners cite *EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996), for the proposition that "Section 2703(d) and PR/TT orders are court orders to which the public right of access has traditionally applied." Pet'rs' Mem. at 15.  This is misleading in context, as *National Children's Center* neither addressed § 2703(d) or PR/TT orders whatsoever nor involved a First Amendment right of access claim, but held that a district court abused its discretion under the *Hubbard* factors in sealing a consent decree between a federal agency and private employer. *Id.* at 1408.  *Nat'l Children's Ctr.* merely explained that "the starting point in considering a motion to seal court records is a strong presumption in favor of public access to judicial proceedings." *Id.* at 1409.  The Court's Memorandum Opinion cited *Nat'l Children's Ctr.* for this very proposition, *see Leopold*, 300 F. Supp. 3d at 80, and concluded that the common law (although not the First Amendment) affords the petitioners a qualified, prospective right of access to the judicial records at issue, *see id.* at 69.  *Nat'l Children's Ctr.* thus lends no weight to the petitioners' First Amendment right of access claim.

21

Moreover, had the Court reached the "logic" prong, the petitioners would be entitled to no access under the First Amendment greater than that to which the Court already has determined the petitioners are entitled under the common law, due to the nature of the criminal investigative materials at issue. In deciding whether logic supports a First Amendment right of access, a court asks "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enters. Co. v. Superior Court of Cal. for the Cty. of Riverside*, 478 U.S. 1, 8 (1986). "[I]t takes little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly." *Id.* at 8–9. For example, "'the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings.'" *Id.* at 9 (quoting *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979)). "[S]afeguarding the confidentiality of grand jury proceedings" serves "several distinct interests," such as "assur[ing] that persons who are accused but exonerated by the grand jury will not be held up to public ridicule." *Douglas Oil Co.*, 441 U.S. at 218–219. While the USAO's use of SCA and PR/TT surveillance authorities in the course of ongoing criminal investigations may not always, technically, be grand jury materials subject to Federal Rule of Criminal Procedure 6(e), the same considerations highlighted by the Supreme Court regarding the need for secrecy in grand jury proceedings apply to ongoing criminal investigations.

Public access to the judicial records at issue would raise real risks of disclosing personally identifiable information that could damage the reputations of persons investigated but never charged, jeopardize the safety of cooperating defendants and witnesses, and even discourage potential cooperators in the future. Public access also could compromise future investigations by revealing the existence or workings of "investigative methods and techniques, the very efficacy of which may rely, in large part, on the public's lack of awareness that the

22

USAO employs them." *Leopold*, 300 F. Supp. 3d at 107. These considerations illustrate that logic weighs against any broader right of access under the First Amendment than that which the Court already has recognized under the common law.

This conclusion is confirmed by the fact that while Congress has mandated public reporting on the use of certain surveillance authorities to facilitate oversight, those mandates are carefully circumscribed. For example, the Administrative Office of the U.S. Courts is required to publish an annual report "concerning the number of applications for orders authorizing or approving the interception of wire, oral, or electronic communications," and associated information, 18 U.S.C. § 2519(3), based on reports of judges who issued wiretap orders "that expired during the preceding year," or denied applications for such orders, *id.* § 2519(1). Notably, this reporting is for wiretap orders that have "expired" rather than are ongoing. *Id.* In addition, the Attorney General is required annually to report to Congress "on the number of pen register orders and orders for trap and trace devices applied for by law enforcement agencies of the Department of Justice," with specified associated information, *id.* § 3126, as well as on the number of accounts, with associated information, for which "emergency" voluntary disclosures by providers have been made to governmental entities, *id*. § 2702(d). The Director of the Federal Bureau of Investigation ("FBI"), must also report annually to Congress regarding the number, with associated information, of requests for subscriber and transactional records in counterintelligence investigations. *Id*. § 2709(f). No similar reporting requirements have been mandated with respect to SCA applications or orders under any provision of § 2703. Congress, in mandating reporting of certain categories of information concerning the government's use of surveillance authorities, but not SCA warrants, § 2703 orders, or active PR/TT orders in ongoing

23

criminal investigations, has voiced its judgment concerning the types of information significant

for oversight and for which disclosure serves the public interest.

### 7.  The Petitioners' Accusation that the Court Failed to Address an Asserted Right of Access to Court Dockets is False.

The petitioners assert that "that the Court erred in failing to give separate consideration to

the public's distinct First Amendment right of access to court dockets." Pet'rs' Mem. at 17.  The

Court did not "separate[ly]," *id.*, address the petitioners' particular First Amendment right of

access claim to docket information because the Court concluded that no First Amendment right

of access whatsoever attaches to any of the judicial records the petitioners seek to unseal.  *See*

*Leopold*, 300 F. Supp. 3d at 92.  This wholesale denial of petitioners' First Amendment right of

access claim reached all aspects of the records at issue and naturally encompassed any aspect of

the petitioners' claim concerning docket information.  Significantly, the Court did recognize a

prospective common law right of access to certain SCA warrant, § 2703 order and PR/TT order-

related information, to be disclosed in intervals at least six months after issuance of the legal

process when ongoing criminal investigations are more likely to be closed.  *See Leopold*, 300 F.

Supp. 3d at 94–95, 108.

### 8.  The Reporters Committee Did Not Seek Real-Time Docket Information From the Beginning.

The petitioners assert that the Court "erred as a factual matter when it found that

Petitioners did not 'from the outset' seek access to 'real-time docket information' on a forward-

looking basis."  Pet'rs' Mem. at 18 (quoting *Leopold*, 300 F. Supp. 3d at 94).  The petitioners

argue that the Reporters Committee has always sought real-time disclosure of docket information

for government applications under SCA's §§ 2703(a) and (d), and for PR/TT orders.  *See id.*

While petitioners may now wish to re-write the history of this litigation, the record is clear.  The

very first document the Reporters Committee filed in this matter was a motion to intervene

24

expressing the Reporters Committee's intent to seek unsealing of "records relating to applications for court orders for the use of electronic surveillance tools in investigations *that are no longer active*," as well as "public access to dockets and docket entries concerning applications and orders for the use of *such* tools."  Reporters Comm.'s Unopposed Mot. Intervene, Attach. 1, Mem. Pts. & Auths. at 13, ECF No. 16-1 (emphasis added).  The Court granted the Reporters Committee's motion the next day, *see* Minute Order, dated Aug. 18, 2016, and the Reporters Committee immediately filed an application "to unseal all applications and supporting documents . . . seeking" SCA warrants, § 2703(d) orders, and PR/TT orders, "as well as any court orders granting or denying any [such orders], in connection with any investigation *that is no longer active*," as well as to make public "dockets and docket entries reflecting *such* applications and orders."  Reporters Comm.'s Appl. at 1 (emphasis added). Based on a plain reading of these papers, the Reporters Committee's request was understood to be limited to "*such* applications and orders" appearing in "*no longer active*" criminal investigations.  To seek unsealing of docket information only in closed investigations is of course logically inconsistent with seeking real-time unsealing of such information, as the USAO only applies for, and the Court only grants, surveillance orders in active, ongoing investigations.

Any ambiguity in the records sought to be unsealed was resolved by the petitioners reiterating over the litigation's course that they sought relief only as to closed investigations. *See, e.g.*, Hr'g Tr. at 26:16–17 (Dec. 19, 2016), ECF No. 31 ("[W]e understand the open investigations issue, and we have stayed away from it."); *id.* at 23:3–5 (reiterating that the petitioners do not seek to "expos[e] an ongoing investigation" and have "limited [thei]r requests to closed investigations"); *id.* at 26:4, 16–17 (asserting that "we understand the open investigations issue, and we have stayed away from it," including with respect to "docket

25

sheets"). The Reporters Committee thus limited, from its very first filings in this matter, the unsealing of docket information it sought to closed criminal investigations. In any event, even had the Reporters Committee sought real-time disclosure of docket-information from the outset, the common law would afford no right of access to such information in light of the significant administrative burden, which the Court has detailed at length, *see Leopold*, 300 F. Supp. 3d at 97–99, that would attend the process of redaction to avoid impinging on personal privacy or revealing information that would jeopardize related ongoing investigations.

Significantly, the petitioners cite no case law whatsoever recognizing any entitlement to real-time unsealing of the type and magnitude of information the petitioners seek. *United States v. Appelbaum* (*In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D)*), which the petitioners repeatedly cite in support of their First Amendment right of access claim, rejected a "challenge to the docketing procedures in the Eastern District of Virginia," holding that "there is no First Amendment right of access to § 2703(d) proceedings," and thus that "district courts [need not] publicly docket each matter in the § 2703(d) context." 707 F.3d 283, 295 (4th Cir. 2013); *see also id.* (describing the petitioners' demand as "uncharted waters").[14]

---

[14]    In a similar vein, the petitioners assert that the Court failed to consider the petitioners' request for docket information from PR/TT applications the USAO filed in 2017. *See* Pet'rs' Mem. at 22. This too is incorrect. The Court identified "a prospective right of access . . . to certain categories of information, which will be disclosed on a periodic basis, regarding the total number of PR/TT . . . applications filed by the USAO, the number and type of accounts that such applications target, the names of the providers to which these applications are directed, and the primary criminal offense under investigation for these applications." *Leopold*, 300 F. Supp. 3d at 108. Pursuant to this right of access, the Court has unsealed a list of all PR/TT applications that the USAO filed during the first nine months of 2017, *see* Order & Notice, ECF No. 1, *In re Disclosure of Pen Registers From Jan. 1, 2017 Through Sept. 30, 2017*, 18-mc-61 (Apr. 30, 2018) (Howell, C.J.), which list is identical in kind to the PR/TT docket information the Court previously has unsealed during this litigation, *see* Order & Notice to the Parties, Attachs. A–C, Lists of Misc. Case Nos. for PR/TT Appls. & Orders Filed in 2008–2010 by USAO, ECF Nos. 37-1, 37-2, 37-3; Order & Notice to the Parties, Attachs. A–E, Lists of Misc. Case Nos. for PR/TT Appls. & Orders Filed in 2011, 2013–2016 by USAO, ECF Nos. 32-1, 32-2, 32-3, 32-4, 32-5; Order & Notice to the Parties, Attach. A, List of Misc. Case Numbers for PR/TT Appls. & Orders Filed in 2012 by USAO ("2012 PR/TT List"), ECF No. 22-1. A similar list covering the remaining months in 2017 will be unsealed in due time. Thus, the petitioners are incorrect to say that the Court did not consider the petitioners' request for docket information as to PR/TT applications that the USAO filed in 2017, and, even if this request were not resolved in the context of this litigation, the unsealing of PR/TT docket information already accomplished renders this request moot.

26

\*     \*     \*

In sum, the petitioners have identified no error in the Court's analysis of their asserted

First Amendment right of access to the surveillance materials at issue, and thus are not entitled to

reconsideration in this regard.  *See Messina*, 439 F.3d at 758.

### B.  The Court Properly Weighed the Administrative Burden the Petitioners' Requested Retrospective Relief Would Impose.

To establish a right of access to judicial records under the common law, a petitioner must

show that "the public's interest in disclosure" outweighs "the government's interest in keeping

the document[s] secret."  *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897, 902

(D.C. Cir. 1996) (internal quotation marks omitted).  In undertaking this analysis, courts weigh

six "generalized" factors, enumerated in *United States v. Hubbard*, as well as any relevant

"particularized" factors," to determine "the precise weight to be assigned . . . to the always strong

presumption in favor of public access to judicial proceedings."  650 F.2d 293, 317 (D.C. Cir.

1980).  The six generalized *Hubbard* factors are "(1) the need for public access to the documents

at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has

objected to disclosure, and the identity of that person; (4) the strength of any property and

privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6)

the purposes for which the documents were introduced during the judicial proceedings."  *Metlife,*

*Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 665 (D.C. Cir. 2017) (quoting *EEOC v.*

*Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996)).

The Court concluded that five of the six generalized *Hubbard* factors weigh in favor of

some limited right of access to SCA warrant, § 2703(d) order, and PR/TT order materials, but

that the significant administrative burdens on the USAO and Clerk's Office that would attend

retrospective access to these materials constituted a "particularized" factor, *Hubbard*, 650 F.2d at

27

322–24, weighing against recognition of a retrospective right of access. *Leopold*, 300 F. Supp. 3d at 97–103. The Court further concluded that the common law afforded the petitioners a limited prospective right of access to certain categories of information regarding SCA warrant, § 2703(d) order, and PR/TT order materials, to be disclosed on a periodic basis. *Id.* at 103–07. The Court's recognition of a prospective right of access rested in significant part on administrative and operational changes to the filing and processing of sealed government surveillance applications that the USAO and Clerk's Office recently adopted, pursuant to a Memorandum of Understanding, that significantly ease the administrative burdens that limited, forward-looking unsealing of surveillance materials would entail. *Id.* at 108.

The petitioners argue that the Court erred in weighing, under *Hubbard*, the administrative burden that recognizing a retrospective right of access would entail, and assert that considering administrative burden under *Hubbard* will disadvantage members of the public seeking to access judicial records without conserving judicial resources. Pet'rs' Mem. at 21. For the reasons that follow, these arguments are unpersuasive.

### 1. The Court Did Not Err in Recognizing Administrative Burden as a Cognizable Factor Under *Hubbard*.

The petitioners find error in the Court's consideration of the administrative burden that compliance with the petitioners' requested retrospective relief would impose on the USAO and Clerk's Office. Pet'rs' Mem. at 19.[15] The petitioners argue that "to the extent courts can

---

[15]    The petitioners object to the Court's characterization of their request for unsealing as "across-the-board" and giving rise to an "all-or-nothing situation," complaining that such descriptions are "inaccurate[.]" Pet'rs' Mem. at 21 (citing *Leopold*, 300 F. Supp. 3d at 101, 103). As the Court's Memorandum Opinion made clear, the petitioners' request for unsealing sought "access to extracted information from USAO-initiated PR/TT matters and § 2703(d) docket information in closed matters filed over a nine-year period." *Leopold*, 300 F. Supp. 3d at 101. The Court noted the petitioners' own contention, asserted through multiple declarations, that "access to less than one hundred percent of USAO-initiated PR/TT matters would have little to no value, and in fact might be worse than useless by yielding incomplete and misleading information." *Id.* at 61; *see also id.* at 59–61 (collecting declarations through which the petitioners asserted that unsealing extracted information from less than 100% of PR/TT matters for a given year would produce no useful information and in fact might yield misleading results); Pet'rs' Mem.

28

consider interests beyond the six enumerated factors identified by the D.C. Circuit in *Hubbard*, those interests must be connected to the content of the records at issue," *id.*, but cite no authority to support this claim.  Instead, they only note *Hubbard*'s instruction that "the potential for prejudice inherent in the documents' release must be assessed with specific reference to the documents' contents," 650 F.2d at 323 n.116, which language they say "makes clear that the countervailing interests sought to be protected by sealing in a given case must be connected to the contents of the specific records at issue," Pet'rs' Mem. at 20.  This language, however, applies only where the particularized interest weighing against disclosure is in fact "the potential for prejudice inherent in the documents' release," *Hubbard*, 650 F.2d at 323 n.116, not where, as here, the particularized interest weighing against disclosure is something different altogether.  In this regard, *Hubbard*'s very next line clarifies that "[t]he possibility of prejudice is [] *another* 'particularized' interest which may be asserted to deny public access." *Id.* (emphasis added).  This language's natural import is that particularized interests that can weigh against unsealing are not limited to prejudice potentially stemming from release of the document's contents.

Indeed, *Hubbard* instructs courts to weigh "the particularized privacy *or other* interests that" a "defendant may assert" to oppose unsealing, without defining or limiting in any way which "particularized . . . other interests" a court may consider.  650 F.2d at 323.  The Court previously explained this point, *see Leopold*, 300 F. Supp. 2d at 82 & n.19 ("*Hubbard* makes clear . . . that a court also must consider such particularized interests as specific contexts make relevant," and "that privacy interests are not the only type of particularized interest a court may

---

Supp. App. Unseal at 37 ("Because information from a non-statistically significant 10% sampling of PR/TT matters will not, among other things, allow journalists or the public to identify trends or identify non-routine requests, Petitioners respectfully request the following relief, which is necessary for the public to gain meaningful insight into the sealed PR/TT matters filed by the USAO in this District.").  While the petitioners' tactic to urge the unsealing of extracted information from "one hundred percent" of the sealed matters at issue, rather than some lesser sampling amount, may have backfired by creating an unduly burdensome "all-or-nothing situation," petitioners cannot be heard now to complain that the Court inaccurately described the petitioners' litigation position.

29

consider in evaluating a motion to unseal."), and the petitioners identify no flaw in the Court's

reasoning. The petitioners' contention that the administrative burden that would attend large-

scale unsealing is not a cognizable interest under *Hubbard* simply finds no support in that or any

other opinion.[16]

The petitioners emphasize that "the purpose for which the documents at issue were

introduced," Pet'rs' Mem. at 23, is the "single most important element" of *Hubbard* analysis.

650 F.2d at 321. While the Court recognized that this factor weighs in favor of disclosure, *see*

*Leopold*, 300 F. Supp. 3d at 96–97, since the purpose for which documents were introduced

bears heavily on whether to recognize a common law right of access at all, this factor bears less

heavily on the precise scope of the right of access to be recognized. There is no inconsistency in

concluding that the important purpose the materials at issue play in judicial proceedings counsels

for a right of access, and that the administrative burden that would attend retrospective unsealing

counsels for a purely prospective scope to that right of access. Furthermore, the purpose the

materials at issue serve do not weigh so heavily in favor of disclosure as the petitioners seem to

think. SCA warrants, § 2703(d) orders, and PR/TT orders enable the government to collect

information in the course of an ongoing criminal investigation. Pre-indictment criminal

investigations require secrecy to function, so as to curb "the risk that those about to be indicted

would flee" or spoliate evidence and assure that persons exonerated by the investigation, or who

---

[16]    The petitioners highlight that in *Metlife*, the D.C. Circuit instructed the district court to "[a]pply *Hubbard* to the records in this case," which consisted of over two thousand pages of documents, because "the district court is best suited to conduct that analysis given its considerable familiarity with those records." 865 F.3d at 675–76. This case is inapposite since there, the party seeking to retain records under seal made no argument that administrative burden weighed against disclosure, and so the D.C. Circuit did not consider, much less reject, such argument. *See generally id.*; *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (internal quotation marks omitted)). In fact, the district court in *Metlife* did not apply the *Hubbard* factors at all, having concluded erroneously that a federal statute superseded the *Hubbard* test. *See Metlife*, 865 F.3d at 675. The *Metlife* panel, moreover, made a point of declining to direct the district court's *Hubbard* analysis. *Id.* at 676.

assist the government as cooperating witnesses, "will not be held up to public ridicule." *Douglas Oil Co.*, 441 U.S. at 219. For these reasons, the purpose that the materials at issue serve lean only narrowly toward disclosure under *Hubbard*, and then only toward a limited amount of disclosure with respect only to closed investigations.

The petitioners say that "administrative burden may be asserted in every case in which a member of the public seeks to unseal records to which the common law right of access applies." Pet'rs' Mem. at 20; *accord id.* at 24–25 ("[A]dministrative burden is conceivably present in every case where a member of the public seeks access to sealed judicial records."). This is true enough, but the weight a court will assign such concern will correspond to the volume of documents a petitioner seeks to unseal. Where petitioners seek to unseal "specific documents," *Leopold*, 300 F. Supp. 3d at 101, the administrative burden that attends unsealing may be slight, and so will not weigh heavily on a court's *Hubbard* analysis. Where, in contrast, petitioners seek to unseal "wholesale categories of sealed matters filed over an almost decade-long period," *id.*, the administrative burden such unsealing will entail appropriately may weigh more heavily in a court's *Hubbard* analysis. The petitioners say that "[t]reating administrative burden as a *Hubbard* factor would make the public's ability to obtain access to judicial records dependent not on the content of the particular records at issue, but rather on the type (or extent) of relief sought in a particular case." Pet'rs' Mem. at 20. This is correct. Where the type of record sought to be unsealed requires careful review prior to unsealing to ensure that information properly retained under seal is not disclosed, and where the volume of the materials sought be unsealed amplifies the burden that undertaking such review will impose on a party and/or the Court, *Hubbard* properly allows a court to cognize such burden in weighing a motion to unseal. *See* 650 F.3d at 323.

31

On this point, as the Court has noted, *Leopold*, 300 F. Supp. 3d at 101, the only judicial

decisions involving similarly broad unsealing requests cited by either party denied such requests

on the ground of administrative infeasibility. *See In re Sealed Case*, 199 F.3d 522, 524, 526

(D.C. Cir. 2000); Order Den. Mot. Unseal Docs. & Publicly Docket Ct. Rs. at 1–3, *In re Jennifer

Granick & Riana Pfeffkorn* ("*Granick* Order"), No. 16-mc-80206-KAW (N.D. Cal. June 23,

2017). The petitioners' silence as to these decisions reflects that their position—that

considerations of administrative burden cannot tip the scales against unsealing—is not tenable.[17]

The petitioners are critical that the Court's Memorandum Opinion "marks the first time

that a court has found that the administrative burden of unsealing is an appropriate factor to

consider when balancing the public's interest in disclosure against competing interest under

*Hubbard*." Pet'rs' Mem. at 24. This criticism is misleading to the extent the petitioners suggest

that courts do not weigh administrative burden in resolving requests to unseal.

_____

[17]    *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 97 (2d Cir. 2004), which the petitioners now cite, for the first time, for the proposition that "courts have corrected systemic denials of the public's rights of access to judicial records notwithstanding associated administrative burden," Pet'rs' Mem. at 24, is not to the contrary. *Pellegrino* recognized "a qualified First Amendment right of access to docket sheets" in "thousands of cases where sealing procedures prohibited court personnel from allowing the public to access the files in those proceedings and, in certain comparatively rare instances, from acknowledging the existence of these cases altogether." 380 F.3d at 86, 102. *Pellegrino* is distinguishable on two grounds. First, the dockets at issue involved civil and criminal matters, rather than pre-indictment investigatory matters, such as "grand jury proceedings," which *Pellegrino* acknowledged "function properly only if kept secret." *Id.* at 96; *see also id.* ("The only decision denying a First Amendment right to public docketing concerned grand jury proceedings, which the Supreme Court has emphasized are entitled to a presumption of secrecy."). The public's interest in transparency as to civil and criminal cases, *cf.* U.S. CONST. amend. VI (guaranteeing a "public trial"), does not extend to pre-indictment investigative matters, which require secrecy to function properly, *see Pellegrino*, 380 F.3d at 96. *Pellegrino* thus did not confront the need to prevent inadvertent disclosure of materials properly left under seal to protect individuals' privacy or related ongoing criminal investigations. Second, the government never contended that administrative burden counseled against recognizing such a right of access, and so *Pellegrino* never passed upon such an argument. *See Cooper Indus.*, 543 U.S. at 170.
        The petitioners also cite *United States v. Valenti*, which held that the U.S. District Court for the Middle District of Florida's maintenance of a "sealed docket in criminal cases" was "inconsistent with affording the various interests of the public and the press meaningful access to criminal proceedings." 987 F.2d 708, 710, 715 (11th Cir. 1993). Specifically, the petitioners cite *Valenti*'s rejection of the government's assertion "that this court should avoid binding the district court to any formal procedure that is unduly burdensome." Pet'rs' Mem. at 24 (citing *Valenti*, 987 F.2d at 715). Like *Pellegrino*, however, *Valenti* involved criminal cases, not pre-indictment criminal investigative matters, as to which significant law enforcement, public safety and privacy interests counterbalance the public's interest in transparency.

32

As the Court previously has explained, *In re Sealed Case* held the district court did not abuse its discretion in concluding that "mandatory public docketing of grand jury ancillary proceedings . . . . would be unduly burdensome." 199 F.3d at 525–26; *see also Leopold*, 300 F. Supp. 3d at 101 (citing and analyzing *In re Sealed Case*). *In re Sealed Case* further recognized that "administrative burdens [can] justif[y] the denial of across-the-board docketing." *Id.* at 527. The D.C. Circuit thus has acknowledged that considerations of administrative burden can justify denial of broadly-sweeping requests to unseal. Likewise, as the Court previously has explained, the petitioners in *Granick* sought "the unsealing of the docket sheets of all sealed criminal miscellaneous cases filed between January 1, 2006 and December 31, 2011." *Granick* Order at 1. *Granick* held that such "request for wholesale unsealing is not practicable, as each case needs to be evaluated on an individual basis to ensure that unsealing is permissible." *Id.* at 2–3; *see also Leopold*, 300 F. Supp. 3d at 101 (citing and analyzing *Granick*). The petitioners fail to acknowledge, much less explain away, either *In re Sealed Case* and *Granick*.

The petitioners thus are incorrect to the extent they assert that courts do not consider administrative burden in resolving broad requests to disclose materials maintained under seal.

### 2. Negative Practical Consequences Will Not Attend Recognition of Administrative Burden as Cognizable Under *Hubbard*.

The petitioners argue that recognizing administrative burden as a cognizable factor under *Hubbard* will have two "significant practical implications that both disadvantage members of the public seeking to assert their right of access to judicial records and run counter to any goal of conserving judicial resources." Pet'rs' Mem. at 21. First, the petitioners argue that allowing courts to "deny the public access to judicial records . . . based upon the type or extent of access that is sought . . . will shift the burden to members of the public to attempt to identify the exact right amount of access that a court will not deem too administratively burdensome for the

33

Government." *Id.* This is correct. A petitioner seeking access to dockets maintained under seal must be mindful that an overly-broad request for unsealing may impose on the Clerk's Office and/or USAO such undue administrative burden as to weigh against disclosure under *Hubbard*. This does place on the petitioner some responsibility to exercise good judgment in deciding the scope of unsealing to seek, especially where, as here, the judicial records to be unsealed require careful, page-by-page review prior to disclosure to ensure that no information properly left under seal inadvertently is disclosed, so as to protect ongoing investigations and the considerable privacy interests of potential subjects or targets of criminal investigations that may not have resulted in any formal charges. To require a petitioner to contemplate the possibility that an overly-burdensome request for unsealing may be denied does not amount to legal error.

Second, the petitioners argue that allowing courts to deny requests for unsealing that pose undue administrative burden "will also incentivize future petitioners to file multiple petitions, each seeking a different, limited form of access, in the hopes of satisfying what is an entirely unclear standard for determining what level of public access to judicial records is low-burden enough to be available under the common law." Pet'rs' Mem. at 21. This assumes courts will turn a blind eye toward such transparent gamesmanship. Nothing in *Hubbard* compels courts to indulge such tactics, of course. A court reviewing a petition for access to sealed judicial records properly may consider, under *Hubbard*, the access to such records already granted through other, notionally separate petitions, as well as the administrative burden that granting each notionally separate petition collectively may impose on the Clerk's Office and government.

Finally, the petitioners describes the Court's conclusion as holding "that administrative burden to the Government outweighs the public's common law right of access with respect to the specific relief sought by Petitioners as to SCA Search Warrant, Section 2703(d), and PR/TT

34

matters."  Pet'rs' Mem. at 25.  This characterization is inaccurate, suggesting the Court concluded that the public in fact has a retrospective common law right of access to the surveillance materials the petitioners seek to unseal, and that considerations of administrative burden "outweigh[ed]" this right of access.  *Id.*  That is not what the Court said.  Rather, the Court recognized that under *Hubbard*, a court may consider administrative burden in deciding whether to recognize any right of access in the first place, not that such a right of access exists but nonetheless gives way to countervailing considerations.  *See Leopold*, 300 F. Supp. 3d at 103 ("[T]he common law right of access does not entitle the petitioners to any additional retrospective relief."); *see also id.* at 108 ("No retrospective right of access is recognized, in consideration of the significant administrative burdens that retrospective disclosure would impose on the Clerk's Office and USAO.").

Similarly, the petitioners' assertion that "the Court's recognition of administrative burden as a new *Hubbard* factor will allow violations of the public's common law right of access so long as those violations are broad and systemic enough to be administratively challenging to remedy," Pet'rs' Mem. at 24, is predicated on a misunderstanding of the Court's decision.  First, as explained above, administrative burden is not a new *Hubbard* factor, but one *Hubbard* has always allowed a court to weigh.  *See* 650 F.2d at 323 (instructing courts to weigh "the particularized privacy *or other* interests that" a "defendants may assert" to oppose unsealing (emphasis added)).  Second, also as explained above, cognizing administrative burden under *Hubbard* will not "allow violations of the public's common law right of access" to go unremedied, as a court may conclude that no asserted common law right of access exists in the first place where recognizing such right of access would impose undue administrative burdens.

### C.  The Court Appropriately Identified the Factual Findings Supporting a Conclusion that the Common Law Affords No Additional Retrospective Relief.

35

Finally, the petitioners argue that the Court failed "to make on-the-record factual findings in support of its determination that the Government made the requisite showing to overcome the public's presumptive right of access to all of the SCA Search Warrant, Section 2703(d), and PR/TT Materials at issue in this case." Pet'rs' Mem. at 22. This is incorrect. The Court has already identified, in great detail, the practical challenges that attend the wide-scale unsealing of sealed surveillance applications and associated materials, including, most significantly, the high degree of individual review of each page of each document proposed to be unsealed, which is needed to ensure that confidential information properly retained under seal is not inadvertently disclosed.

The Court found that "completing the extraction process for one hundred percent of PR/TT matters that [the USAO] initiated between the years 2008 through 2016, minus the twenty-four 2012 PR/TT applications from which information has already been extracted, would take" between 720 and 788 hours, the latter figure amounting to "nearly 33 days working around the clock nonstop, or nearly twenty 40-hour workweeks." *Leopold*, F. Supp. 3d at 98. "Complying with such a mandate," the Court found, "would divert significant amounts of valuable AUSA time and resources." *Id.*

The Court further found that unsealing "§ 2703(d) matter docket information . . . would impose similarly significant resource burdens on the Court and Clerk's Office by consuming substantial amounts of staff time—in particular, time necessary to ensure that information properly left under seal is not inadvertently disclosed." *Id.* The Court found that "assembling lists of historical § 2703(d) matters would require multiple Court and Clerk's Office staff members to scrutinize meticulously every entry on each page of every list released to purge these lists of any information bearing on personal identification or law enforcement investigative

36

concerns," and that "[c]ompleting this painstaking process of examination and redaction for the PR/TT Lists took several Court and Clerk's Office personnel days to complete." *Id.* at 99. As the Court explained, "[t]he lack of standardized case names or captions on applications and orders filed during the relevant nine-year period makes this task particularly challenging, as these captions have sensitive information bearing on personal identification peppered throughout." *Id.*

The fact that § 2703(d) captions were standardized only recently, prior to which "such captions not infrequently would reference not § 2703(d) itself but only 18 U.S.C. § 2705(b), the SCA's delayed notice provision," moreover, means that "providing accurate and comprehensive § 2703(d) docket information would require carefully reviewing each § 2705(b) application that the USAO had filed to ascertain whether the application actually pertained to non-disclosure of a § 2703(d) order, a task fraught with peril given that § 2705(b)'s nondisclosure provision is available for both § 2703(d) orders and to grand jury subpoenas, which reveal 'matter[s] occurring before the grand jury' and therefore are protected by Rule 6(e)'s secrecy protections." *Id.* (quoting FED. R. CRIM. P. 6(e)(2)). "Ensuring that disclosure of § 2703(d) materials would not inadvertently reveal confidential grand jury matters," the Court found, "would require Court and Clerk's Office staff to undertake additional manual, time-consuming review." *Id.* The Court found that while administrative changes to the USAO's filing and the Clerk's Office's docketing of PR/TT and § 2703(d) orders will minimize such practical challenges going forward, "such administrative burdens are unavoidable as to disclosure of docket information concerning historical . . . applications." *Id.*

Finally, the Court considered "the amount of information already publicly disclosed during the course of this litigation," including "(1) the total numbers of USAO-filed PR/TT matters during the period of 2008 through 2016; (2) the total numbers of § 2703(d) and SCA

37

warrant matters, retrieved using certain search criteria, filed by the USAO and DOJ components during this period; (3) certain docket information concerning PR/TT matters the USAO initiated during this period; (4) over 100 pages of redacted documents from four representative sample PR/TT matters from 2012; and (5) fifteen categories of extracted information from a representative sample of ten percent of USAO-filed PR/TT matters from 2012." *Id.* at 100. These disclosures, the Court found, "have already provided an unprecedented level of transparency into the process of judicial review of the USAO's use of PR/TT and SCA authorities to collect evidence in criminal investigations, and enables the petitioners to inform and educate the public." *Id.*

In sum, the Court has amply identified the factual findings supporting a conclusion that the common law affords no additional retrospective relief. Based on these extensive findings, no need is presented to clarify the Court's Memorandum Opinion or Order "to set forth the specific factual findings upon which" the Court reached that conclusion. Pet'rs' Mem. at 25.

## IV.    CONCLUSION

For the foregoing reasons, the petitioners' motion for reconsideration is denied. An appropriate Order accompanies this Memorandum Opinion.

**Date:** August 16, 2018

_____
BERYL A. HOWELL
Chief Judge

38

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF JASON LEOPOLD TO UNSEAL CERTAIN ELECTRONIC SURVEILLANCE APPLICATIONS AND ORDERS. | Misc. Action No. 13-mc-00712<br><br>Chief Judge Beryl A. Howell |

## <u>ORDER</u>

Upon consideration of petitioner Jason Leopold's Petition to Unseal Records, ECF No. 1, and petitioner Reporters Committee for Freedom of the Press's Application to Unseal and for Other Appropriate Relief, ECF No. 18 (collectively "petitions"), the related legal memoranda in support of and opposition to these petitions, the exhibits and affidavits attached thereto, and the entire record herein, for the reasons set out in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the petitions are GRANTED in part and DENIED in part; and it is further

**ORDERED** that the Clerk's Office shall, on a prospective basis, periodically publish certain docket information regarding applications filed by the U.S. Attorney's Office for the District of Columbia ("USAO") for orders authorizing installation of Pen Register/Trap and Trace devices, orders pursuant to 18 U.S.C. § 2703(d), and warrants pursuant to 18 U.S.C. § 2703(a)-(b), to the extent such applications are filed by the USAO electronically, as authorized by the Memorandum of Understanding ("MOU") between the USAO and Clerk of Court, dated September 14, 2017, and updates thereto, and LCrR 49(e)(4); and it is further

**ORDERED** that such publication shall disclose, consistent with the relief requested by the petitioners, the total number of USAO-electronically filed applications, the captions for such

applications, the case numbers assigned to such applications, the dates such applications were

filed, and the assigned Magistrate Judge; and it is further

**ORDERED** that the petitions are DENIED in all other respects.

**SO ORDERED.**

*This is a final and appealable order*.

Date: February 26, 2018

_____
BERYL A. HOWELL
Chief Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE APPLICATION
OF JASON LEOPOLD TO UNSEAL
CERTAIN ELECTRONIC SURVEILLANCE
APPLICATIONS AND ORDERS.

Misc. Action No. 13-mc-00712

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

Invoking both the First Amendment and common law rights of access to judicial records, Jason Leopold, an investigative journalist, and the Reporters Committee for Freedom of the Press initially petitioned the Court to unseal almost twenty years of sealed government applications, and related orders, to obtain information about, and the contents of, electronic communications in criminal investigations now closed. *See generally* Pet. Unseal Records ("Pet."), ECF No. 1; Appl. to Unseal and for Other Appropriate Relief ("Intervenor's Pet."), ECF No. 18. These petitions commenced a constructive effort among the petitioners, U.S. Attorney's Office for the District of Columbia ("USAO"), and Clerk of this Court to consider mechanisms for allowing greater transparency in the judicial review process for such applications and orders, while maintaining the secrecy of information implicating both legitimate individual privacy and law enforcement interests, and navigating the practical difficulties posed by evolving internal technological tools and administrative practices within the USAO and the Clerk's Office for processing and docketing these records. The parties' commendable willingness to work together, in good faith, to identify areas of common ground and compromise has substantially narrowed the legal dispute and resulted in a largely collaborative rather than an acrimonious litigation. For the reasons set out below, the petitions are granted in part and denied in part.

1

## I.     BACKGROUND

This is not the only court with a significant volume of sealed government surveillance

records on secret dockets that remain inaccessible to the public.[1]  The progress of this litigation

is outlined in some detail because the lessons learned and issues confronted inform the relief

available, and may be instructive to other courts confronting similar issues.

Jason Leopold, a journalist currently employed by BuzzFeed News, filed a petition in

July 2013 to unseal government applications and related orders for the following types of

statutorily authorized surveillance: "pen registers, trap and trace devices [collectively "PR/TT

devices"], tracking devices, cell site location, stored email, telephone logs, and customer account

records from electronic service providers, except for those which relate to an ongoing

investigation."  Pet. at 1; *see also* Gov't's Resp. to Pet. ("Gov't's Resp.") at 1, ECF No. 10.[2]

These records, along with the docket numbers assigned by the Clerk's Office and docket sheets

identifying all documents filed on each docket for such matters, typically remain under seal

indefinitely.  In view of this fact, Leopold also sought a list of all docket numbers, in closed

investigations, associated with government applications and orders relating to PR/TT devices and

the compelled disclosure of electronically stored communications and records, pursuant to the

Stored Communications Act, 18 U.S.C. § 2701 *et seq.* ("SCA").  Pet. at 4.  In addition to this

retrospective relief in the form of unsealing docket numbers and PR/TT and SCA materials in

---

[1]     This case is not the first occasion this Court has taken steps to facilitate greater transparency regarding sealed material. *See, e.g.,* Memorandum & Order, *In re Search Warrant for E-Mail Account [redacted] Maintained on Computer Servers Operated by Google, Inc., Headquartered At 1600 Amphitheatre Parkway, Mountain View, Calif.*, 946 F. Supp. 2d 67, 69 (D.D.C. May 22, 2013) (Lamberth, C.J.) (announcing creation of a new page on the Court's website "where all search warrants and arrest warrants will be publicly available after execution, unless a separate sealing order is entered to redact all or portions when the government makes the [requisite] showing . . . .").
[2]     Leopold was employed by Vice News and was a regulator contributor to Al Jazeera English at the time he filed his petition.  Pet. at 1–2; Pet'rs' Suppl. Mem. Supp. Pet. ("Pet'rs' Mem.") at 5, ECF No. 47.

2

closed criminal investigations, Leopold requested prospective relief in the form of a presumptive 180-day expiration date for all sealing or non-disclosure orders for such materials, extendable for ongoing investigations or in exceptional circumstances. *Id.* at 5.

In response to the petition, the USAO acknowledged, in December 2013, "that applications and orders relating to electronic surveillance methods need not necessarily be permanently sealed." Gov't's Resp. at 2. Nonetheless, asserting that the requested relief was overbroad, the USAO identified several obstacles to the wholesale unsealing and disclosure that Leopold sought. *Id.* at 2–3. First, the USAO could not provide a complete list of docket numbers associated with all PR/TT and SCA applications and/or orders filed in this Court because other components of the U.S. Department of Justice ("DOJ"), applied for and obtained such surveillance orders, without USAO involvement. *Id.* at 2. Second, limiting the requested unsealing to "closed" investigations posed administrative burdens in (1) identifying the appropriate USAO personnel and law enforcement officials to verify the status of the investigation, and, (2) where an aspect of an investigation was closed, assessing whether the need for secrecy remained due to concerns over witness safety, national security, or jeopardizing ongoing investigations growing out of closed investigations. *Id.* at 2–3. Third, the USAO criticized the petition's suggested protocol of a presumptive 180-day expiration date for sealing and non-disclosure orders as "arbitrary on its face," as that presumptive limit gave short shrift to the interests justifying the initial sealing and unduly cabined judicial discretion, in conflict with governing statutes. *Id.* at 3.

While taking no position on whether the First Amendment or common law established a right of access to the materials at issue, the USAO pointed out, correctly, that "the decision whether, and if so how, to establish a protocol to identify more accurately, track, and ultimately

3

terminate sealing orders is a matter that falls within the administrative responsibility of this

Court," and offered, as an institutional litigant, to "assist the Court in whatever manner the Court

might deem appropriate towards the aim of formulating appropriate guidelines" in this area. *Id.*

at 2–3 nn.2–3.

Nothing more transpired in this matter for over two years, until the matter was reassigned

to the undersigned in March 2016.[3] At subsequent status hearings, Leopold's counsel clarified

that the petition sought no personally identifying information concerning investigative targets,

Hr'g Tr. ("May 2016 Tr.") at 9:5–25, 10:1–21 (May 4, 2016), ECF No. 20; Hr'g Tr. ("June 2016

Tr.") at 9:14–17 (June 24, 2016), ECF No. 21, and agreed, at the Court's suggestion, to limit the

scope of requested relief to only those PR/TT and SCA applications filed by the USAO, June

2016 Tr. at 12:2–5, 9.

The USAO provided additional detail on the practical challenges presented by the

petition, some of which, ironically, were exacerbated by the limitations agreed to by Leopold. In

particular, determining whether the USAO or a different DOJ component had filed a PR/TT or

SCA application would be challenging, as the USAO maintained no lists of docket numbers for

PR/TT and SCA matters initiated by USAO prosecutors, and because the USAO's internal

tracking system for criminal investigations did not correspond to the Miscellaneous ("MC")

docket numbers assigned by the Clerk's office. June 2016 Tr. at 12:15–22.[4] Moreover, even the

---

[3]    During this period, Leopold moved for the appointment of a special master, Leopold's Mot. Appoint. Special Master, ECF No. 11, which motion was withdrawn in June 2016, *see* Hr'g Tr. ("June 2016 Tr.") at 5:3 (June 24, 2016), ECF No. 21.

[4]    Until January, 2018, the Clerk's Office used four case types to docket new matters: civil cases were then and still are docketed with a "CV" case number; criminal cases initiated by indictment or information were then and still are docketed with a "CR" case number; search warrants filed pursuant to Federal Rule 41 of Criminal Procedure, criminal complaints and associated arrest warrants, misdemeanor informations, and financial affidavits filed pursuant to the Criminal Justice Act, were docketed with a "Magistrate Judge" or "MJ" matter number; and various types of civil, bankruptcy, grand jury and criminal investigative matters were docketed with a

4

USAO lacked access to the sealed MC dockets and, thus, could not determine which PR/TT and SCA applications were filed by the USAO or a different DOJ component or the status, as open or closed, of the investigations in connection with which those applications were filed. *Id.* at 12:23–25, 13:1–5.

While acknowledging that the petition was "quite broad," *id.* at 5:24, Leopold's counsel explained that the relief sought would reveal changes over time in the types of surveillance requests the government made pursuant to particular statutory authorities, as well as the government's evolving legal arguments in support of particular surveillance applications, citing, as an example, the government's argument that 18 U.S.C. § 2703(d) allowed the government to obtain historical cell cite data. May 2016 Tr. at 12:7–15; *see also* June 2016 Tr. at 6:2–3 (describing petition's "overall goal" as enabling the public "to understand the use of and justification for [PR/TT] and [§] 2703(d) orders."). Similarly to the USAO, Leopold expressed willingness "to work with the Court to narrow it down to the things that we're specifically interested in." June 2016 Tr. at 5:24–25, 6:1.

The Court directed the parties to propose a future course and, given the breadth of relief

---

"Miscellaneous" or "MC" matter number. *See, e.g.*, LCvRs 40.3(a)(1) n.1 & 57.10(a)(1) n.3 (describing "miscellaneous cases" to include "(a) actions to perpetuate testimony as in Rule 27, Federal Rules of Civil Procedure; (b) actions to enforce administrative subpoenas and summonses; (c) proceedings ancillary to an action pending in another district; (d) supplementary proceedings brought in aid of execution; (e) motions for return of property in criminal proceedings; and (f) requests for judicial assistance."); LCvR 40.3(c)(2)(iii) ("[A]ny motion relating to a bankruptcy case or proceeding (including . . . any motion for a writ of mandamus or prohibition) (which motion shall be assigned a miscellaneous case number)"); LCrR 6.1 ("A motion or application filed in connection with a grand jury subpoena or other matter occurring before a grand jury, all other papers filed in support of or in opposition to such a motion or application, and all orders entered by the Court in connection therewith, shall be filed under seal" and "assigned a Miscellaneous case number."); LCrR 17.2 ("When any papers are filed by a non-party opposing closure [in a criminal case], the matter shall be assigned a Miscellaneous docket number"); LCrR 57.6 ("Any news organization or other interested person, other than a party or a subpoenaed witness, who seeks relief relating to any aspect of the proceedings in a criminal case shall file an application for such relief in the Miscellaneous Docket of the Court."); DCt.LBR 5011-1(d) (assigning MC number to emergency bankruptcy matters). In January, 2018, the Clerk's Office adopted new case types to designate grand jury and criminal investigative matters, as described in more detail *infra* Part II.D.

5

the petitioners sought, to refine the scope of Leopold's request to "a manageable time period

where we have records that are electronic and so more easily accessible to review and to track."

*Id.* at 18:13–15. [5]  In addition, the parties were directed to identify any "information the parties

would need from the Court to help facilitate moving forward."  *Id*. at 18:16–18.  The Reporters

Committee for Freedom of the Press moved to intervene soon thereafter, *see* Reporters Comm.'s

Unopposed Mot. to Intervene ("Mot. Intervene"), ECF No. 16, which motion was granted,

Minute Order, dated Aug. 18, 2016.[6]

---

[5]     The Case Management/Electronic Case Filing system ("CM/ECF system") is an electronic filing system that allows attorneys "to open new civil cases, and file civil, criminal, and miscellaneous pleadings (including some sealed documents) electronically right from their office." *Electronic Case Filing & Court Records*, U.S. DISTRICT COURT, DIST. OF COLUMBIA, http://www.dcd.uscourts.gov/ECFCR (last visited Feb. 20, 2018).  CM/ECF is used across the federal judiciary to give "the courts a way to easily manage these files electronically," *Electronic Filing (CM/ECF)*, U.S. COURTS, http://www.uscourts.gov/courtrecords/electronic-filing-cmecf (last visited Feb. 20, 2018), and to provide attorneys and the public "[c]ase information, including the docket sheet and the filed documents, . . . from locations other than the courthouse," *FAQs: Case Management / Electronic Case Files (CM/ECF)*, U.S. COURTS, http://www.uscourts.gov/courtrecords/electronic-filing-cmecf/faqs-case-management-electronic-case-files-cmecf (last visited Feb. 20, 2018).

        The Administrative Office of the U.S. Courts first developed CM/ECF in 1996 "for use in the [U.S. District Court for the] Northern District of Ohio to help the court deal with an onslaught of asbestos litigation and the massive amount of paperwork associated with it."  Tanya White Cromwell, *Electronic Case Filing Saves Space, Time, Improves Access to Documents*, KAN. CITY BUS. J. (May 2, 2003, 11:00 PM CST), https://www.bizjournals.com/kansascity/stories/2003/03/03/focus3.html.  After pilot programs were conducted in a handful of district courts, the system began to be rolled out nationwide to federal district courts in 2001 and 2002, soon followed by federal appellate courts in 2005.  Daniel T. Fenske, *E-Filing in Federal Courts: How to Avoid Common Mistakes*, 17 PRETRIAL PRAC. & DISCOVERY 4, 4 (2009).  According to information obtained from the Clerk's Office, this Court implemented CM/ECF for use in public civil cases in 2003, and in public criminal cases in 2005.  Today, all federal district, bankruptcy, and appellate courts, except the U.S. Supreme Court, use the CM/ECF system.  ADMIN. OFFICE OF THE U.S. COURTS, NEXT GENERATION OF CM/ECF: ADDITIONAL FUNCTIONAL REQUIREMENTS GROUP FINAL REPORT 1 (Feb. 27, 2012).  The Clerk's Office has further advised that this Court began to use CM/ECF for the docketing in sealed cases of sealed government applications and orders in criminal investigative matters in 2008.  New functionality added to the CM/ECF system allowed sealed documents to be docketed electronically on CM/ECF by the Clerk's Office on otherwise public civil dockets in 2009, and on public criminal dockets in 2011. In November 2013, the CM/ECF system in this Court was further enhanced to allow the electronic docketing by attorneys of sealed documents in otherwise public civil and criminal cases, with access to the sealed docket entries limited to court personnel and designated parties.

[6]     The Reporters Committee is "an unincorporated nonprofit association of reporters and editors dedicated to safeguarding the First Amendment rights and freedom of information interests of the news media and public." Intervenor's Pet. ¶ 2.  The Reporters Committee sought (1) retrospectively, to unseal applications, supporting materials, and orders concerning PR/TT devices and warrants or orders, issued pursuant to the SCA, requiring disclosure of contents or records of electronic communications, and (2) prospectively, to place all such materials on the Court's public docket, or else to unseal them after an appropriate period of time.  *Id.* ¶ 1.  Leopold and the Reporters Committee collectively are "the petitioners."

The parties' efforts to narrow the issues then progressed in three overlapping phases: (1) the unsealing and public release by the Clerk's Office of docket numbers and limited docket information for PR/TT and certain SCA matters filed during an agreed-upon range of years; (2) the unsealing and public release by the USAO of redacted PR/TT applications and orders from a sampling of such matters filed in 2012, in order to assess both the burdens of redacting and unsealing the requested records and the value of the information yielded; and (3) the extraction by the USAO of agreed-upon categories of information from ten percent of PR/TT matters filed in 2012, and the unsealing and public release of that extracted information. Each phase is described further below.

### A.    The Court Unseals Docket Numbers and Limited Docket Information for PR/TT and Certain SCA Applications and Orders.

As summarized in a series of joint status reports, the parties agreed upon the steps required to begin identifying the PR/TT and SCA applications and orders at issue. While declining to limit the scope of their requests for ultimate relief, the petitioners agreed to limit the unsealing immediately sought to PR/TT matters that the USAO initiated in 2012 "[f]or purposes of this stage of the litigation." First Joint Status Report ("1st Jt. Rpt.") ¶ 2, ECF No. 19. The USAO, in turn, agreed to "produce to petitioner a representative sampling of redacted applications for the year 2012," though the petitioners "declined to agree to a representative sampling." *Id.* ¶ 2. The parties requested that the Clerk's Office prepare a list of the docket numbers for PR/TT matters that the USAO initiated in 2012, and explained that the USAO would then file a motion to partially unseal the dockets for these PR/TT matters for the limited purpose of obtaining and using this list of docket numbers to match them with the relevant

7

internal USAO criminal investigation files. *Id.* ¶¶ 3–4.[7] Once an actual investigation was

identified, the USAO would then determine which Assistant U.S. Attorney ("AUSA"), law

enforcement agent, and law enforcement agency had been assigned to that investigation, and

query whether a particular PR/TT matter concerned a pending, closed, or related pending

investigation. *Id.* ¶ 5. After a determination of the status of an investigation, the USAO would

move to unseal partially any PR/TT matter that the USAO could verify related to a closed

investigation and was irrelevant to any pending investigation, for the limited purpose of

obtaining certified copies of the PR/TT application and order as well as any other pleadings filed.

*Id.* ¶ 6. The USAO would then review such partially unsealed documents to determine whether

cause nonetheless existed to maintain the PR/TT matter under seal and, if not, what redactions

would be necessary prior to unsealing. *Id.* The USAO would redact personal identifying

information and the factual basis for each investigation, but disclose the statutory violation under

investigation. *Id.*

> The USAO noted that this process
>
> could take some time, inasmuch as the identification of the broader investigation
> that is implicated by a particular pen register application may not always be evident
> from the document itself, and in some instances those agents and Assistants with
> knowledge of the relevant investigation may have since been transferred or may no
> longer be employed with the government.

*Id.* ¶ 5. Indeed, determining whether an investigation is pending, closed, or related to a pending

investigation may itself "require consultation and coordination with various internal databases

and other jurisdictions." *Id.* Despite the "problem" posed in verifying the status of an

---

[7]    The Clerk's Office ascertained from review of CM/ECF dockets for sealed MC and MJ matters that the Clerk's Office could identify which PR/TT applications had been filed by the USAO rather than by other DOJ components only through manual review of each PR/TT matter's docket. 1st Jt. Rpt. ¶ 3.

investigation, the USAO acknowledged that most PR/TT applications filed in 2012 likely related to investigations that were closed. Hr'g Tr. ("Sept. 2016 Tr.") at 5:20–22, 8:22 (Sept. 16, 2016), ECF No. 23. Recognizing that "it is impossible to determine how long this process could take with respect to all [PR/TT] pleadings for 2012," the parties agreed that the USAO would initially produce a small number of redacted 2012 PR/TT applications and orders. 1st Jt. Rpt. ¶ 7; *see also* Sept. 2016 Tr. at 1–3 (reaffirming the parties' intent to proceed initially with the unsealing of three PR/TT matters from 2012). "The exercise of locating, redacting and producing these documents," the parties said, "should provide insight . . . regarding the work entailed" and inform the scope and form of any further disclosure to follow. 1st Jt. Rpt. ¶ 7. The parties agreed to confer once the USAO had released redacted materials from three 2012 PR/TT matters to determine how to proceed from there. Sept. 2016 Tr. at 20:15–16, 21:1–13.

The Court agreed to the parties' request to unseal MC docket numbers for PR/TT matters that the USAO initiated in 2012. *Id.* at 4:6–13. To re-focus the parties on prospective relief, the Court also instructed the parties to advise whether a docketing system similar to that implemented in the U.S. District Court for the Eastern District of Virginia would provide the petitioners meaningful prospective relief in the form of limited public information about PR/TT and § 2703(d) matters. *Id.* at 11:15–25, 12:1–25, 13:1–9, 16:22–24.[8]

---

[8]    The U.S. District Court for the Eastern District of Virginia maintains what is known as the "EC" ("electronic communications") docket, which is "a 'running list' that is publicly available from the [U.S. District Court for the Eastern District of Virginia's] clerk's office." *United States v. Appelbaum* (*In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D)*), 707 F.3d 283, 288 (4th Cir. 2013). The EC docket "indicates all assigned case numbers, the date of assignment, the presiding judge, and whether the case is sealed" for PR/TT and SCA applications under 18 U.S.C. § 2703(d), and "lacks individual docket entries for all types of documents filed in each case and the dates of such entries." *Id.* The USAO has indicated that the Eastern District of Virginia's EC docket reveals to the public some information that relates to open investigations, but "doesn't seem to put anybody in danger," and that a similar docketing system's implementation in this jurisdiction would be "acceptable." Hr'g Tr. ("Dec. 2016 Tr.") at 10:8 (Dec. 19, 2016), ECF No. 31.

9

Shortly thereafter, the Court provided Notice to the parties of the unsealing of a 53-page

list of 235 matter numbers, most of which were MC numbers, for all PR/TT matters that the

USAO initiated in 2012, along with limited docket information (*i.e.,* the matter caption, dates of

the application's filing and entry onto the docket, the application's caption, and the application's

CM/ECF case type). *See* Order and Notice to the Parties, Attach. A, List of Misc. Case Numbers

for PR/TT Applications and Orders Filed in 2012 by USAO ("2012 PR/TT List"), ECF No. 22-

1.[9]  With the unsealing and release of this PR/TT matter docket information, the USAO was

directed to undertake the proposed sampling process to which the parties had agreed. *See* Order

and Notice to the Parties, ECF No. 22.[10]

The parties subsequently jointly proposed, as an "initial step in the process for addressing

sealed original [PR/TT] matters filed by the USAO in other years," that the Clerk's Office

compile lists of all PR/TT matters that the USAO filed in the years 2008 through 2011, and 2013

through 2016. Third Joint Status Report ("3rd Jt. Rpt.") ¶ 9, ECF No. 27; *see also* Fourth Joint

Status Report ("4th Jt. Rpt.") ¶ 3, ECF No. 28 (petitioners agreeing to limit earliest year for

PR/TT applications and orders to 2008); Hr'g Tr. ("Dec. 2016 Tr.") at 10:10–15 (Dec. 19, 2016),

ECF No. 31 (USAO withdrawing objection to petitioners' request for PR/TT matters lists

through 2016). In separate Notices filed in February and April, 2017, the Court granted this

request and provided the parties unsealed matter numbers for USAO-initiated PR/TT matters and

orders in the years 2008 through 2011 and 2013 through 2016, along with limited docket

---

[9]      The 2012 PR/TT List refers for each matter to a date "Entered," *see generally* Order and Notice, which date
is when the PR/TT application was entered on the docket.

[10]      Notably, the 2012 PR/TT List revealed that PR/TT applications filed in 2012 had been assigned
inconsistent CM/ECF case types: some applications had been docketed using the "MC" case type, others using the
"Complaint" ("CMP") case type, and others using the "Order" case type. *See generally* 2012 PR/TT Lists. The
Clerk's Office overcame this lack of administrative uniformity by searching the local CM/ECF dockets for the term
"Pen Register" and the relevant statutory authority in the application caption.

information (*i.e.*, the matter caption, dates of the application's filing and entry onto the docket, the application's caption, and the application's CM/ECF case type). *See* Order & Notice to the Parties, ECF No. 32; *id.*, Attachs. A–E, Lists of Misc. Case Nos. for PR/TT Appls. & Orders Filed in 2011, 2013–2016 by USAO, ECF Nos. 32-1, 32-2, 32-3, 32-4, 32-5; Order and Notice to the Parties, ECF No. 37; *id.*, Attachs. A–C, Lists of Misc. Case Nos. for PR/TT Appls. & Orders Filed in 2008–2010 by USAO ECF Nos. 37-1, 37-2, 37-3 (collectively, with 2012 PR/TT List, "PR/TT Lists"). These lists identified the USAO as having initiated the following numbers of PR/TT matters in each year: 329 in 2008; 244 in 2009; 231 in 2010; 284 in 2011; 310 in 2013; 209 in 2014; 217 in 2015; and 189 in 2016. *See* PR/TT Lists. Thus, lists of USAO-initiated PR/TT matters, with limited associated docket information, were released for nine years, 2008 through 2016, and reflected a total of 2,248 USAO-initiated PR/TT matters, not counting any extensions. *Id.*

The parties also requested access, similar to that for PR/TT matters, to lists of sealed matters regarding USAO applications for disclosure of electronic communications records, pursuant to 18 U.S.C. § 2703(d), for the years 2008 through 2016. Sixth Joint Status Report ("6th Jt. Rpt.") ¶ 20, ECF No. 36. This request was denied, "due to the myriad challenges, and resultant burden, of compiling such a list." Order & Notice to the Parties at 2, ECF No. 40. First, due to "the lack of uniform captions or textual form used for these records," which led to inconsistent docketing "on the [CM/ECF] system for these records," accurate identification of § 2703(d) matters was challenging and time-consuming. *Id.* In fact, the effort to compile a list of over eight hundred § 2703(d) matters for the year 2016 had taken the Clerk's Office over one month. *Id.* Second, determining whether the USAO or another entity had filed a § 2703(d) application would require review of individual dockets, "a time-consuming task given the

11

number of [matters] potentially subject to such review." *Id.* Third, determining whether §

2703(d) materials implicated grand jury subpoenas, to which obligations of secrecy attach under

Rule 6(e) of the Federal Rules of Criminal Procedure, likewise would require time-consuming

review of individual dockets. *Id.* at 3. Fourth, "these and other challenges may be exacerbated

for earlier years based upon the Clerk's Office staff experience compiling the previously issued

PR/TT lists." *Id.*

In response to the Court's practical concerns over compiling lists of § 2703(d) matters,

the parties proposed, through a joint status report, that the Clerk's Office conduct targeted

searches that "would alleviate any need . . . to manually open and review dockets." Seventh

Joint Status Report (7th Jt. Rpt.") ¶ 15, ECF No. 41. The parties specifically requested that the

Clerk's Office search for matters (1) corresponding with CM/ECF's § 2703(d) designated event

type, regardless of whether accompanied by an application for delayed notice pursuant to 18

U.S.C. § 2705(b) or filed by the USAO or a different DOJ component, and (2) responsive to a set

of five defined search terms likely to capture SCA warrant applications, pursuant to 18 U.S.C. §

2703(a) and (b) (there being no designated CM/ECF case or event type for SCA warrant

materials). *Id.* ¶¶ 13–14.[11] The parties acknowledged that any lists generated by such searches

likely "would be under-inclusive," but asserted "that use of these search terms would be

substantially effective and significantly reduce [the] burden on the Clerk's Office." *Id.* ¶ 15.

The parties "respectfully request[ed] as an initial matter that the Clerk's Office run the searches

described above to generate a total number of matters for each [type] of materials," so as to

---

[11]     The five search terms that the parties believed "would be highly likely to capture SCA Search Warrant
Materials" are: "a. *INFORMATION ASSOCIATED WITH*; b. *EMAIL ACCOUNT*; c. *E-MAIL
ACCOUNT*; d. *USER ID*; e. *COMPUTER SERVERS*." 7th Jt. Rpt. ¶ 14.

"allow the parties to understand the volume of Section 2703(d) and SCA Search Warrant matters at issue." *Id.* ¶ 16.

The Court provided the parties with the total number of matters responsive to the above-described searches, with the significant caveats that such numbers could be under-inclusive by not capturing all SCA matters initiated by the USAO and other DOJ components, and may also reflect double-counting of § 2703(d) matters "since applications for § 2703(d) orders filed in more than one year in the same Miscellaneous matter will result in the same matter being counted in more than one year." *See* Notice to the Parties ("Section 2703(d) Notice") at 2, ECF No. 43; Notice to the Parties ("SCA Warrant Notice") at 2, ECF No. 45. Specifically, the number of § 2703(d) matters responsive to the searches and filed in the following years were: 2008 – 80; 2009 – 55; 2010 – 136; 2011 – 90; 2012 – 64; 2013 – 160; 2014 – 334; 2015 – 581; 2016 – 1,136. Section 2703(d) Notice.[12] The number of SCA warrant matters responsive to the parties' suggested searches and filed in the following years were: 2008 – 0; 2009 – 68; 2010 – 121; 2011 – 152; 2012 – 164; 2013 – 131; 2014 – 107; 2015 – 252; 2016 – 271. SCA Warrant Notice. Thus, the total approximate number, over the relevant nine year period, of § 2703(d) matters was 2,636, and SCA warrant materials was 1,266.

### B. The USAO Produces Redacted Materials From Four PR/TT Matters Using Sampling Process.

Following the Court's unsealing and release of the 2012 PR/TT List, the USAO reviewed the list to match each docket number with the USAO's internal investigative file, using the target

---

[12]     The Clerk's Office calculated these numbers by tabulating, for each year, "the total number of Miscellaneous matters connected to three event [types] in CM/ECF, namely (1) Application for Order Pursuant to 18 U.S.C. § 2703(d); (2) Application for an Order Pursuant to 18 U.S.C. § 2703(c)(1)(B) & 2703(d); and (3) Application for Historical Cell Site Information for a Telephone Number." Section 2703(d) Notice.

13

telephone or account number, and then identified the AUSA assigned to the matter, a process that took several days. Gov't Status Report ¶ 2, ECF No. 24. Upon completing that review, the USAO selected a representative sampling of ten PR/TT matters assigned to AUSAs still employed by the USAO, and contacted each AUSA to determine whether, in the AUSA's view, a PR/TT matter could be unsealed, in part or whole. *Id.* In determining whether a PR/TT matter could be unsealed, "the AUSAs first retrieved and reviewed paper and/or electronic files, and, in some instances, consulted with the law enforcement agents and/or their supervisors." *Id.* The USAO ultimately determined that four of the ten sample PR/TT matters could be unsealed with redactions, but lacked sufficient information to make an informed determination on unsealing as to the other six matters. *Id.* The USAO then moved to unseal in part those four matters for the limited purpose of obtaining certified copies of all documents filed in each docket, which motions the Court granted. *Id.* ¶ 3; Minute Order, dated October 31, 2016 (granting USAO motions to unseal in part 12-MC-12, 12-MC-129, 12-MC-227, and 12-MC-397 for limited purpose). The USAO received certified copies of the documents filed in each of the four PR/TT matter dockets soon thereafter, and provided the documents to each matter's assigned AUSA for review and to propose redactions. Gov't Status Report ¶ 4.

The USAO then moved to unseal in part the four PR/TT matters, *see* Second Joint Status Report ¶ 2, ECF No 25, with uniform redaction of personally identifiable information, such as names, addresses, and telephone or account numbers, as well as details about the underlying criminal investigations, *see* 3rd Jt. Rpt. ¶ 3; *see* Minute Order, dated Dec. 2, 2016 (directing USAO to move to unseal the four PR/TT matters under review and propose any needed redactions). The Court granted these motions and placed redacted copies of the documents for the four sample PR/TT matters on the public docket in this matter. *See* Notice to the Parties,

14

Attach. A, Unsealed & Redacted Filings in Matter No. 12-MC-12, ECF No. 26-1; *id.*, Attach. B, Unsealed & Redacted Filings in Matter No. 12-MC-129, ECF No. 26-2; *id.*, Attach. C, Unsealed & Redacted Filings in Matter No. 12-MC-227, ECF No. 26-3; *id.*, Attach. D, Unsealed & Redacted Filings in Matter No. 12-MC-397, ECF No. 26-4 (collectively "Sample PR/TT Materials"). These redacted filings amount to 127 pages overall, and covered both original PR/TT applications and extension applications. *See* Sample PR/TT Materials.

The redacted PR/TT materials, stripped of identifying information about the individual or underlying criminal activity under investigation, revealed that the USAO's PR/TT applications largely used the same language to describe (1) the service provider from whom the USAO sought to compel production, (2) the scope of legal authority sought, (3) the need for such authority, (4) the steps the USAO would take in exercising that authority, including technical assistance to be required of the service provider, and (5) a request for sealing. *See generally id.* The parties expressed disagreement as to the significance of the information that the sample PR/TT matter materials revealed. The USAO described the materials as "substantially similar and reveal[ing] largely boilerplate information," and argued that any additional information that unsealing all of the remaining 2012 PR/TT matters might yield would have little value to the public relative to the significant "expendi[ture of] judicial and prosecutorial resources" that such broad unsealing would entail. 3rd Jt. Rpt. ¶¶ 4, 7. Consequently, the USAO proposed instead to undertake the same sampling process used for the ten PR/TT matters in 2012 for a representative sample of PR/TT applications in other years. *Id.* ¶ 7.

The petitioners, meanwhile, continued to insist that all PR/TT materials in closed investigations filed by the USAO be unsealed, subject to categorical redaction of personal or

15

criminal investigation identifying information, "on a mutually agreeable schedule." *Id.* ¶ 8.[13]

The petitioners described the unsealed sample materials as "substantively of interest to the[m], and the press and public more generally," given that the materials "reveal[ed], among a number of other things, the carriers involved in each matter, as well as the fact that in two of the four matters the government repeatedly sought extensions of the court's authorization to use a [PR/TT] device." *Id.* ¶ 5.

### C.    The USAO Extracts Categories of Information from Sealed PR/TT Matters.

At a status conference, in December 2016, to address the apparent impasse between the parties regarding the scope of unsealing records on the 2012 PR/TT List, the USAO described several practical challenges associated with the unsealing and redaction process used with respect to the four sample PR/TT matters.  Dec. 2016 Tr. at 11:15–25, 12:1–5.  The USAO explained that roughly half of the AUSAs who had filed particular PR/TT applications in 2012 no longer worked at the USAO, and that those AUSAs still employed had difficulty matching PR/TT applications with particular docket numbers, given that the USAO's internal tracking system organizes files using internal reference numbers different from the docket number assigned by the Clerk's Office to a particular matter.  *Id.* at 11:15–24. The USAO represented that it was "rethinking" how it maintains its own files to facilitate more easily the matching of Miscellaneous matter numbers to the internal USAO investigative file, but that "[w]e're not there yet." *Id.* at 12:3, 11.[14]  Further, the process of partially unsealing a PR/TT matter to identify its

---

[13]    The petitioners declined to "concede that the[se] categorical redactions are warranted or permissible in any individual matter," but agreed not to "challenge the propriety of redactions made by the government" so as "to facilitate the prompt unsealing of all of the electronic surveillance materials at issue that the government agrees should be unsealed." 3rd Jt. Rpt. ¶ 8.

[14]    As described *infra* Part II.D, this issue has now been addressed by the USAO's adoption of the use of templates that include the internal USAO reference number on sealed PR/TT and SCA-related applications.

16

initiating AUSA "was just too time consuming," *id.* at 12:4, particularly since the USAO was required to obtain physical copies of docket materials, as the USAO lacked electronic access to such sealed materials, *id.* at 33:1–21, and the redaction process was "painstaking" to ensure protection of all personally identifiable information and details about an underlying criminal investigation, *id.* at 20:14–24.[15]

In response to these practical concerns about the "painstaking" unsealing and redaction process the USAO had used with respect to the four sample 2012 PR/TT matters, the Court suggested that the USAO use an "extract[ion]" process as a "simple[r] . . . alternative" going forward. *Id.* Under this approach, the parties would identify particular categories of information contained in PR/TT materials that the USAO would extract and provide to the petitioners. *Id.* Extracting information from PR/TT materials not only would consume less of the USAO's time than an unsealing and redaction process, but would minimize the possibility of inadvertent disclosure of information properly kept under seal, such as personally identifying information. *Id.* at 24:1–7. The parties agreed in principle to consider and confer about such an extraction process. *Id.* at 37:23–25, 38:1–7. In response to the USAO's concern about accessing PR/TT materials electronically, the Court agreed to allow the USAO to access such sealed materials electronically. *Id.* at 33:22–25, 34:1–11. In addition, the Court proposed that the petitioners limit the scope of their request for unsealing and disclosure to materials that the USAO had filed electronically through CM/ECF, and urged the parties to confer as to the scope of potential prospective relief. *Id.* at33:22–25, 34:1–17, 35:15–18, 21–22, 25, 36:1.

---

[15]    As to the latter concern, the Court suggested that the USAO adopt templates for PR/TT applications and proposed orders that located all personally identifying information in uniform paragraphs within, rather than scattered throughout, the documents. Dec. 2016 Tr. at 16:15–23. Such templates have recently been adopted by the USAO. *See infra* Part II.D.

17

The parties soon advised that they would use the Court's proposed extraction method

going forward as an alternative to the unsealing and redaction process the USAO had used with

respect to the four sample 2012 PR/TT matters. 4th Jt. Rpt. ¶¶ 4–7. In addition, the parties

reached three agreements regarding the scope of the petitioners' requests. First, the petitioners

"agreed to limit their request for the unsealing of [PR/TT] matters to those matters filed by the

USAO" from 2008 to the present, as earlier-filed PR/TT matters are not "electronically stored

and retrievable." *Id.* ¶ 3.[16] Second, the USAO agreed to the unsealing or partial unsealing of

two narrow categories of PR/TT materials—(1) PR/TT applications, along with related filings,

that had been denied by judicial order, and (2) any substantive judicial opinions or orders entered

in connection with a PR/TT application. *Id.* ¶ 4. Third, the parties "agreed, in principle," that

the Court should create a public docketing system, modeled largely on the Eastern District of

Virginia's "EC" docket, that would provide limited public information about sealed matters,

including PR/TT matters. *Id.* ¶ 8. The USAO expressed "willing[ness] to engage in . . .

discussions to help facilitate implementation of this type of system," and observed "that any

change to the manner in which sealed matters are docketed would be greatly aided if the

government were permitted to file sealed matters electronically," rather than in paper form, as

then-existing policy required. *Id.*

The parties did not agree, however, on two issues: first, they failed to agree on the

categories of information the USAO would extract, but pledged to "continue to discuss and

attempt to reach an agreement on what categories of information can be extracted," and, second,

they disagreed on whether the USAO would extract information from a ten percent sample or

---

[16]      In a subsequent joint status report, the parties clarified that "the present" referred to the year 2016. *See*
Fifth Joint Status Report (5th Jt. Rpt.") ¶ 3, ECF No. 30.

from all PR/TT matters for each year. *Id.* ¶¶ 5, 6.

The parties soon reached a general agreement that the USAO would extract fifteen specific categories of information from some or all of the sealed PR/TT dockets: (1) Case Number, (2) Docket Number, (3) Date Executed, (4) Date Docketed, (5) Type (original or extension application), (6) Order Accompanied By Opinion (yes, no, or not applicable), (7) Number of Pages, (8) Signed By (AUSA or Magistrate Judge name), (9) Device Type, (10) Statutory Violation(s), (11) Agency, (12) Service Provider, (13) Number of Target Email Addresses / Phone Numbers / Addresses, Etc., (14) Other Statutory Authority, And If So, What (e.g., Section 2703(d)), and (15) Other Requests, And If So, For What (e.g., Cell Site Data) (collectively "extracted information"). Fifth Joint Status Report ("5th Jt. Rpt.") ¶ 5, p.6 tbl., ECF No. 30. Notwithstanding this broad agreement, however, the parties continued to disagree on three points: whether (1) the USAO would provide names of AUSAs who had initiated PR/TT applications; (2) the USAO would redact the statutory violation at issue where such information is deemed "particularly sensitive," with reservation of the petitioners' "right to challenge the redaction of any information in the chart [that the USAO] provided;" and (3) the USAO would extract information from ten percent or all of the sealed PR/TT matters. *Id.* ¶¶ 5–8.

The parties' three disagreements were resolved through Court rulings the following week. Specifically, the Court ruled that the USAO was not required to: (1) extract the names of AUSAs who had initiated particular PR/TT applications, Hr'g Tr. ("Feb. 2017 Tr.") at 21:24–25, 28:7–20, 42:18 (Feb. 17, 2017), ECF No. 34; (2) reveal the underlying statutory violations being investigated, when such information was sensitive and could potentially disclose or affect an ongoing investigation, subject to the petitioners' right to challenge any such withholding as to particular matters, *id.* at 22:13 – 25, 23:9–13; or (3) extract information from all sealed PR/TT

19

matters—rather, the USAO would be required to extract information from only ten percent of matters, at least initially, although the petitioners could later seek additional extraction should the extraction process turn out to be less burdensome than the USAO anticipated, *id.* at 45:14–18.

The USAO completed the extraction process and provided the petitioners an extraction chart for ten percent of PR/TT matters filed by the USAO in 2012, for a total of 24 PR/TT matters.  6th Jt. Rpt., Ex. A, Extraction Chart, ECF No. 36.  The USAO asserted that completing the extraction process for the 2012 PR/TT matters "took approximately 8.5 hours," *id.* ¶ 10, but nonetheless expressed willingness to perform the same extraction process for a ten percent sample of the remaining eight years of PR/TT matters, *id.* ¶ 10.[17]  Despite the USAO's proposal to proceed with the extraction process for other years, the parties reported that they "ha[d] reached an impasse," as to whether USAO should extract information from ten percent or all of the sealed PR/TT matters for 2012 and the remaining years.  *Id.* ¶¶ 15, 19.

Due to the petitioners' objection to moving forward with the extraction process from only a sample of ten percent from each list, the cooperative review and release of additional information from the sealed records at issue came to a screeching halt. The parties instead requested a briefing schedule to address "whether the common law and/or U.S. Constitution provide the public and, thus, petitioners, a right of access to the records from [PR/TT] matters that their respective Petitions seek to unseal."  *Id.* ¶ 19.[18]

---

[17]     A Reporters Committee fellow asserted that she had completed the extraction process for the four 2012 matters previously unsealed in 47 minutes.  *See* 6th Jt. Rpt., Ex. B, Decl. of Selina MacLaren, Legal Fellow, Reporters Comm. ¶¶ 2–4, ECF No. 36.

[18]     The first briefing schedule, *see* Minute Order, dated April 20, 2017, required modification since the petitioners initially addressed only the relief sought as to PR/TT materials, even though the petitioners clarified that they had not abandoned their claims for relief as to SCA applications and orders. Pet'rs' Mem. Supp. Pet. at 1 n.1, ECF No. 38.  The Court directed the parties to confer regarding SCA materials, revised the briefing schedule to accommodate such conference, and directed the petitioners to address their SCA claims along with their PR/TT claims and "specify the precise relief sought."  *See* Minute Order, dated May 22, 2017.  After providing the parties

20

Briefing on these legal issues is now complete, and the petitioners' requests are ripe for review.

## II.    DISCUSSION

"The right of public access is a fundamental element of the rule of law, important to maintaining the integrity and legitimacy of an independent Judicial Branch." *Metlife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 663 (D.C. Cir. 2017). "[D]istrust for secret trials has been variously ascribed to the notorious use of this practice by the Spanish Inquisition, to the excesses of the English Court of Star Chamber, and to the French monarchy's abuse of the *lettre de cachet.*" *In re Oliver,* 333 U.S. 257, 268–69 (1948) (footnotes omitted). James Madison warned that "[a] popular Government without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy: or perhaps both. . . . A people who mean to be their own Governors, must arm themselves with the power which knowledge gives." *Metlife, Inc.*, 865 F.3d at 665 (quoting Letter from James Madison to W. T. Barry, Aug. 4, 1822, *in* 9 THE WRITINGS OF JAMES MADISON 103 (Gaillard Hunt ed. 1910)).

"The public right of access [thus] is undisputed in both its importance and its historical pedigree." *United States v. El-Sayegh*, 131 F.3d 158, 161 (D.C. Cir. 1997). "Public access serves to promote trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of fairness." *Doe v. Pub. Citizen*, 749 F.3d 246, 266 (4th Cir. 2014) (quoting *Littlejohn v. Bic Corp.*, 851 F.2d 673, 682 (3d Cir. 1988)). Unlike"[t]he political branches of government," which "claim legitimacy by election, [a] judge[']s" legitimacy derives solely "by

---

the SCA matter lists discussed above, the Court set a revised briefing schedule.  Minute Order, dated July 28, 2017.

21

reason." *Hicklin Eng'g, L.C. v. Bartell,* 439 F.3d 346, 348 (7th Cir. 2006). "Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like a fiat and requires rigorous justification." *Id.* "Although the right [of public access] is not absolute, there is a strong presumption in its favor, which courts must weigh against any competing interests." *Metlife, Inc.*, 865 F.3d at 663.

"The right of public access" to judicial proceedings and records "springs from [both] the First Amendment and the common-law tradition" that such proceedings and records "are presumptively open to public scrutiny." *Doe*, 749 F.3d at 265; *see In re U.S. for an Order of Nondisclosure Pursuant to 18 U.S.C. § 2705(b) for Grand Jury Subpoena # GJ2014031422765*, 41 F. Supp. 3d 1, 7 (D.D.C. 2014) ("The First Amendment or the common law provides the legal basis for the public's right of access to court records, depending on the particular court records at issue."). "[T]he right of public access, whether arising under the First Amendment or the common law, 'may be abrogated only in unusual circumstances.'" *Doe*, 749 F.3d at 266 (quoting *Stone v. Univ. of Md. Med. Sys. Corp.,* 855 F.2d 178, 182 (4th Cir. 1988)); *cf. EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996) ("[T]he starting point in considering a motion to seal court records is a strong presumption in favor of public access to judicial proceedings." (internal quotation marks omitted)). Different analytical frameworks apply to claimed rights of access established by the First Amendment and the common law, respectively. Those legal frameworks are discussed first, followed by a brief examination of the statutes authorizing the government surveillance applications and orders at issue, and then an analysis of the petitioners' requested relief, both prospectively and retrospectively.

A.    **Legal Framework**

22

**1.    First Amendment Right of Access to Judicial Records**

Courts utilize a two-step framework to assess the validity of a claimed First Amendment right of access.  *See Press–Enter. Co. v. Superior Court of Cal. for Riverside Cty.* ("*Press-Enter. II*"), 478 U.S. 1, 8–9 (1986).  The inquiry's first step, sometimes called the "experience and logic" test, is to determine whether a qualified right of access exists.  *Id.* at 9.  "The public possesses a qualified First Amendment right of access to judicial proceedings where (i) there is an 'unbroken, uncontradicted history' of openness, and (ii) public access plays a significant positive role in the functioning of the proceeding."  *United States v. Brice*, 649 F.3d 793, 795 (D.C. Cir. 2011) (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980)).

The inquiry's second step is to determine whether an "overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest" nonetheless trumps any qualified right of access that attaches.  *Press-Enter. II*, 478 U.S. at 9 (quoting *Press–Enter. Co. v. Superior Court of Cal.* ("*Press–Enter. I*"), 464 U.S. 501, 510 (1984)).  "Where there is a First Amendment right of access to a judicial proceeding, the 'presumption of access can be overridden only if (1) closure serves a compelling interest; (2) there is a substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect the compelling interest.'"  *Brice*, 649 F.3d at 796 (quoting *Wash. Post v. Robinson*, 935 F.2d 282, 290 (D.C. Cir. 1991)).

The Supreme Court has applied the First Amendment right of access not only to criminal trials, *see Richmond Newspapers, Inc.*, 448 U.S. at 573, but also to "judicial proceedings that are part of the criminal trial process," *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 935 (D.C. Cir. 2003); *see Press-Enter. I*, 464 U.S. at 505 (criminal voir dire); *Press-Enter.*

23

*II*, 478 U.S. at 13 (criminal preliminary hearings, as "conducted in California"). "[M]ost circuit courts," moreover, "have recognized that the First Amendment right of access extends to civil trials and some civil filings." *ACLU v. Holder*, 673 F.3d 245, 252 (4th Cir. 2011) (collecting decisions).

### 2.    Common Law Right of Access to Judicial Records

The common law also provides a right of access "to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) (footnote omitted). Determining "whether a document must be disclosed pursuant to the common law right of access involves a two-step inquiry." *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897, 902 (D.C. Cir. 1996). "First, the court must decide whether the document sought is a 'public record.'" *Id.* (internal quotation mark omitted). Second, "the court should proceed to balance the government's interest in keeping the document secret against the public's interest in disclosure." *Id.* (internal quotation mark omitted).

Courts weigh six "generalized" factors, enumerated in *United States v. Hubbard*, and any relevant "particularized" factors in determining "the precise weight to be assigned . . . to the always strong presumption in favor of public access to judicial proceedings." 650 F.2d 293, 317 (D.C. Cir. 1980). The *Hubbard* test is the D.C. Circuit's "lodestar because it ensures that we fully account for the various public and private interests at stake." *Metlife, Inc.*, 865 F.3d at 666 (collecting citations). The six generalized *Hubbard* factors are "(1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial

24

proceedings." *Id.* at 665 (quoting *Nat'l Children's Ctr., Inc.*, 98 F.3d at 1409).

*Hubbard* makes clear, however, that these generalized interests do not exhaust the considerations that a court weighs in determining whether to unseal documents, and that a court also must consider such particularized interests as specific contexts make relevant, where the generalized factors do not adequately account for such particularized interests. *See Hubbard*, 650 F.2d at 323 ("To be weighed against the particularized reasons which may justify public access are the particularized privacy or other interests. . . defendants may assert."), 324 (recognizing that a court may, in proper circumstances, determine disclosure's propriety "on the basis of the 'particularized' factors" even where "analysis of the generalized interests at stake" suggest a different outcome).[19]  A court's ultimate task, in applying the *Hubbard* factors, is to "consider[] the relevant facts and circumstances of the particular case, . . . weigh[] the interests advanced by the parties in light of the public interest and the duty of the courts," and reach a "conclu[sion]" as to "[w]hat justice so requires.'" *Metlife, Inc.*, 865 F.3d at 665–66 (quoting *In re Nat'l Broad. Co.*, 653 F.2d 609, 613 (D.C. Cir. 1981)).

### B.    The Surveillance Materials At Issue

The government's gathering of evidence, both real-time and historical, in criminal investigations is highly regulated by statutes, codified in Title 18 of the United States Code, and in rules set out in the Federal Rules of Criminal Procedure. *See, e.g.*, 18 U.S.C. §§ 2510 *et seq*. (governing real-time interception of wire, oral, or electronic communications); 18 U.S.C. §

---

[19]    Although the particularized interests identified by the *Hubbard* panel as relevant to that case were interests in personal privacy, *Hubbard* made clear that privacy interests are not the only type of particularized interest a court may consider in evaluating a motion to unseal.  650 F.2d at 323 ("To be weighed against the particularized reasons which may justify public access are the particularized privacy *or other interests* . . . defendants may assert." (emphasis added)).

25

2518(11), (12) (governing roving wiretaps); 18 U.S.C. § 2703(c) (governing compelled disclosure of basic subscriber information from electronic communications service and remote computing providers); 18 U.S.C. § 3103a (permitting covert searches if notice will cause an "adverse result"); 18 U.S.C. § 3117 (governing mobile tracking devices); FED. R. CRIM. P. 41 (governing search and seizure warrants).  While the petitioners' focus in this case is concededly "broad," June 2016 Tr. at 5:24, they nonetheless seek the unsealing of records related to only a subset of law enforcement evidence collection efforts, as authorized by the Pen Register Act ("PRA") and parts of the SCA. These two statutes are reviewed below, with particular attention to any provisions reflecting any presumption regarding initial or eventual public access.

### 1.    The Pen Register Act—PR/TT Materials

The PRA authorizes "[a]n attorney for the Government" to apply "for an order or an extension of an order . . . authorizing or approving the installation and use of a pen register or a trap and trace device under this chapter, in writing under oath or equivalent affirmation, to a court of competent jurisdiction."  18 U.S.C. § 3122(a)(1).  PR/TT devices are devices or processes that record outgoing and incoming signals from an instrument or facility that transmits or receives an "electronic communication," and can be used to identify the source or recipient of that communication, "albeit not the contents of that communication." *In re U.S. for an Order Authorizing the Installation & Use of A Pen Register & A Trap & Trace Device on E-Mail Account*, 416 F. Supp. 2d 13, 15–16 (D.D.C. 2006) (Hogan, C.J.) (citing definitions in 18 U.S.C. § 3127(3), (4), and concluding that the PRA "authorize[s] the Government to use pen registers and trap and trace devices on e-mail accounts during the course of criminal investigations"); *see also Labow v. U.S. Dep't of Justice*, 831 F.3d 523, 527 (D.C. Cir. 2016) ("A pen register is a

26

device installed on a phone line to enable recording the phone numbers dialed on that line.").[20]

The PRA provides explicit instructions regarding the requisite content of applications seeking, and orders authorizing, the use of PR/TT devices. Each application must include "(1) the identity of the attorney for the Government or the State law enforcement or investigative officer making the application and the identity of the law enforcement agency conducting the investigation; and (2) a certification by the applicant that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by that agency." *Id.* § 3122(b). The order authorizing the use of the PR/TT device must be entered "*ex parte*" based on a judicial finding "that the attorney for the Government has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation." *Id.* § 3123(a)(1).

A PR/TT order "shall specify" certain information about the target of this form of real-time surveillance, including: "the identity, if known, of the person to whom is leased or in whose name is listed the telephone line or other facility" on which the PR/TT device is used; "the identity, if known, of the person who is the subject of the criminal investigation;" "the attributes of the communications to which the order applies, including the number or other identifier and, if known, the location of the telephone line or other facility" on which the PR/TT device is used; and "a statement of the offense to which the information likely to be obtained by the pen register or trap and trace device relates." *Id.* § 3123(b)(1). PR/TT orders "shall authorize" the installation

---

[20] A "pen register" is "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, provided, however, that such information shall not include the contents of any communication." 18 U.S.C. § 3127(3). A "trap and trace device" is "a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication, provided, however, that such information shall not include the contents of any communication." *Id.* § 3127(4).

27

of a PR/TT device for no longer than 60 days, though extensions may be granted. *Id.* § 3123(c).

Notably, such orders also "shall direct that . . . (1) the order be sealed until otherwise ordered by the court; and (2) the person owning or leasing the line or other facility to which the pen register or a trap and trace device is attached or applied, or who is obligated by the order to provide assistance to the applicant, not disclose the existence of the pen register or trap and trace device or the existence of the investigation to the listed subscriber, or to any other person, unless or until otherwise ordered by the court." *Id.* § 3123(d). The D.C. Circuit has pointed out that the PRA "provides for sealing [only] of a pen register order itself, not sealing of any and all information the order may contain even if appearing in other documents." *Labow*, 831 F.3d at 528 (concluding that a pen register order was "shielded" from disclosure, under the Freedom of Information Act ("FOIA"), as specifically exempt by operation of the PRA, but not addressing "the extent [to which] the [PRA] arguably authorizes withholding documents other than a pen register order").

### 2. The Stored Communications Act—SCA Warrant and Section 2703(d) Materials

The SCA was enacted in 1986 as Title II of the Electronic Communications Privacy Act ("ECPA"), Pub. L. No. 99-508, 100 Stat. 1848 (1986), and regulates, *inter alia*, the government's access to stored wire and electronic communications. The SCA's § 2703 "permits the government, in specified circumstances, to compel service providers to disclose records or information pertaining to their customers as well as the contents of their customers' stored electronic communications." *In re Search of Info. Associated with [redacted]@gmail.com That is Stored at Premises Controlled by Google, Inc.* ("*Google*"), No. 16-MJ-00757 (BAH), 2017 WL 3445634, at *6 (D.D.C. July 31, 2017) (Howell, C. J.). "This provision's framework provides a sliding scale of protections, such that the legal mechanism law enforcement utilizes

28

and showing required depends on the kind of information sought." *Id.*

Particularly relevant here, the SCA authorizes the government to require electronic communication service and remote computing service providers to disclose "the contents of a wire or electronic communication," without notice to the subscriber, pursuant to a warrant "issued using the procedures described in the Federal Rules of Criminal Procedure." 18 U.S.C. §§ 2703(a), (b)(1)(A). In addition to such SCA warrants, the SCA also authorizes the government to compel disclosure under § 2703(d) of records pertaining to the subscriber, beyond the basic information set out in 2703(c)(1), to include such records as "logs maintained by a network server." Orin S. Kerr, *A User's Guide to the Stored Communications Act, and A Legislator's Guide to Amending It* ("*User's Guide*"), 72 GEO. WASH. L. REV. 1208, 1219 (2004).[21] A § 2703(d) order may issue "only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that . . . the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d).[22]

Unlike the PRA, the SCA contains no provision requiring the sealing of SCA warrants or

---

[21]    Section 2703(d) has been interpreted to allow the government to obtain historical cell site data, *see, e.g.*, *In re U.S. for an Order Authorizing Monitoring of Geolocation & Cell Site Data for a Sprint Spectrum Cell Phone No.*, No. 06-mc-0186, 2006 WL 6217584, at \*2 n.3 (D.D.C. Aug. 25, 2006) (Hogan, C. J.); *In re U.S. for an Order Authorizing the Installation and Use of a Pen Register and/or Trap and Trace for Mobile Identification Number (585) 111–1111 and the Disclosure of Subscriber and Activity Information under 18 U.S.C. § 2703*, 415 F. Supp. 2d 211, 214 (W.D.N.Y. 2006), but pending before the Supreme Court is the issue of "[w]hether the warrantless seizure and search of historical cell phone records revealing the location and movements of a cell phone user over the course of 127 days," pursuant to § 2703(d), "is permitted by the Fourth Amendment," *Carpenter v. United States*, 2017 WL 2407484 (U.S. June 5, 2017) (No. 16-402).

[22]    Although § 2703(d), by its terms, authorizes the government to obtain the contents of electronic communications stored for over six months based on this standard, as this Court has explained, "the Sixth Circuit has held that the Fourth Amendment applies to the contents of emails and thus that a warrant, issued upon probable cause, is required to search or seize those communications." *Google*, 2017 WL 3445634, at \*7 n.13 (citing *United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010)). Since 2013, the policy of the Department of Justice has been to use SCA warrants exclusively when compelling the disclosure of the contents of electronic communications. *Id.* (citing H.R. Rep. No. 114-528, at 9 (2016)).

29

§ 2703(d) orders and applications in support thereof. Nevertheless, the SCA explicitly relieves the government of any obligation to notify a subscriber or customer about the compelled disclosure pursuant to an SCA warrant, *see* 18 U.S.C. § 2703(b)(1)(A), and authorizes delayed notification to the subscriber of compelled disclosure pursuant to a § 2703(d) order, *see id*. § 2705(a). In addition, the SCA authorizes the government to seek an order requiring the provider not to disclose to the subscriber, "for such period as the court deems appropriate," that the government had compelled disclosure of records, upon a showing that an enumerated adverse result may occur. *Id.* § 2705(b).

## C.    Analysis

The petitioners now seek, as prospective relief, publication, for all PR/TT and SCA warrant and § 2703(d) applications, of "case number[s] and certain associated docket information, including the case name, date of application, and magistrate judge to whom the matter is assigned," as well as periodic unsealing of dockets that no longer require secrecy. Pet'rs' Suppl. Mem. Supp. Pet. ("Pet'rs' Mem.") at 33–35, 39–40, 41–42, ECF No. 47. As to retrospective relief, the petitioners seek extracted information from all sealed PR/TT matters that the USAO initiated since 2008, rather than only from a ten percent sample of such matters, plus "case numbers and certain associated docket information for [§ 2703(d)] matters filed from 2008 to the present." *Id.* at 36, 40. The petitioners do not seek extracted information from materials related to § 2703(d) applications, nor do the petitioners seek any retrospective relief as to SCA warrants. *Id.* at 40, 42–43.[23] They contend that both the First Amendment and the common law

---

[23]    The petitioners acknowledge "that because Section 2703(d) Materials currently under seal may include grand jury-related information subject to Rule 6, broader unsealing (or extraction of information from sealed filings) for Section 2703(d) matters would require document-by-document review and pose other practical challenges." Pet'rs' Mem. at 40. The petitioners also acknowledge that the lack of any reliable method to identify SCA warrant

30

grant a right of access to these surveillance materials.

As explained below, the petitioners' First Amendment claim fails, however, because the prerequisite of showing a longstanding tradition of public access simply does not exist as to the PR/TT and SCA materials at issue. Nevertheless, the petitioners' common law claim succeeds, albeit not to the full extent requested by the petitioners, as the materials at issue indisputably are judicial records, and the *Hubbard* factors, which govern decisions on whether to maintain documents under seal in the D.C. Circuit weigh in disclosure's favor, in light of the changes recently adopted by the USAO and Clerk's Office in the processing of such materials.

### 1.    First Amendment

To satisfy the First Amendment right of access test's first prong requires a court to conclude that "an 'unbroken, uncontradicted history' of openness" exists, *Brice*, 649 F.3d at 795, with respect to SCA warrant, § 2703(d), and PR/TT materials in "particular," *Press-Enter. II*, 478 U.S. at 9. Historical practice, as well as the PRA and SCA's text and statutory context, show that no such tradition of openness exists with respect to the sealed materials the petitioners seek to unseal and disclose. Nor can the petitioners rely on search warrants' judicially-recognized history of openness, as none of the materials to which the petitioners seek access— not even SCA warrants—are analogous to traditional search warrants issued under Rule 41 of the Federal Rules of Criminal Procedure. For these reasons, the petitioners cannot satisfy the "experience and logic" test's prong, and so cannot prevail on their First Amendment right of access claim.

---

materials currently under seal within the CM/ECF system would cause any unsealing or extraction of such materials to yield "under-inclusive information" that will not "provide the public meaningful insight into government electronic surveillance practices." *Id.* at 41–42.

31

SCA materials historically have not been publically available. The petitioners do not dispute this fact, instead acknowledging that such materials "routinely" are "maintained under seal," Pet'rs' Mem. at 1, and that SCA warrants and § 2703(d) materials "are frequently sealed and kept under seal indefinitely," depriving "the public [of] information as to the number of SCA search warrants and Section 2703(d) orders issued by district courts in any given time period." *Id*. at 4. The petitioners also concede that the "unsealing" of PR/TT orders and related materials "is in practice uncommon, and [that] judicial records regarding PR/TT devices, including basic docket information, are typically shielded from public scrutiny indefinitely." *Id.* at 3.

Statutory text and context likewise show that ECPA materials generally have not traditionally been available to the public. ECPA consists of three titles—Title I, amending the wiretap statute, which is not at issue here; Title II, the SCA; and Title III, the PRA. *See* ECPA, 100 Stat. 1848; S. Rep. No. 99–541 (1986), at 3; *Google*, 2017 WL 3445634, at *6 n.9. The PRA and wiretap statute each provide for default indefinite sealing of surveillance orders. *See* 18 U.S.C. §§ 2518(8)(b) ("Applications made and orders granted under [the wiretap statute] shall be sealed by the judge."), 3123(d) ("An order authorizing or approving the installation and use of a pen register or a trap and trace device shall direct that . . . the order be sealed until otherwise ordered by the court."). The wiretap statute also provides for default sealing of wiretap applications, while the PRA imposes default nondisclosure obligations on third parties who own or lease facilities to which PR/TT devices are attached or who are obligated to assist the government in installing such devices. *Id.* §§ 2518(8)(b), 3123(d)(2). Although the SCA contains no similar default sealing or nondisclosure provisions, the SCA authorizes the government to seek such nondisclosure and, in practice, the government has "always been able to restrict access" to SCA warrants and § 2703(d) orders "by requesting a sealing order, regardless

32

of the statutory default," *United States v. Appelbaum* (*In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D)*), 707 F.3d 283, 291 n.9 (4th Cir. 2013) (quoting *Times Mirror Co. v. United States*, 873 F.2d 1210, 1214 (9th Cir. 1989)), and to delay or preclude a notification to a subscriber or customer of an SCA warrant or § 2703(d) order's existence, *see* 18 U.S.C. § 2705(a)–(b).[24]

The SCA, moreover, does not exist in isolation, but is nestled between the PRA and wiretap statute within a statutory framework that broadly prioritizes law enforcement's need for secrecy over the public's interest in transparency. Indeed, one commentator urging ECPA's reform has mused that "[t]hrough a potent mix of indefinite sealing, nondisclosure (i.e., gagging), and delayed-notice provisions, ECPA surveillance orders all but vanish into a legal void." Stephen W. Smith, *Gagged, Sealed & Delivered: Reforming ECPA's Secret Docket*, 6 HARV. L. & POL'Y REV. 313, 314 (2012).[25]

The petitioners argue that the absence of any longstanding tradition of openness as to materials relating to ECPA materials generally or SCA materials, in particular, does not defeat their First Amendment right of access claim, given ECPA's relatively recent vintage. Pet'rs' Mem. at 22–23. Instead, the petitioners contend that courts should evaluate ECPA procedures "by the historical tradition of access applicable to an older, analogous process—in this case, search warrants." *Id.* The First Amendment may create a right of access to a procedure that has

---

[24] The government may obtain an order delaying or precluding notification to a subscriber or customer of an SCA warrant or § 2703(d) order's existence upon a showing "that there is reason to believe" that notification would result in "endanger[ment of] the life or physical safety of an individual," "flight from prosecution," "destruction of or tampering with evidence," "intimidation of potential witnesses," or "seriously jeopardizing an investigation or unduly delaying a trial." 18 U.S.C. § 2705(a)(1)–(2), (b). Given the posture of incipient criminal investigations when the government uses SCA authorities to gather evidence, this standard, in practice, often is easily met.

[25] Indeed, this Court is aware of only one other district court—the U.S. District Court for the Eastern District of Virginia—that systematically provides the public with limited information about matters involving § 2703(d) and PR/TT applications. *See supra* note 8.

33

no historical counterpart, as "[a] new procedure that substituted for an older one would presumably be evaluated by the tradition of access to the older procedure." *El-Sayegh*, 131 F.3d at 161. Although "affidavits submitted in support of search warrants are sometimes sealed to protect the secrecy of an ongoing criminal investigation," *Hubbard*, 650 F.2d at 316 n.84, the public has indeed had access to post-execution search warrant materials. "Frequently—probably most frequently—the warrant papers including supporting affidavits are open for inspection by the press and public in the clerk's office after the warrant has been executed." *Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 64 (4th Cir. 1989); *see also Times Mirror Co.*, 873 F.2d at 1214 ("[M]ost search warrant materials routinely become public."); *In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569, 573 (8th Cir. 1988) ("[A]lthough the process of issuing search warrants has traditionally not been conducted in an open fashion, search warrant applications and receipts are routinely filed with the clerk of court without seal."); *In re N.Y. Times Co. for Access to Certain Sealed Court Records*, 585 F. Supp. 2d 83, 88 (D.D.C. 2008) ("[P]ost-investigation warrant materials . . . have historically been available to the public . . . . [W]arrant applications and receipts are routinely filed with the clerk of court without seal."). The "routine practice" in this Court "is to make [search] warrant materials publicly available after a search has been executed and a return is available," although "in a particular case a party may file a motion to seal the warrant materials even after a search is executed." *Id.* at 88 n.8.

To evaluate SCA procedures in light of executed search warrants' historical tradition of openness, however, is an inapposite analogy. Analytical substitution of one judicial procedure for another is appropriate only where the procedure to which petitioners assert a right of access is "new." *El-Sayegh*, 131 F.3d at 161. The SCA, as enacted as part of ECPA, is over 31 years old. *See generally* ECPA, 100 Stat. 1848. Thus, whether SCA orders are of such recent vintage as to

34

require analytical substitution of Rule 41 search warrants is doubtful.

More fundamentally, analytical substitution is appropriate only where "[a] new procedure [] substituted for an older one." *El-Sayegh*, 131 F.3d at 161. First Amendment analysis "look[s] to the substance of [the government's] power[s] rather than how [an] Act nominally refers to those powers." *Big Ridge, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 715 F.3d 631, 646 (7th Cir. 2013) (prioritizing substance over form in Fourth Amendment analysis); *cf. R.J. Reynolds Tobacco Co. v. Shewry*, 423 F.3d 906, 929 (9th Cir. 2005) (rejecting an "approach [that] would elevate form over substance and . . . enable the government to dictate the First Amendment result simply by manipulating the agency in the decision-making process" (internal quotation marks omitted)). To determine whether the history of one judicial procedure may be substituted for another, then, requires determining the procedures' degree of functional similarity, rather than looking to labels. SCA orders, even SCA warrants, are functionally unlike traditional search warrants and more akin to subpoenas, to which no recognized First Amendment right of access attaches, in two significant respects: their method of execution and opportunity for pre-disclosure challenge. SCA orders thus do not analytically substitute for search warrants, meaning that the petitioners cannot rely on post-execution search warrant materials' "unbroken, uncontradicted history of openness," *Brice*, 649 F.3d at 795, to support their asserted First Amendment right of access to SCA materials.

"A warrant," as the Fourth Circuit has explained, "is a judicial authorization to a law enforcement officer to search or seize persons or things." *In re Subpoena Duces Tecum*, 228 F.3d 341, 348 (4th Cir. 2000). A search warrant "is issued without prior notice and is executed, often by force, with an unannounced and unanticipated physical intrusion," so as "[t]o preserve advantages of speed and surprise." *Id.* The target, moreover, has no opportunity to challenge a

35

search warrant "before the warrant issues"—a judicial probable cause determination is the only pre-execution check on the government's ability to obtain information via a warrant. *Id.* ("The demonstration of probable cause to 'a neutral judicial officer' places a 'checkpoint between the Government and the citizen' where there otherwise would be no judicial supervision." (quoting *Steagald v. United States*, 451 U.S. 204, 212 (1981)). For these reasons, search warrants entail an "intrusion [that] is both an immediate and substantial invasion of privacy." *Id.*

A subpoena operates differently. Whereas a search warrant entitles government agents to inspect and/or rifle through targets' "persons, houses, papers, and effects," U.S. CONST. amend. IV, a subpoena instead directs a target to "comply" with a "demand" for information, *Subpoena Duces Tecum*, 228 F.3d at 348; *see also* FED. R. CRIM. P. 17(a), (c). A subpoena "commences an adversary process during which the person served with the subpoena may challenge it in court before complying," meaning that "judicial process is afforded before any intrusion occurs." *Subpoena Duces Tecum*, 228 F.3d at 348; *see also* FED. R. CRIM. P. 17(c)(2) ("On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive."). A subpoena thus does not subject a target to "the immediacy and intrusiveness of a search and seizure conducted pursuant to a warrant." *Subpoena Duces Tecum*, 228 F.3d at 348. These distinctions between search warrants and subpoenas—(1) execution via government agents' physical presence and search or a recipient's individual compliance, and (2) the absence or provision of an *ex ante* opportunity to challenge the disclosure sought—are so significant that they form the basis for the search warrant's "probable cause" requirement. *Id.* at 348–49.

An SCA warrant, though a warrant in name, is more analogous to a subpoena than to a traditional search warrant with respect to (1) method of execution and (2) *ex ante* opportunity to challenge compelled disclosure. As to method of execution, an SCA warrant does not authorize

36

the government to search and seize "persons or things," in a search warrant's manner, *id.* at 348,

but rather requires a provider's "disclosure . . . of the contents of [certain] communication[s,]" 18

U.S.C. § 2703(a), in a subpoena's manner. As this Court has recently explained:

> SCA warrants are not like the search warrants used in the physical world: they are 'executed' when a law enforcement agent delivers (sometimes by fax) the warrant to the service provider. The service provider, not the agent, performs the 'search'; the service provider 'produces' the relevant material to the agent; the user associated with the inbox often never learns that his inbox has been 'searched.'

*Google*, 2017 WL 3445634, at *18 (quoting Paul K. Ohm, *Parallel-Effect Statutes and E-Mail*

*"Warrants": Reframing the Internet Surveillance Debate*, 72 GEO. WASH. L. REV. 1599, 1610–

11 (2004)) (internal alterations and quotation marks omitted). As to an *ex ante* opportunity to

challenge compelled disclosure, a recipient may move to quash an SCA warrant, *see In re*

*Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp.*, 15

F. Supp. 3d 466, 467 (S.D.N.Y. 2014) ("*Microsoft I*"), *rev'd*, 829 F.3d 197, 201 (2d Cir. 2016)

("*Microsoft II*"), *reh'g denied*, 855 F.3d 53 (2d Cir.) ("*Microsoft III*"), *cert. granted sub nom.*

*United States v. Microsoft Corp.*, 138 S. Ct. 356 (2017), and need not disclose any information

sought until the adversary process completes. A traditional search warrant, in contrast, generally

provides the target neither prior notice of the search and/or seizure nor *ex ante* opportunity to

quash. *See Subpoena Duces Tecum*, 228 F.3d at 348.

In short, as other Judges have recognized, the government executes an SCA warrant in a

manner more akin to that of a subpoena than to that of a traditional search warrant. *See, e.g.*,

*Microsoft III*, 855 F.3d at 60 (Jacobs, J., dissenting from the denial of rehearing *en banc*)

(observing that an SCA warrant "functions as a subpoena though the [SCA] calls it a warrant");

*id.* at 70 (Raggi, J., dissenting from the order denying rehearing *en banc*) ("[An SCA warrant]

does not authorize federal agents to *search* any premises or to *seize* any person or materials," but

37

"authorizes a federal agent to require a service provider to disclose materials in its possession. . . . A search warrant is executed with respect to a *place* . . . [b]y contrast, . . . a § 2703(a) warrant is executed with respect to a *person*."); *Microsoft II*, 829 F.3d at 226 (Lynch, J., concurring) ("[An SCA] 'warrant' . . . does not appear to be a traditional search warrant . . . . [T]he SCA does not . . . contain language implying . . . that the warrant . . . authorizes government agents to go to the premises of a service provider without prior notice to the provider, search those premises until they find the computer, server or other device on which the sought communications reside, and seize that device . . . . Rather, the statute expressly requires the 'warrant' not to authorize a search or seizure, but . . . to allow the government to require a service provider to disclose the contents of certain electronic communications." (alterations, emphasis, and internal citation and quotation marks omitted)); *Microsoft I*, 15 F. Supp. 3d at 471 ("Although section 2703(a) uses the term 'warrant' and refers to the use of warrant procedures, the resulting order is not a conventional warrant . . . . [I]t is executed like a subpoena in that it is served on the ISP in possession of the information and does not involve government agents entering the premises of the ISP to search its servers and seize the e-mail account in question.").

Other aspects of the SCA confirm that an SCA warrant is in substance more analogous to a subpoena than to a traditional search warrant. First, "[p]arallel provisions" of § 2703 "permit the government to require equivalent disclosure of" identical categories of "communications by the service provider" through an SCA warrant, § 2703(d) order, or subpoena. *Microsoft II*, 829 F.3d at 227 (Lynch, J., concurring). "Indeed, the various methods of obtaining the communications . . . are not merely parallel" but "all depend on the same verbal phrase"— "disclose" or "disclosure"—constituting "alternative means, applicable in different circumstances, to require the service provider to disclose the communications." *Id.* (alterations

38

and internal quotation marks omitted); *see* 18 U.S.C. § 2703(a), (b)(1), (c)(1)–(2). Second, §

2703 uses the term "warrant" rather than "search warrant" in all but one instance, and then only

with respect to a "search warrant . . . requiring *disclosure* by a provider." 18 U.S.C. § 2703(g)

(emphasis added). Third, § 2703 incorporates only those procedures of Federal Rule of Criminal

Procedure 41 that govern a warrant's issuance, not those addressing execution. *Id.* § 2703(a); *see*

*Google*, 2017 WL 3445634, at *8 ("The applicable *procedures* [governing an SCA warrant's

issuance] are those found in Federal Rule of Criminal Procedure 41.").[26]

For these reasons, SCA warrants in fact "are not search warrants at all and to call them

such confuses legal terminology." *Google*, 2017 WL 3445634, at *18 (quoting Ohm, *supra*, at

1611). "The structure of § 2703 . . . evinces an intent to create a distinct procedural mechanism

from a traditional Rule 41 'search warrant.'" *Id.* To the extent SCA warrants are analogous to

any longstanding procedures used by the government to collect evidence in criminal

investigations, they are analogous to grand jury subpoenas, for the reasons explained above. No

historical tradition of public access to grand jury subpoenas exists. *See* FED. R. CRIM. P.

6(e)(2)(B) (prohibiting prosecutors, grand jurors, court reporters, and others from "disclos[ing] a

matter occurring before the grand jury"); *Press-Enter. II*, 478 U.S. at 10 ("[G]rand jury

proceedings have traditionally been closed to the public and the accused."); *Douglas Oil Co. of

Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 218 n.9 (1979) ("Since the 17th century, grand jury

---

[26]    Indeed, this Court's recent decision holding that an SCA warrant operates to compel a domestic service provider to produce records, which the provider may store overseas in whole or part, similarly concluded that SCA warrants are akin to mere "subpoena[s] requiring the production of documents" domestically, rather than to search "warrants for extraterritorial searches," which "courts may not issue." *Google*, 2017 WL 3445634, at *14–15 (*quoting FTC v. Compagnie De Saint–Gobain–Pont-a-Mousson*, 636 F.2d 1300, 1316 (D.C. Cir. 1980)). The Supreme Court recently granted *certiorari* in *United States v. Microsoft Corp.*, which will resolve "[w]hether a United States provider of email services must comply with a probable-cause-based warrant issued under 18 U.S.C. 2703 by making disclosure in the United States of electronic communications within that provider's control, even if the provider has decided to store that material abroad." *See* 138 S. Ct. 356 (U.S. Oct. 16, 2017) (No. 17-2).

39

proceedings have been closed to the public, and records of such proceedings have been kept from the public eye. The rule of grand jury secrecy was imported into our federal common law and is an integral part of our criminal justice system."); *In re Sealed Case*, 199 F.3d 522, 526 (D.C. Cir. 2000) ("[T]he grand jury context presents an unusual setting where privacy and secrecy are the norm."); *In re Dow Jones & Co.*, 142 F.3d 496, 499 (D.C. Cir. 1998) ("[T]here is no First Amendment right of access to grand jury proceedings.").

Section 2703(d) and PR/TT orders are even less analogous to traditional search warrants than are SCA warrants, differing in both execution and applicable legal standard. An § 2703(d) order, like an SCA warrant, requires a provider to disclose information sought rather than authorizing the government to conduct a physical search, and allows a recipient an opportunity to quash prior to complying with the production demanded. 18 U.S.C. § 2703(b)–(d). Unlike an SCA search warrant, a § 2703(d) order's issuance need not comply with Rule 41 procedures or Rule 41's "probable cause" standard, but instead requires only "specific and articulable facts showing that there are reasonable grounds to believe" the information sought is "relevant and material to an ongoing criminal investigation." *Id.* § 2703(d). A PR/TT order likewise does not authorize government agents physically to search or seize "persons or things," *Subpoena Duces Tecum*, 228 F.3d at 348, in the manner of a search warrant, *see Smith v. Maryland*, 442 U.S. 735, 742 (1979) (rejecting the claim that "a pen register's . . . installation and use constitute[s] a 'search'"), although such orders authorize the government physically to install a PR/TT device at a "telephone line or other facility," and the showing required for issuance of a PR/TT order is mere relevance "to an ongoing criminal investigation," 18 U.S.C. §§ 3123(a)(1), (b)(1)(A).

In sum, no historical tradition of openness exists as to PR/TT, SCA warrant, or § 2703(d) materials, and such orders are too functionally unlike search warrants in issuance, execution or

40

challenge procedures to justify the latter's analytical substitution in evaluating the historical aspect of the petitioners' First Amendment right of access claim. The petitioners' failure to show an "'unbroken, uncontradicted history' of openness," *Brice*, 649 F.3d at 795, as to these statutorily authorized methods under the PRA and SCA for the government to gather evidence in criminal investigations precludes petitioners from prevailing on their First Amendment right of access claim, *see In re Reporters Comm. For Freedom of the Press*, 773 F.2d 1325, 1332 (D.C. Cir. 1985) ("[B]oth these ['history' and 'logic'] questions must be answered affirmatively before a constitutional requirement of access can be imposed."), making unnecessary any consideration of the claim's other elements.

### 2. Common Law

The petitioners also argue that the common law affords them a right of access to the PR/TT and SCA materials at issue. Pet'rs' Mem. at 15–21. The limited scope of the petitioners' claim is significant—the petitioners seek access only to PR/TT, SCA warrant and § 2703(d) materials from closed criminal investigations, and only to those portions of such materials that do not reveal personally identifying information. As such, the USAO does not contend that disclosure would impede an ongoing criminal investigation or reveal information that would impinge on personal privacy. For the reasons that follow, the *Hubbard* factors weigh in favor of a prospective common law right of access to the materials to which the petitioners seek access, in light of administrative changes recently adopted by both the USAO and the Clerk's Office. The significant burdens on the USAO and Clerk's Office that would attend recognizing a common law right of access to previously initiated PR/TT and SCA matters, however, properly are cognizable as particularized interests that weigh heavily against further retrospective relief than has already been provided.

### a. The Materials At Issue Are Judicial Records

A presumptive common law right of access attaches only to documents that are "public record[s.]" *Wash. Legal Found.*, 89 F.3d at 902 (internal quotation mark omitted). The USAO "[a]ssum[es] for the sake of argument" that the PR/TT and SCA materials at issue satisfy this requirement. Gov't's Opp'n at 25, ECF No. 51. The USAO is correct to so assume. "[W]hether something is a judicial record depends on 'the role it plays in the adjudicatory process.'" *Metlife, Inc.*, 865 F.3d at 666 (quoting *SEC v. Am. Int'l Grp.*, 712 F.3d 1, 3 (D.C. Cir. 2013)). PR/TT and SCA applications and orders are judicial records, as "it is commonsensical that judicially authored or created documents are judicial records." *Appelbaum*, 707 F.3d at 290. A document filed with a court (1) that "can affect a court's decisionmaking process," (2) "which the parties hope to influence the court," and (3) "upon which the court must base its decision" likewise is a judicial record. *Metlife, Inc.*, 865 F.3d at 667. PR/TT and SCA applications and any supporting materials, which the government submits to obtain the related orders and on which courts rely in deciding whether to enter such orders, undoubtedly meet this standard. *See Appelbaum*, 707 F.3d at 291 ("[T]he derivative § 2703(d) motions are 'judicial records' because they were filed with the objective of obtaining judicial action or relief pertaining to § 2703(d) orders."); *accord Goetz*, 886 F.2d at 64 ("[A]ffidavits for search warrants are judicial records."). A "common law presumption of access [thus] attaches to" PR/TT and SCA orders and related materials, *Appelbaum*, 707 F.3d at 291, which the government can rebut only by showing "competing interests" that compel a "conclu[sion] that justice [] requires" maintaining a seal, *Metlife*, 865 F.3d at 665. The *Hubbard* factors govern this analysis. *Id.*

### b. Overview: Hubbard *Factor Analysis*

The petitioners seek access to information concerning the government's reliance on

42

statutory authority under the PRA and SCA to gather evidence in criminal investigations using:

(1) PR/TT devices, (2) § 2703(d) orders, and (3) SCA warrants.  The type of information sought

can be divided into three categories: (1) docket information, including the matter number and

caption, the dates the application was filed and entered onto the docket, the assigned case type

(*e.g.*, MC, CV, CR, MJ) and event type (*e.g.*, "Application for Pen Register"), and the assigned

Magistrate Judge, *see, e.g.*, Order and Notice to the Parties, Attach. A, List of Misc. Case

Numbers With Assoc. Docket Info., ECF No. 22-1; (2) fifteen specified categories of

information extracted from applications and orders for such materials, *see, e.g.,* Extraction Chart;

and (3) unsealed materials filed in a particular docket, with such redactions needed to protect

information implicating privacy and law enforcement investigative interests.  Having already

obtained docket information for USAO-initiated PR/TT matters over a nine year period, as noted

*supra* Part I.C, the petitioners continue to seek retrospective access to extracted information for

all PR/TT matters and docket information for § 2703(d) matters.  They also seek prospective

access to real-time docket information and full unsealing, upon an investigation's closure, with

appropriate redactions, of PR/TT, § 2703(d), and SCA warrant materials, with persistent

monitoring by the Court.  Pet'rs' Mem. at 30–43.  Significantly, by contrast to their initial

petitions, they no longer seek retrospectively the full unsealing, with redactions, of such

materials.  *See id.*

   Resolving the petitioners' common law right of access claim thus requires applying the

*Hubbard* factors to three separate variables: (1) the statutory authority relied upon for the

government's application and related order; (2) the type of information sought, *i.e.,* docket

information, extracted information, or full unsealing of materials; and (3) whether the petitioners

seek this information prospectively or retrospectively.  To simplify this analysis, the prospective

43

aspect of the petitioners' claim is considered first, followed by the claim's retrospective aspect.

Consideration of the *Hubbard* factors, in light of the "'strong presumption in favor of public access to judicial proceedings,'" *Metlife*, 865 F.3d at 665 (quoting *Hubbard*, 650 F.2d at 317), and the petitioners' decision to disclaim any entitlement to materials whose disclosure would impinge upon privacy or law enforcement investigative prerogatives, yields a conclusion, due largely to the administrative changes recently adopted by the USAO and Clerk's Office, that the petitioners are entitled to prospective relief, albeit not all they request nor on a real-time basis. The retrospective relief sought, however, involves to a much greater extent than the prospective relief the imposition of substantial burdens on the USAO and the Clerk's Office in complying with any order requiring the unsealing and extraction of information from over two thousand PR/TT matters, and compilation of docket information for over two thousand 2703(d) matters. This burden, cognizable as a particularized *Hubbard* factor, weighs firmly against allowing the petitioners additional retrospective access to the PR/TT and SCA materials at issue beyond the significant access already granted.

### c.    *Common Law Right To Prospective Access*

The petitioners seek prospective access to "case number[s] and certain associated docket information" in all PR/TT, SCA warrant, and § 2703(d) matters "including the case name, date of application, and magistrate judge to whom the matter is assigned," along with continuous unsealing of all the records on the dockets that no longer need be maintained under seal. Pet'rs' Mem. at 33–35, 39–40, 41–42. Given their request for unsealing, the petitioners do not seek prospective extraction of any of the categories of information that the USAO extracted from the 2012 PR/TT matter sampling. *See id.* For the reasons that follow, the *Hubbard* factors weigh in favor of some prospective access to docket information for PR/TT, § 2703(d) , and SCA warrant

44

matters, though not in favor of the timetable for disclosure of such information requested by the

petitioners nor in favor of the continuous unsealing of the underlying materials on dates certain,

subject to rigorous judicial monitoring.

### i.    Need for Public Access to the Documents at Issue

The need for public access to the documents at issue is the first *Hubbard* factor a court

weighs in determining whether to unseal documents.  650 F.2d at 317.  The USAO concedes

"that transparency is important," and objects only to additional retrospective disclosure given the

"disclosures that have been made to date," not to additional prospective disclosure.  Gov't's

Opp'n at 33.  Transparency as to docket information for PR/TT, SCA warrant, and § 2703(d)

matters "is necessary for journalists to inform the public [of], and for the public to understand,

the USAO's use of [these statutorily-authorized surveillance] devices" and "the role of the courts

in overseeing their use."  Pet'rs' Mem. at 36.  "Such information, if provided for all of the sealed

PR/TT[, SCA warrant, and § 2703(d)] matters filed by the USAO, will shed light on, *inter alia*,

how frequently judges deny [such surveillance] applications, the types of crimes that are

investigated using [such] devices, how frequently orders authorizing the installation and[/or] use

of [such] devices are extended, and how frequently [such] applications have been accompanied

by other types of requests."  *Id.* at 36–37.  These points are well-taken, and not disputed by the

government. Thus, the first *Hubbard* factor thus weighs in favor of prospective disclosure of

PR/TT, SCA warrant, and § 2703(d) matter docket information.

### ii.    Extent of Previous Public Access to the Documents

The extent of the public's previous access to the documents at issue is the second factor

to be weighed in determining whether to unseal documents.  *Hubbard*, 650 F.2d at 318.

"[P]revious access has been considered relevant to a determination whether more liberal access

45

should be granted to materials formerly properly accessible on a limited basis through legitimate public channels and to a determination [of] whether further dissemination of already accessible materials can be restrained." *Id.* (internal citation omitted).  This factor is typically applied to actual, extant documents and has limited usefulness in evaluating the docket information the petitioners seek *prospectively* to disclose since, obviously, the public could not possibly have enjoyed access to documents that have not yet been filed with or entered by the Court.

Nonetheless, as the petitioners observe, "[t]he public is well aware that law enforcement uses PR/TT devices, search warrants under the SCA, and Section 2703(d) orders in criminal investigations."  Pet'rs' Mem. at 18–19.  The public also has access to docket and limited extracted information concerning the USAO's filing of PR/TT applications from 2008 through 2016 in this Court, which information has been made publicly available in this litigation, *see* PR/TT Lists, as well as to the number of matters that both the USAO and DOJ filed during that period connected to case types in the CM/ECF system associated with § 2703(d) and SCA warrant applications, *see* SCA Warrant Notice; Section 2703(d) Notice, respectively.  In the petitioners' view, such docket information provides valuable information to the public primarily due to the light shed on broad trends and patterns in the USAO's use of PR/TT orders, § 2703(d) orders, and SCA warrants.  Pet'rs' Mem. at 12–13, 18.

The petitioners seek disclosure of docket information about PR/TT, § 2703(d), and SCA warrant matters on a continuous, real-time basis, and point to the U.S. District Court for the Eastern District of Virginia as doing so.  *See* Pet'rs' Mem. at 32–33, 37–40.  Indeed, the Eastern District of Virginia does make publicly available on a real-time basis limited docket information as to PR/TT and § 2703(d) applications (but not as to SCA warrant applications), apparently without any adverse results.  *See Appelbaum*, 707 F.3d at 288.  Yet, such real-time docket

46

information necessarily implicates pending, active criminal investigations, while the petitioners

here have from the outset limited their request to closed investigations, a limitation better

respected by delaying disclosure of the docket information for at least six months.  Moreover, the

prospective docket information sought by the petitioners here is more extensive than that

provided in the Eastern District of Virginia on a real-time basis, and, consequently, this

commendable example from a single neighboring district court simply does not provide a

sufficiently parallel docket disclosure to establish this *Hubbard* factor.[27]  Thus, the second

*Hubbard* factor weighs against any common law right of access claim to a continuous, real-time

stream of the more fulsome docket information relating to PR/TT, § 2703(d), and SCA warrant

matters requested by the petitioners.

### iii.    Fact of Objection and Objector's Identity

The fact that someone has objected to the documents' unsealing, and the objector's

identity, is the third *Hubbard* factor to be weighed in reviewing motions to unseal.  650 F.2d at

319.  No individual or entity, other than the USAO, has objected to prospective disclosure of the

PR/TT, § 2703(d), and SCA warrant matter docket information at issue.  *See* Pet'rs' Mem. at 19.

The USAO asserts that the scope of the retrospective relief that the petitioners seek makes this

factor's application impossible or unworkable, *see* Gov't's Opp'n at 34, but makes no similar

argument as to prospective disclosure.  The third factor thus weighs in favor of a common law

right of access to the prospective disclosure of the docket information sought.

### iv.    Strength of Property and Privacy Interests Asserted

---

[27]     The Eastern District of Virginia discloses "assigned case numbers, the date of assignment, the presiding judge, and whether the case is sealed," *see Appelbaum*, 707 F.3d at 288, without providing information on the case caption, which can reveal additional information about an ongoing criminal investigation, and is information sought by the petitioners here as part of their prospective relief, *see* Pet'rs' Mem. at 33, 39, 41.

47

The strength of any property and privacy interests asserted is the fourth *Hubbard* factor. 650 F.2d at 320. No privacy or property interests are asserted with respect to the PR/TT, § 2703(d), and SCA warrant docket information the petitioners seek as prospective relief. Not only has no individual or entity (other than the USAO) come forward to object to the petitioners' request, but the petitioners expressly disclaim any right of access to personally identifiable information, and agree to redaction "[t]o the extent personally identifiable information would appear in any of the currently sealed docket information or other information that [p]etitioners seek to have unsealed." Pet'rs' Mem. at 19. In this circumstance, the requested docket information's disclosure is unlikely to impinge upon personal privacy concerns.

Moreover, the USAO has recently adopted use of uniform captions for PR/TT, § 2703(d), and SCA warrant matters that do not reveal, directly or indirectly, investigatory targets' identities and that facilitate disclosure, by avoiding the need to undertake the time-consuming and burdensome task of reviewing each caption to redact such information. In these circumstances, the fourth *Hubbard* factor thus weighs in favor of prospective disclosure of PR/TT, § 2703(d), and SCA warrant docket information.

### v.    *Possibility of Prejudice*

Possibility of prejudice to an individual is the fifth *Hubbard* factor to be weighed in reviewing a motion to unseal. 650 F.2d at 320. Disclosing prospectively PR/TT, § 2703(d), and SCA warrant docket information would prejudice no individual, as such information reveals no personally identifiable information, due to the uniform captions adopted by the USAO. Nor would disclosure prejudice the USAO, as the petitioners also disclaim any right of access to information that would, if publicized, compromise an ongoing criminal investigation. *See* Pet'rs' Mem. at 26–27. The fifth *Hubbard* factor thus weighs in favor of disclosure of the docket

48

information that the petitioners seek.

### vi. *Purposes for Which Documents Were Introduced*

The purpose for which documents were introduced is the sixth, final, and "single most important" *Hubbard* factor. 650 F.2d at 321. The public's entitlement to judicial records is commensurate with the documents' importance to the judicial proceeding in question. *See id.* (concluding that the sixth factor weighed against a right of access to documents that "were not determined by the trial judge to be relevant to the crimes charged," "used in the subsequent 'trial,'" or "described or even expressly relied upon by the trial judge in his decision on the suppression motion," and that were only "admitted in the criminal proceedings [] to assist the court in its determination of whether the search and seizure were unlawfully overbroad."). In *Hubbard*, the Church of Scientology objected to the unsealing of papers that the defendants, who were all Church officials or employees, introduced into the underlying criminal proceedings for the sole purpose of contending that a government search and seizure had been unlawfully overbroad. *Id.* at 297–98, 317–318. The *Hubbard* panel observed, in the context of that case's particular facts, that recognizing a right of access to the documents at issue would create the perverse dynamic

> [where]by the act of attempting to show the excesses of the search by the extent of the documents seized—documents which may not be relevant to criminal charges or necessary to trial—defendants . . . and nondefendant owners . . . will invite public dissemination of the contents of the documents and thereby impair the very privacy rights they seek to vindicate, regardless of the use ultimately made of the documents by the court.

*Id.* at 321.

Recognizing a common law right of access to prospective docket information here, in contrast, would place no one in a similar bind. PR/TT, § 2703(d), and SCA warrant materials,

49

moreover, play a far more important role to judicial proceedings than did the documents at issue in *Hubbard*. Each PR/TT, § 2703(d), or SCA warrant application is generally treated as a separate judicial matter and initiates the assignment of a unique docket number.[28] The information to which the petitioners seek access thus serves a crucial purpose to—and are, in a sense, the entire purpose of—the judicial proceedings in which they are docketed.

Even measuring PR/TT, § 2703(d), and SCA warrant materials' importance relative to the criminal case in which the USAO introduces a surveillance order's fruits (and not all criminal investigations result in charges being filed), documents that the USAO uses to obtain evidence for presentation to the grand jury to obtain an indictment and/or to introduce at trial, serve an important purpose to judicial proceedings. To be sure, docket information from PR/TT, § 2703(d), and SCA warrant matters perhaps are less important to judicial proceedings than are the actual materials themselves. Even so, the sixth *Hubbard* factor weighs in disclosure's favor.

*        *        *

In sum, five of six *Hubbard* factors, including the "single most important" such factor, *id.* —need for public access to the documents at issue, fact of objection and objector's identity, strength of any property and privacy interests asserted, possibility of prejudice, and purposes for which the documents were introduced—weigh in favor of prospective disclosure of PR/TT, § 2703(d), and SCA warrant matter docket information, while one factor—the extent of previous public access to the documents—has limited applicability. The Court thus concludes, considering the *Hubbard* factors together and as applied to the recently adopted administrative changes in the USAO and this Court's Clerk's Office, that the common law affords the

---

[28] Other entries in the dockets for these government applications include the orders granting or denying the application, any amended application, applications for extension (*e.g.*, in a PR/TT matter), or a motion to seal.

50

petitioners a prospective right of access to the PR/TT, § 2703(d), and SCA warrant matter docket information.[29]  The precise scope of such relief, which a recently-adopted Memorandum of Understanding ("MOU") between the Clerk of the Court and the USAO will more than provide, is discussed *infra* Part II.D.

### d.    No Common Law Right To Additional Retrospective Access

The petitioners also seek retrospective relief in the form of public access to a different set of materials than those to which they seek prospective access. Specifically, as to retrospective relief, the petitioners seek: (1) to supplement the docket information already provided for PR/TT matters for the nine-year period of 2008 through 2016 with similar docket information over the same period for § 2703(d) matters; and (2) to compel the USAO to extract and disclose, as to all USAO-filed PR/TT matters during the years 2008 through 2016, the fifteen categories of information that the USAO provided as to the sampling of 2012 PR/TT matters.  Pet'rs' Mem. at 35–38.  The petitioners do not seek extracted information concerning historical § 2703(d) matters, and seek no retrospective relief whatsoever as to SCA warrants.  *Id.* at 40, 42–43.

*Hubbard*'s generalized factors weigh in favor of retrospective access to PR/TT extracted information and § 2703(d) docket information for essentially the same reasons they weigh in favor of prospective relief, as discussed above.  For example*,* the process of manually extracting specified categories of information from closed PR/TT matters and providing such information in chart form substantially eliminates any risk that information properly left under seal, such as information bearing on personal privacy or law enforcement investigative prerogatives, will

---

[29]    The petitioners' decision not to seek, as part of their requested prospective relief, extraction of specified categories of information, *see supra*, means that no occasion is presented to determine whether the common law entitles the petitioners to such relief.

51

inadvertently be disclosed due to a human redaction error.

Nevertheless, that *Hubbard*'s generalized factors weigh favorably toward retrospective unsealing and disclosure is not dispositive. The retrospective relief inquiry also implicates a particularized consideration that the petitioners' claim for prospective relief does not implicate as much, due to operational and administrative changes adopted recently by the USAO and Clerk's Office—namely, the enormous burden that complying with an order granting the retrospective relief sought would impose on the USAO and Clerk's Office. Under *Hubbard*, a district court must consider any "particularized . . . interests" that a party may assert in support of maintaining documents under seal. 650 F.2d at 323. These burdens are described below for the two parts of retrospective relief the petitioners seek: (1) extracted information from the 2,248 PR/TT matters filed by the USAO over nine years from 2008 through 2016; and (2) docket information from the roughly 2,636 § 2703(d) matters filed by the USAO and DOJ components over the same period.

*i. Estimated Burden of Extracting Information From 2,248 PR/TT Matters*

The USAO estimates that completing the extraction process for one hundred percent of PR/TT matters that it initiated between the years 2008 through 2016, minus the twenty-four 2012 PR/TT applications from which information has already been extracted, would take roughly 720 hours. 6th Jt. Rpt. ¶ 10 n.2. To be sure, extraction, though somewhat less burdensome than unsealing and redacting actual PR/TT documents, nonetheless is a time-consuming process.[30]

Though disputed by the petitioners, the time estimate given by the USAO appears, if anything, to underestimate the time commitment that extracting information from one hundred

---

[30]    The process of redaction and unsealing would require the USAO to scrutinize carefully every page of every document filed in each PR/TT matter in order to ensure that no information bearing on personal identification or ongoing law enforcement concerns, which properly should be maintained under seal, inadvertently is disclosed. 3rd Jt. Rpt. ¶ 3.

percent of PR/TT matters that the USAO initiated from 2008 through 2016 would require.

According to the Clerk's Office, the USAO filed a total of 2,248 PR/TT applications during this

period. *See generally* PR/TT Lists. Assuming the USAO can extract information from twenty-

four PR/TT matters in eight hours—a simplifying assumption made by the USAO, 6th Jt. Rpt. ¶

10 n.2—extracting categories of information from all 2,248 matters the USAO filed over nine

years, minus the 24 sample 2012 PR/TT matters already extracted, would take over 741 hours.

Moreover, the USAO represented to the Court that extracting information from the 24 sample

PR/TT matters actually took roughly eight and a half, rather than eight, hours—an estimate the

Court has no reason to doubt. *Id.* ¶ 10. Assuming the USAO can extract information from

twenty-four PR/TT matters in eight and a half hours, extracting categories of information from

2,248 matters, minus the 24 sample PR/TT matters from 2012 already extracted, would take

approximately 788 hours—nearly 33 days working around the clock nonstop, or nearly twenty

40-hour workweeks. Complying with such a mandate would divert significant amounts of

valuable AUSA time and resources.

### ii. Estimated Burden of Producing § 2703(d) Docket Information

Producing requested lists of § 2703(d) matter docket information for the relevant nine

year period, meanwhile, would impose similarly significant resource burdens on the Court and

Clerk's Office by consuming substantial amounts of staff time—in particular, time necessary to

ensure that information properly left under seal is not inadvertently disclosed. The petitioners

appear to assume that unsealing docket information for 2,636 § 2703(d) matters, *see* Section

2703(d) Notice, is a trivial clerical task, as easily performed as pressing the "print" button for a

53

list of CM/ECF matters generated by the search criteria. [31]

In reality, the process is substantially more time- and resource-intensive than that.  The task of assembling lists of historical § 2703(d) matters would require multiple Court and Clerk's Office staff members to scrutinize meticulously every entry on each page of every list released to purge these lists of any information bearing on personal identification or law enforcement investigative concerns.  Completing this painstaking process of examination and redaction for the PR/TT Lists took several Court and Clerk's Office personnel days to complete.  The lack of standardized case names or captions on applications and orders filed during the relevant nine-year period makes this task particularly challenging, as these captions have sensitive information bearing on personal identification peppered throughout.

Moreover, prior to the standardization of § 2703(d) captions, *see infra* Part II.D, such captions not infrequently would reference not § 2703(d) itself but only 18 U.S.C. § 2705(b), the SCA's delayed notice provision.  As a practical consequence, providing accurate and comprehensive § 2703(d) docket information would require carefully reviewing each § 2705(b) application that the USAO had filed to ascertain whether the application actually pertained to non-disclosure of a § 2703(d) order, a task fraught with peril given that § 2705(b)'s nondisclosure provision is available for both § 2703(d) orders and to grand jury subpoenas, which reveal "matter[s] occurring before the grand jury" and therefore are protected by Rule 6(e)'s secrecy protections.  *See* Fed. R. Crim. P. 6(e)(2).  Ensuring that disclosure of § 2703(d) materials would not inadvertently reveal confidential grand jury matters would require Court and Clerk's Office staff to undertake additional manual, time-consuming review.

---

[31]     To put this figure in context, the USAO initiated nearly 400 more § 2703(d) matters during the relevant nine-year period than PR/TT matters.  *Compare* PR/TT Lists *with* Section 2703(d) Notice.

These practical challenges should be minimized in future efforts to disclose docket information from USAO-initiated PR/TT, § 2703(d), and SCA warrant matters.  The standardization of caption information adopted by the USAO for new PR/TT, § 2703(d), and SCA warrant applications and administrative steps taken by the Clerk's Office in assigning different CM/ECF case type designations to various sealed criminal investigative matters, described in further detail *infra* Part II.D, is intended to facilitate the unsealing and disclosure of docket information by predictably placing specified categories of information in designated locations within the caption and by enabling retrieval of specific types of sealed materials from CM/ECF.  Yet, such administrative burdens are unavoidable as to disclosure of docket information concerning historical § 2703(d) and SCA warrant applications, and unwarranted in light of the unreliability and under-inclusiveness of the identification of these materials by the Clerk's Office, as detailed *supra* Part I.A; *see* 7th Jt. Rpt. ¶ 15 (acknowledging that a list of SCA warrant matters "would be under-inclusive," given the limitations of the CM/ECF system and other administrative challenges). Thus, the same reason that the petitioners give for not requesting retrospective docket information for SCA warrant materials, *see supra* note 23, and for eschewing extracted information for ten percent of PR/TT materials, *see infra* Part II.C.2.d.iii—that the results would fall short of "provid[ing] the public meaningful insight into government electronic surveillance practices," Pet'rs' Mem. at 41–42—applies here.

### iii. Considering Burdens On Clerk's Office and USAO As Hubbard Specialized Factors

As described above, the burdens on the Clerk's Office and the USAO of the petitioners' requested retrospective relief, delimited as it is, remains considerable.  At the same time, this burden is not evaluated on a blank slate but instead against the backdrop of the amount of information already publicly disclosed during the course of this litigation. Specifically, to date,

55

the petitioners and the public have been provided with (1) the total numbers of USAO-filed

PR/TT matters during the period of 2008 through 2016; (2) the total numbers of § 2703(d) and

SCA warrant matters, retrieved using certain search criteria, filed by the USAO and DOJ

components during this period; (3) certain docket information concerning PR/TT matters the

USAO initiated during this period; (4) over 100 pages of redacted documents from four

representative sample PR/TT matters from 2012; and (5) fifteen categories of extracted

information from a representative sample of ten percent of USAO-filed PR/TT matters from

2012.  These disclosures have already provided an unprecedented level of transparency into the

process of judicial review of the USAO's use of PR/TT and SCA authorities to collect evidence

in criminal investigations, and enables the petitioners to inform and educate the public.  The

question now is whether the common law right of access, as mediated through application of the

*Hubbard* particularized interests, requires more?

The petitioners argue that any administrative burden on the USAO or Clerk's Office that

would attend granting the full scope of the retrospective relief sought "is not a compelling or

countervailing interest sufficient to overcome the public's . . . common law rights of access."

Pet'rs' Mem. at 30.  *Hubbard*, however, specifically instructs district courts to consider any

"particularized . . . interests" asserted against unsealing, 650 F.2d at 323, and such interests may,

under appropriate circumstances, include the burden that complying with an order granting such

relief would impose.  The petitioners observe, correctly, that courts generally do not recognize

such burden as a relevant factor in deciding the scope of a common law right of access to judicial

records.  Pet'rs' Mem. at 29–30 (citing *United States v. Camick*, 796 F.3d 1206, 1213 n.5 (10th

Cir. 2015) (denying a motion to seal supplemental record, which allegedly was necessary to

avoid an "unduly burdensome and costly" process of "review or redaction," given the

56

"presumption in favor of the common-law right of access to judicial records" (internal quotation

marks omitted)); *Meyer v. UNUM Life Ins. Co. of Am.*, Civ. No. 12-1134-KHV, 2014 WL

1095743, at *2 (D. Kan. Mar. 19, 2014) (concluding that "[t]he task of redacting," though

admittedly "unwieldy and burdensome," nonetheless "does not rise to a significant interest that

outweighs the public's right of access")). This, however, is largely due to the fact that litigants

ordinarily invoke the common law right of access with respect to specific documents, not to

wholesale categories of sealed matters filed over an almost decade-long period, *see, e.g.*,

*Camick*, 796 F.3d at 1213 n.5 (reviewing motion to seal the supplemental record in a single

criminal case); *Meyer*, 2014 WL 1095743, at *2 (reviewing motions to file particular exhibits in

a single case under seal). Indeed, the petitioners identify no judicial decision recognizing such a

right of access to broad categories of sealed materials filed over a period of years, let alone when

such sealed materials are quintessentially sensitive because they relate to the exercise of statutory

authorities to collect evidence in criminal investigations. Courts thus have had little occasion, in

common law right of access matters, to grapple with the issue of administrative burden that

would attend unsealing and disclosure requests of the pending petitions' scope.

      Contrary to the petitioners' argument, the only judicial decision of which the Court is

aware to have confronted an analogously broad request for unsealing and/or disclosure of sealed

criminal materials denied the request on the ground that "the scope of the relief sought . . . is

overbroad" and "not practicable, as each case needs to be evaluated on an individual basis to

ensure that unsealing is permissible." Order Den. Mot. Unseal Docs. & Publicly Docket Ct. Rs.

at 1–3, *In re Jennifer Granick & Riana Pfeffkorn*, No. 16-mc-80206-KAW (N.D. Cal. June 23,

2017) ("*Granick*") (denying petition for the unsealing and disclosure of "all sealed criminal

miscellaneous cases filed between January 1, 2006 and December 31, 2011"). *Granick*, though

57

decided under the First Amendment rather than common law right of access, *see id.*, illustrates

that a court properly may consider the breadth of access to judicial records that a petition seeks,

and the burden that would attend compliance with an order requiring such disclosure, in

determining the scope of disclosure to grant.

Likewise, this Court has "declined to establish a public docket of materials filed in

connection with any grand jury proceedings" on the ground, among others, "that to impose such

a rule would be unduly burdensome"—a decision that the D.C. Circuit affirmed as within this

Court's discretion. *In re Sealed Case*, 199 F.3d 522, 524, 526 (D.C. Cir. 2000) (internal

quotation marks omitted). Though the petitioners there asserted an entitlement to disclosure

under Local Rule of Criminal Procedure 6.1 rather than the common law, *In re Sealed Case*

illustrates that a district court, in exercising discretion to make public or maintain under seal

voluminous judicial records from entire categories of sealed matters, properly may consider

whether granting the relief sought would "impos[e] undue administrative burdens on the trial

court." *Id.* at 525.[32] The D.C. Circuit held, moreover, that the "District Court's explanation" for

its denial of a request "for a redacted public docket in a *specific proceeding* . . . . must bear some

logical connection to the *individual request*," meaning that such denial "must rest on something

more than the administrative burdens that justified the denial of across-the-board docketing." *Id.*

at 527 (emphasis added). In doing so, the Circuit implicitly recognized that a court properly may

cite "administrative burdens" to "justif[y] the denial of across-the-board" disclosure where a

petitioner does not make an "*individual request*" for disclosure "in a *specific proceeding*," but

---

[32]    Local Rule of Criminal Procedure 6.1 provides, in relevant part, that "[p]apers, orders and transcripts of
hearings subject to [grand jury secrecy], or portions thereof, may be made public by the Court on its own motion or
on motion of any person upon a finding that continued secrecy is not necessary to prevent disclosure of matters
occurring before the grand jury." LCrR 6.1.

58

seeks wholesale disclosure of sealed materials across entire categories of matters initiated over a period of years. *Id.* (emphasis added).

Here, as in *Granick* and *In re Sealed Case*, granting the petitioners' request for "across-the-board" access to extracted information from USAO-initiated PR/TT matters and § 2703(d) docket information in closed matters filed over a nine-year period, for the reasons explained above, "would be unduly burdensome" on the USAO and the Clerk's Office, thereby detracting from other mission-critical responsibilities. *Id.* at 523, 527; *cf. Dietz v. Bouldin*, 136 S. Ct. 1885, 1892–93 (2016) (recognizing a district court's "inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases . . . sav[ing] the parties, the court, and society . . . costly time and litigation expense." (internal quotation marks omitted)).

Although the USAO had agreed to extract fifteen categories of information from ten percent of USAO-filed PR/TT matters from each year from 2008 to 2011 and 2013 to 2016, the petitioners have rejected that offer. Pet'rs' Mem. at 35–38. In the petitioners' view, such a limited sampling of PR/TT matters would be "non-statistically significant" and inadequate "for the public to gain meaningful insight into the sealed PR/TT matters filed by the USAO" or to "allow journalists or the public to identify trends or identify non-routine requests." *Id.* at 37. They emphasize the virtual uselessness of extracted information from a small percentage of USAO-filed PR/TT matters in three declarations. *See* Decl. of Jason Leopold ("Leopold Decl.") ¶¶ 11, 15, ECF No. 38-2 ("[T]here is no way to accurately report on or understand the full scope of the PR/TT matters in this Court with only 10% of the relevant data. . . . [T]he limited data available to [journalists] severely hampers [their] ability to provide the comprehensive coverage the public deserves."); Decl. of Riana Pfefferkorn, Cryptography Fellow, Center for Internet &

59

Soc'y ("CIS"), Stan. Law School ("CIS Decl.") ¶ 11–12, ECF No. 38-3 ("Unsealing a 10%

sample of the D.C. PRTT Matters would be extremely unlikely to reveal all of the haystack's

needles, and might capture none at all.  In short: the only way to be sure that the public learns

about these important matters—to find all of the needles—is to disclose the whole haystack for

public review. . . . The public cannot get a full, informed understanding of government

surveillance in this District if it is permitted to see only one small sample that will not reliably

capture all the public-interest cases."); Decl. of Will Potter, Prof. of Journalism, Univ. of Mich.

("Potter Decl.") ¶ 12, ECF No. 38-4 ("Unsealing only 10% of these records will continue to

prevent journalists, researchers, and academics from understanding the trends in the use of

PR/TT devices.").

Indeed, the petitioners have represented that providing extracted information from a ten

percent sampling of PR/TT matters could be worse than providing no information at all, as such

a limited sampling "could lead to misleading, if not demonstrably inaccurate results."  Leopold

Decl. ¶ 11; *see also* Potter Decl. ¶ 12–13 ("It is methodologically unsound to attempt to show

trends based on a random selection of only 10% of records from a given year. . . . With only 10%

of the data available, a reporter would need to tell the editor, 'No, the data is not even close to

comprehensive, and any conclusions that can be drawn would not be reliable.'  As one can

imagine, a journalist would be severely limited in what they could write about the data.").  The

petitioners also assert that providing extracted information from less than one hundred percent of

PR/TT matters would have little to no public value.  *See, e.g.*, Leopold Decl. ¶ 13 ("A larger

sample size would not solve this problem.  Because the universe of PR/TT matters at issue is so

small, absent the release of data from all of the sealed cases relating to closed investigations

there is little [one] could meaningfully say about the 'big picture' with a level of confidence that

60

would meet journalistic standards."); Potter Decl. ¶ 14 ("[U]nsealing or providing information for less than 100% of the records for these years will leave a journalist unable to perform a clear and thorough job reporting on the use of PR/TT devices. This would significantly undermine the ability of the public to understand law enforcement's use of this surveillance technology and to hold the government accountable.").

Through these submissions, the petitioners make amply clear that, in their view, retrospective access to extracted information in PR/TT matters is an all-or-nothing situation: such access to less than one hundred percent of USAO-initiated PR/TT matters would have little to no value, and in fact might be worse than useless by yielding incomplete and misleading information. Yet, the administrative burden on the USAO and Clerk's Office that would be triggered by compelling the USAO to fulfill the petitioners' request for unsealing and disclosure of fifteen categories of extracted information in all PR/TT matters filed over nine years, would be unduly significant.

Accordingly, upon consideration, under *Hubbard*, of the USAO's and Clerk's Office's particularized interest in avoiding undue administrative burden, the common law right of access does not entitle the petitioners to any additional retrospective relief.

### D. Prospective Relief

Having concluded that, given the USAO's and Clerk's Office's recently adopted administrative and operational changes in processing sealed government surveillance applications in criminal investigative matters, the common law affords the petitioners a prospective right of access sealed PR/TT, 2703(d), and SCA warrant matters, the Court next addresses the precise scope of the prospective access to which the petitioners are entitled. The agreement entered into by the Clerk's Office and USAO provides the public with a significant

61

degree of information about this Court's judicial review process for such USAO-initiated matters that, in many respects, addresses substantial parts of the prospective relief the petitioners seek. *See* CLERK'S OFFICE, U.S. DIST. COURT, D.C. & CRIM. DIV., U.S. ATT'Y'S OFFICE, D.C., MEM. OF UNDERSTANDING: ELECTRONIC FILING OF CERTAIN SEALED APPLICATIONS & ORDERS ("MOU") (Aug. 15, 2017), http://www.dcd.uscourts.gov/sites/dcd/files/MOU_Electronic_Filing_Pen_Registers.pdf.

For example, among "changes to current practices relating to the filing, docketing, and unsealing" of sealed PR/TT, § 2703(d) and SCA warrant materials "in this District" demanded by the petitioners is that "government attorneys should be both permitted and required to file . . . electronically via CM/ECF" such sealed materials.  Pet'rs' Mem. at 32, 38, 41.  The petitioners further ask that the "USAO and other government entities that file [these sealed materials] in this District should be encouraged to adopt uniform, standardized case captions and document titles . . . that do not include, for example, target names, telephone numbers, and e-mail addresses."  *Id*. at 33, 39, 42.  These steps have already been accomplished or are underway.[33]

Historically, the USAO was required by this Court's local rules to file all sealed applications for PR/TT orders, § 2703(d) orders, and/or SCA warrants in paper form, but effective November 9, 2017, the local rules were amended to permit the electronic filing of such documents, with the "prior written authorization" of the Clerk of Court.  *See* LCrR 49(e)(4) ("Unless prior written authorization for electronic filing is given by the Clerk of Court, every document filed prior to the initial appearance of a criminal defendant, including but not limited to . . . a pen register application . . . [and] an application for stored electronic information or

---

[33]    The USAO may still submit applications in paper form "on weekends, outside of normal business hours, or in exigent circumstances."  MOU at 1.

62

evidence . . . [or] for disclosure of electronically stored evidence shall be filed in paper form.").

The MOU provides the written authorization from the Clerk of the Court, required under revised

Local Criminal Rule 49(e)(4), for the USAO to file such applications electronically.[34]

In addition, the MOU requires case captions for sealed applications and orders to follow

standardized formats.  MOU at 2.  The standardized captions will contain no personally

identifying information, such as the targeted email account, telephone number, or subscriber

name, but, depending on the type of application, generally will include pertinent information

about the number of targeted accounts, the service provider and the primary offense statute

applicable to the criminal activity under investigation.  *Id.*  The captions for PR/TT applications,

for example, must contain: (1) the number of target telephone lines, subscriber accounts, and/or

devices that are the application's subject or subjects; (2) the type of target or targets (*e.g.*, a

landline, cellular, or mobile telephone; email account; cell tower; or other facility or device)

subject to the application; (3) the service provider to which the order would be directed; and (4)

the primary offense statute(s) under investigation.  *Id.*  This standard case caption containing the

variable information detailed above must be used by the USAO when initiating or making

successive applications in a sealed PR/TT matter.  *Id.*[35]

Such standardized captions will enable the Clerk's Office periodically to generate reports

on the CM/ECF system reflecting the total number, matter docket numbers, and case captions

associated with sealed matters, which reports may be unsealed and made publicly accessible,

---

[34]      In operation, the MOU authorizes the USAO to submit PR/TT, § 2703(d), and SCA warrant applications electronically, by opening a sealed matter on CM/ECF, in accordance with written instructions provided by the Clerk's Office. MOU at 1–2.  Upon the duty Magistrate Judge's execution of an order granting or denying the application, the Clerk's Office will electronically docket the order, then advise USAO, through a notice of electronic filing, that the order has been signed and docketed, and can be accessed on CM/ECF.  *Id.*
[35]      One or more such caption variables may be omitted by the USAO if disclosure would risk compromising an ongoing investigation.  MOU at 2.

63

without undertaking the burdensome task of redacting personally identifiable or target

information that may otherwise—and historically has been—placed in the caption.[36] Thus, while

the petitioners seek prospective relief about only PR/TT, § 2703(d), and SCA warrant materials,

the MOU will facilitate the unsealing and disclosure of limited information revealing the

numbers, case captions and filing dates of additional categories of sealed surveillance materials,

as such materials are added to coverage under the MOU.[37]

The Clerk's Office has also adopted new CM/ECF case types to more readily identify the

type of criminal investigative matter being initiated. Thus, rather than assigning general MC

numbers to many different types of sealed criminal investigative matters, the Clerk's Office will

assign more specialized docket numbers reflective of the matter at hand. For example, "PR" will

be used for PR/TT applications and "SC" for SCA applications, with special designations within

the SC case type for SCA warrant and § 2703(d) materials.

The petitioners would have both the Clerk's Office and the USAO take two additional

---

[36]    The Clerk's Office plans to generate, via CM/ECF, biannual docket reports reflecting docket numbers and case captions associated with certain categories of sealed criminal investigative matters filed during the six-month period ending six months prior to a given report's issuance. MOU at 3. A docket report issued on September 30, 2019, for example, would account for a sealed matter initiated in November 2018. *Id.* Upon unsealing, these biannual docket reports will be made publicly available.

[37]    The MOU currently authorizes the USAO to submit only PR/TT and § 2703(d) applications electronically, *see* MOU, Attach. A, Sealed Applications and Orders Subject to Electronic Filing MOU (Sept. 14, 2017), but this MOU and the attachment will be updated to authorize the electronic submission of other sealed government surveillance applications as administrative operations within both the Clerk's Office and the USAO allow. As stressed above, the common law entitles the petitioners to prospective relief only because recently-adopted administrative and operational changes to the USAO and Clerk's Office's processing of sealed government surveillance applications in criminal investigative matters, as reflected in the MOU, reduces, to an administratively manageable level, the burdens that providing such disclosure would impose. These administrative and operational reforms include allowing the USAO to file PR/TT, § 2703(d), and SCA warrant applications electronically. The *Hubbard* factor analysis favoring prospective relief presupposes that the USAO can file such applications electronically with standard templates, which remove from application and case captions any personally identifiable or other information properly remaining under seal. Otherwise, the particularized *Hubbard* factor of administrative burden on the USAO and the Clerk's Office would outweigh the generalized *Hubbard* factors that weigh toward disclosure, and the common law would provide no right of access. Thus, a prospective right of access to information regarding SCA warrant matters shall not come into being until the MOU is updated to authorize the USAO to file such applications electronically.

64

steps in providing prospective relief.[38]  First, the petitioners request real-time unsealing and

public posting on PACER, upon initial filing of sealed PR/TT, § 2703(d), and SCA warrant

materials, of each matter's "case number and certain associated docket information," including

"case name, date of application, and magistrate judge to whom the matter is assigned." Pet'rs'

Mem. at 33, 39, 41. This information, petitioners explain, would "allow[] the public to know the

number of applications for PR/TT devices filed by the government and pending at a given time

in this District, and gives the public an opportunity to request that judicial records in particular

matters be unsealed." *Id*. at 33–34.

This request for real-time reporting by the Clerk's Office on the filing of PR/TT, §

2703(d), and SCA warrant materials represents a significant shift in the petitioners' position.

Over the course of this five-year litigation, the petitioners have insisted that they do not seek

access to pending, open and active criminal investigations, which this real-time reporting would

necessarily provide.  To the contrary, the original petitions in this case sought information only

about closed investigations.  *See*, *e.g*., Pet. at 1 (disclaiming access to materials "which relate to

an ongoing investigation"); May 2016 Tr. at 5:10–11 ("[W]e're not asking for anything

---

[38]    The petitioners' extraordinary complaint that the MOU represents an "an end-run around [p]etitioners and this litigation," Pets.' Reply to Gov'ts' Opp'n ("Pets.' Reply") at 5, ECF No. 52, is both misplaced and short-sighted for several reasons.  First, as the USAO correctly observes, "the decision . . . how[] to establish a protocol to identify more accurately, track, and ultimately terminate sealing orders is a matter that falls within the administrative responsibility of this Court," Gov't's Resp. at 3 n.3—a responsibility that stands entirely independent of any particular litigant or case.  Second, the MOU does not apply to the petitioners' requests alone, and the petitioners are far from the only persons who may benefit from the MOU.  Going forward, the additional transparency as to the judicial review process for sealed criminal investigative matters that the MOU provides will have benefit to the public far broader than merely to the litigants in this case.  The petitioners simply have no unique status among the public to be made privy to "private negotiations with the Clerk's Office," Pet'rs' Reply at 5, regarding administrative and operational matters, as they demand.  Finally, and most importantly, as made clear in the text, the petitioners' success in prevailing on their common law right of access claim as to prospective relief is due entirely to the advances outlined in the MOU and adopted by both the USAO and the Clerk's Office in processing the sealed criminal investigative matters at issue.  In this respect, "[s]ome people might call" the petitioners' accusation—that the MOU's entry was improper and constituted some sort of "end-run" around them, Pets.' Reply at 4—"*chutzpah*." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 766 (2011) (Kagan, J., dissenting).

65

involving an ongoing investigation."); Sept. 2016 Tr. at 22:14 (reaffirming that the petitioners

seek disclosure of information from only investigations that are "completely closed"); Dec. 2016

Tr. at 26:16–17 ("[W]e understand the open investigations issue, and we have stayed away from

it."); *id.* at 23:3–5 (reiterating that the petitioners do not seek to "expos[e] an ongoing

investigation" and have "limited [thei]r requests to closed investigations"); Feb. 2017 Tr. at

16:13, 38:15–16 (disclaiming "access to the documents" in "an ongoing investigation" and

emphasizing that the petitioners seek access to materials "only . . . for closed investigations").

On this basis alone, the petitioners' demand for prospective relief in the form of real-time

reporting of sealed matters for pending, open, and active criminal investigations is denied.

Instead, the Clerk's Office, as set out in the MOU, plans to provide biannual docket

reports about various types of sealed criminal investigative matters filed twelve through six

months prior to each report's publication. While some of these matters will remain open, the six-

month delay in reporting somewhat reduces the risk to an ongoing criminal investigation. These

reports will provide information about the total numbers of such matters and, as reflected in the

standardized caption for each matter, the number and type of target accounts (*e.g.*, landline

telephone, cellular telephone, and/or email), the providers' names, and the primary offense

statutes under investigation. This information on the sealed applications subject to judicial

review will provide additional transparency as to the processing of these sensitive matters,

without jeopardizing either privacy or law enforcement interests. Indeed, this information is far

more robust than that seemingly sought by the petitioners.

Second, the petitioners would require the USAO or other government entity initiating a

sealed matter "to promptly move to unseal or partially unseal" upon "the close of the related

criminal investigation," and, if a matter remains sealed "six months (180 days) after the date it

66

was initially filed," that the Court be prepared to issue "an order to show cause why it should not be unsealed in its entirety."  Pet'rs' Mem. at 34–35, 39, 42.  As the USAO correctly indicates, adoption of "a system that calls for the Court to issue show cause orders in each of the hundreds of PR/TT and SCA matters that are filed each year would be labor-intensive for the Clerk's Office and would require the USAO[] to expend resources to review each matter and respond to each show cause order."  Gov't's Opp'n at 41 n.18.  This is simply unworkable.  Instead, periodic reports by the Clerk's Office concerning sealed criminal investigative matters and dockets will serve the public interest by providing additional transparency regarding the judicial review of sealed criminal investigative matters in a manner that is less burdensome to the Court, the Clerk's Office, and the USAO.

Moreover, the very reasons that the petitioners cite as the public value in obtaining public access to redacted PR/TT, § 2703(d), and SCA warrant materials—making the public aware of the USAO's use of (1) novel legal theories to obtain orders allowing for particular types of surveillance, and/or (2) techniques "to compel a service provider to provide novel or unusual technical assistance," Pets.' Mem. at 13 (quoting CIS Decl. ¶ 10 (alterations omitted))—are the reasons disclosure may be detrimental to ongoing law enforcement investigations.  Such disclosure could tip off targets and subjects of ongoing criminal investigations to the existence of investigative methods and techniques, the very efficacy of which may rely, in large part, on the public's lack of awareness that the USAO employs them.  This, in turn, would enable targets and subjects to structure their communications so as to evade detection or to spoliate, through tampering or outright destruction, potential evidence already in existence, to the prejudice of ongoing criminal investigations and the concomitant increased risk to public safety.  Imposing such burdens on law enforcement investigations cannot be justified, notwithstanding the public

67

value that disclosure of redacted PR/TT, § 2703(d), and SCA warrant materials may have.

A court's "decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Nixon*, 435 U.S. at 599. The additional steps demanded by the petitioners as prospective relief would impose significant administrative and other burdens on the Clerk's Office and USAO, but would do little to increase transparency compared to the information that will be made publicly available under the MOU. For these reasons, the information and access afforded by the steps outlined in the MOU on a going-forward basis provide all the prospective relief to which the common law entitles the petitioners.

## III.   CONCLUSION

This litigation illustrates that "changing technology affects the public's appetite for information concerning court proceedings," and "[t]his in turn changes and affects the requirements for judicial transparency." Hon. T.S. Ellis III, *Sealing, Judicial Transparency and Judicial Independence*, 53 VILL. L. REV. 939, 942–43 (2008). Indeed, "[t]ransparency is a function of both technology and public expectations, and both of these factors vary over time." *Id*. at 941. While judicial independence is embedded in our constitutional framework, this critical feature of our federal government is bolstered by transparency in how the courts review and resolve the matters presented to them. Otherwise, "[s]ecret proceedings, including unwarranted or excessive sealing of court records, engender suspicion, mistrust and a lack of confidence in the judicial process and, if not rare and well understood as necessary, such proceedings will likely lead to attempts to limit judicial authority and independence." *Id.* at 940. Thus, taking stock of where transparency may be improved as to records originally sealed to good purpose, is not just a fruitful exercise that may be prodded by litigation such as the one at

68

bar, but a necessary administrative endeavor for the courts.

In this case, the sealed judicial records at issue are sensitive government applications seeking authorization to collect, for use in ongoing criminal investigations, certain types of information about electronic and telephonic communications. The parties are in agreement that information in these sealed judicial records implicate myriad considerations, including the sensitive personal privacy and reputational interests of the customers or subscribers, about whom the information was sought; important public safety and law enforcement interests in avoiding any disruption of, or loss of evidence in, ongoing criminal investigations; and, finally, the Court's interest in ensuring the administrative feasibility of providing meaningful, rather than misleading, information and imposing no more than manageable burdens on the Clerk's Office and the USAO. These weighty interests of protecting privacy and public safety, and providing additional transparency for these sealed judicial records in an administratively workable manner, exist in significant tension with providing the public access sought by the petitioners. Nonetheless, this Court has striven to articulate a common law right of access to sealed judicial records regarding the government's exercise of statutory surveillance authorities that strikes a workable balance.

To that end, while the First Amendment extends no right of access to these judicial records, the Court identifies a prospective right of access, due to the significant administrative and operational reforms undertaken in tandem by the Clerk's Office and the USAO, to certain categories of information, which will be disclosed on a periodic basis, regarding the total number of PR/TT, § 2703(d), and SCA warrant applications filed by the USAO, the number and type of accounts that such applications target, the names of the providers to which these applications are directed, and the primary criminal offense under investigation for these applications. The

69

prospective right of access articulated here is designed to minimize any risk of revealing

information about ongoing law enforcement investigations or the individuals targeted, but will

enable the public to know, albeit on a limited basis, more about what this Court is doing in

reviewing these types of surveillance applications.  No retrospective right of access is

recognized, in consideration of the significant administrative burdens that retrospective

disclosure would impose on the Clerk's Office and USAO.

For the foregoing reasons, the petitioners' petitions to unseal are granted in part and

denied in part.  An appropriate Order accompanies this Memorandum Opinion.

**Date:** February 26, 2018

_____
BERYL A. HOWELL
Chief Judge

70